1  Tatyana Evgenievna Drevaleva

2  3015 Clement St., Apt. 204,

3  San Francisco, CA, 94121

4  415-806-9864, tdrevaleva@gmail.com

5  Plaintiff in Pro Per

6

7  THE UNITED STATES DISTRICT COURT

8  FOR NORTHERN CALIFORNIA

9

10

11  Tatyana E. Drevaleva

12  *Plaintiff,*

13  vs.

14

15  Mr. Denis Richard McDonough in his capacity as a Secretary of the U.S. Department of Veterans Affairs

16

17  810 Vermont Avenue, NW, Washington, D.C. 20420

18  *Defendant*

19  Facility:

20

21  New Mexico VA Healthcare System 1501 San Pedro Drive, S.E. Albuquerque, NM, 87108

22

Case No. 3:18-cv-03748-JCS

CASE MANAGEMENT STATEMENT.

**Part 1**. Jurisdiction and Service.

**Part 2**. Facts.

Location: Courtroom F – 15th Floor

450 Golden Gate Avenue,

San Francisco, CA 94102

Judge: The Hon. Chief Magistrate

Judge Joseph C. Spero

23

24  Plaintiff Tatyana Drevaleva to the above-entitled action submits Parts 1 and 2 of the

25  CASE MANAGEMENT STATEMENT pursuant to the Standing Order for All Judges of the

26  Northern District of California and Civil Local Rule 16-9. I am submitting **Part 2** – "Facts" in

27  the numbered paragraphs in order to enable the opposing Counsel to respond to these paragraphs.

28

Case Management Statement, Parts 1 and 2; case No. 3:18-cv-03748-JCS

1   1. **Jurisdiction & Service**

2   *The basis for the court's subject matter jurisdiction over plaintiff's claims and*

3   *defendant's counterclaims, whether any issues exist regarding persona jurisdiction or venue,*

4   *whether any parties remain to be served, and, if any parties remain to be served, a proposed*

5   *deadline for service.*

6   The District Court has jurisdiction over my Title VII claim and my Rehabilitation Act of

7   1973 claim. Also, the District Court has jurisdiction over a Federal Defendant. All Federal

8   Defendants were served with a Summons and a Complaint. Defendants appeared in this lawsuit

9   through Assistant U.S. Attorneys Ms. Clair Cormier and Ms. Kimberly Robinson.  Subsequently,

10  Ms. Cormier disqualified herself from representing the Federal Government. Therefore, Ms.

11  Kimberly Robinson was the only Counsel that represented the U.S. Department of Veterans

12  Affairs in this lawsuit.

13  Currently, I need to change the venue, and I need to transfer my Title VII and

14  Rehabilitation Act of 1973 claims to the U.S. District Court for the District of New Mexico for a

15  Jury trial.

16  However, I disagree with multiple erroneous rulings of the 9th Circuit in all my Appeals.

17  Therefore, I wonder whether I should attempt to convince the 9th Circuit to reconsider its

18  previous decisions in my Appeals or whether I should file a Notice of Appeal at the Tenth

19  Circuit that embraces the U.S. District Court for the District of New Mexico.

20  If I convince either the 9th and/or the 10th Circuits to reconsider multiple legally invalid

21  rulings of the 9th Circuit in all my Appeals, I will need to add additional Parties to this lawsuit.

22  Also, I may add additional Parties after I conduct Discovery. Previously, Alsup[1] never conducted

23  Case Management Conferences in any lawsuit, and Alsup fraudulently banned me from

24  conducting Discovery in all my lawsuits.

25  _____

26  [1] There is nothing to convince me that Alsup is an "Honorable Judge." Please, read the Robing

27  Room and the opinions of other litigants, Attorneys, and Court staff about him. I agree with these

28  opinions. Mr. Alsup might have been good for other litigants. I have my own opinion about him.

Case Management Statement, Parts 1 and 2; case No. 3:18-cv-03748-JCS

2. **Facts**

*A brief chronology of the facts and a statement of the principal factual issues in dispute.*

Paragraph 1.

Prior to April 02, 2017, I resided in California for over ten years. On April 02, 2017, I relocated from San Francisco, CA to Albuquerque, NM because I had gotten a full time job at the Raymond G. Murphy VAMC. On April 03, 2017, I started to undergo my probationary period as an Excepted Service Title 38 Hybrid Medical Instrument Technician (MIT) Electrocardiograph (EKG) (**ER Vol. 2, 502**.) I was appointed pursuant to 38 U.S.C. §7401(3) "… medical instrument technicians…" My position was considered as a Title 38 Hybrid position pursuant to the Public Law 108-170, December 06, 2003, Title III, Section 301(a)(1)(B)(3), "…medical instrument technicians…" Please, see a job description of the position of a Medical Instrument Technician (EKG) at (**ER 03748, Vol. 1, 268-273**) and (**ER Vol. 1, 278-285**.)

Paragraph 2.

Please, read (**ER Vol. 1, page 279**),

"**Nursing Service is seeking 5 Medical Instrument Technician (MIT) (EKG) to join the team!** The MIT position is located in the Telemetry Unit within the Nursing Service Line at the New Mexico VA Health Care System. The MIT's functions are to monitor the patient's electrocardiogram (EKG) waveforms in a centralized station and notify the appropriate clinical staff as directed. The employee must be willing to work cooperatively as a member of the inpatient team and demonstrate customer service principles in all aspects of work. The MIT will perform job duties independently and in accordance with established departmental and hospital procedures, including telemetry monitoring and patient care related tasks. The MIT reports to the Telemetry Unit Nurse Manager, but must work in collaboration with all members of the patient care team."

Paragraph 3.

Please, read (**ER Vol. 1 page 280**),

Case Management Statement, Parts 1 and 2; case No. 3:18-cv-03748-JCS

1  "**Basic Requirements**

2  - **Citizenship**: Be a citizen of the United States.

3  - **English Language Proficiency**: Medical Instrument Technicians must be proficient

4  in spoken and written English.

5  - **Education**: There are no specific educational requirements for this occupation.

6  Education may be substituted for experience only at the GS-4 and GS-5 levels.

7  **Experience** refers to paid and unpaid experience, including volunteer work done through

8  National Service programs (e.g., Peace Corps, AmeriCorps) and other organizations (e.g.,

9  professional; philanthropic; religions; spiritual; community; student; social). Volunteer work

10  helps build critical competencies, knowledge, and skills and can provide valuable training and

11  experience that translates directly to paid employment. You will receive credit for all qualifying

12  experience, including volunteer experience."

13

14  Paragraph 4.

15  Please, read (**ER Vol. 1, page 280**),

16  "**Grade determinations**:

17  **GS-7 Experience**. At least 1 year of experience comparable to the next lower grade level

18  which demonstrates the knowledge, skills, abilities, and other characteristics related to the duties

19  of the positions to be filled. This would be experience which provided knowledge of the

20  equipment, standard tests and procedures, and typical readings including arrhythmias and

21  abnormalities. In addition, the candidate must demonstrate the following KSAs: (No Education

22  Substitute)

23  1. Knowledge of typical patient reactions and signs of distress including the ability to

24  recognize, report and treat potentially lethal arrhythmias.

25  2. Knowledge of common equipment settings and standardized procedures plus

26  knowledge of common errors and corrective measures.

27

28

Case Management Statement, Parts 1 and 2; case No. 3:18-cv-03748-JCS

3. Ability to modify procedures/positions to obtain the correct results with patients with complicating conditions such as amputations, Parkinson's disease, structural defects, and scar tissue.

4. Ability to act as a mentor or preceptor to lower graded technicians.

5. Ability to conduct in-service training on the EKG equipment and related instrumentation.

References: VA Handbook 5005/15, Part II, Appendix G27, Medical Instrument Technician Qualification Standards. This can be found in the local Human Resources Office."

Paragraph 5.

Please, read (**ER Vol. 1, page 280**),

"This position is **in the Excepted Service** and does not confer competitive status."

Paragraph 6.

Also, see the New Mexico VA Health Care System's Medical Instrument Technician (Electrocardiograph Technician), GS-0649-07 Functional Statement (**ER Vol. 1, pages 268-273**) with a description of the duties of the Medical Instrument Technicians.

Paragraph 7.

Please, read (**ER Vol. 1, pages 268-270**),

"The technician provides continuous cardiac rhythm interpretation and reporting of monitor tracing of patients to appropriate clinical staff. The technician performs cardiac monitoring activities that include initiating, monitoring, recording, interpreting, documenting, and discontinuing telemetry. Other MIT duties include, but are not limited to the following:

• Continuously monitors electrocardiogram (EKG) tracings.

• Be skilled in interpreting a variety of normal and abnormal EKG tracings and communicates the information to appropriate clinical staff

Case Management Statement, Parts 1 and 2; case No. 3:18-cv-03748-JCS

• Recognizes changes in patients' condition and is astute in identifying the need for intervention

• Performs 12-Lead EKGs

• Has practical knowledge of treatment procedures

• Has knowledge of medical terminology, cardiac conditions, effects of medical and nursing therapies

• Operates and monitor EKG equipment

• Has knowledge of equipment, materials, and supplies, used to perform telemetry

• Maintains patient cardiac rhythm tracing record and other accompanying documentation

• Edits and selects appropriate sample portions of tracing for review by provider

• Sets alarm parameters established by the provider

• Follows emergency procedures

• Routinely evaluates the integrity of equipment both prior to placement on patient and during the patient's telemetry monitoring

• Maintains and keeps track of telemetry equipment as patients are discharged and transferred

• Evaluates patients for discharge from telemetry in collaboration with providers

• Performs supplemental downtime duties which may include additional patient care tasks."

Paragraph 8.

Prior to being appointed to my full time job, I was fully qualified to work as a Monitor Technician and an EKG Technician (**ER Vol. 2, 504-505**.) I was certified as an EKG Technician in California (**ER Vol. 2, 505**.), I possessed a BLS HCP certificate (Basic Life Support for Health Care Providers), I had a few years of experience working as both an EKG and a Monitor Technician, and I had good Letters of Reference from my previous employers (**ER Vol. 2, 608-625**.) Prior to being appointed to a full time job at the Raymond G. Murphy VAMC, I worked as an EKG Technician contractor for 10.5 months at the San Francisco VAMC in 2012 – 2013

Case Management Statement, Parts 1 and 2; case No. 3:18-cv-03748-JCS

where my performance was rated as outstanding and exceptional **(ER Vol. 2, 626-637.)** Therefore, I was a Qualified Individual or the person who was able to perform the Essential Functions of the Job as defined in the ADA or 42 U.S.C. §12111(8.)

However, the U.S. District Court may disagree with my citation of the Americans with Disabilities Act or the ADA and 42 U.S.C. §12111(8.) Please, read the unpublished November 18, 2020 Memorandum of the 9th Circuit in Appeal No, 19-16395, page 2, "The district court properly dismissed Drevaleva's claim that she was discriminated against in violation of the Americans with Disabilities Act ("ADA") because **the federal government** is excluded from the coverage of the ADA. See 42 U.S.C. § 12111(5)(B) (stating that "[t]he term 'employer' does not include the United States [or] a corporation wholly owned by the government of the United States")."

However, in its November 18, 2020 Memorandum in Appeal No. 19-16395, the 9th Circuit spoke about "**the federal government**" in general. This conclusion was factually and legally invalid. The 9th Circuit failed to evaluate whether the Americans with Disabilities Act is applicable **to the U.S. Department of Veterans Affairs**. Moreover, read the Executive Order No. 13548 of July 26, 2010 signed by President Barack Obama that intended to make the Federal Government a model for hiring and retaining individuals with disabilities,

"Sec. 4. *Definitions*. (a) ''Disability'' **shall** be defined as set forth in **the ADA Amendments Act of 2008**."

Read *Tin Cup, LLC, an Alaska limited liability company, v. United States Army Corps of Engineers*, No. 17-35889 (9th Circuit, 2018),

"Indeed, the first paragraph uses the mandatory term "shall," while the second paragraph uses the word "will." The Supreme Court has distinguished descriptive "will" statements from mandatory "**shall**" statements. See *Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55, 69 (2004) (concluding that a statute's requirement that an agency "shall" act in accordance with a land use plan was **a mandatory statement**.")…

Had Congress intended to bind the Corps, it would have used the word "shall." This interpretation comports with the "well established canon of statutory interpretation that the use of

Case Management Statement, Parts 1 and 2; case No. 3:18-cv-03748-JCS

different words or terms within a statute demonstrates that Congress intended to convey a different meaning for those words." *S.E.C. v. McCarthy*, 322 F.3d 650, 656 (9th Cir. 2003) (collecting cases).

… The Corps' interpretation of the provision at issue—that **"shall" connotes a mandatory obligation** and "will" connotes a description of what Congress expected to happen—is a reasonable reading of the statute. It cannot be said that the language of the statute "admits of no other reasonable interpretation" than the interpretation that Tin Cup has proffered. *Minis*, 40 U.S. at 445 [*Minis v. United States*, 40 U.S. (15 Pet.) 423 (1841)]."

Despite I cited the Executive Order No. 13548 in my Complaint for employment Discrimination No. 4:19-cv-02665-HSG, the 9th Circuit failed to consider this citation, announced that my Appeal No. 20-15109 was "frivolous", and failed to apply the provisions of the Americans with Disabilities Act Amendments Act of 2008 in its November 18, 2020 Memorandum in Appeal No. 19-16395.

In my post-November 18, 2020 filings at the District Court in case No. 3:18-cv-03748-JCS, I presented my point of view that the Americans with Disabilities Act **is** applicable to the U.S. Department of Veterans Affairs. Please, see my February 14, 2021 Supplemental Brief named "The ADAAA, Actual Disability, the "Regarded as" prong of disability, *JOSEPH L. BURNS v. KIRSTJEN NIELSEN, Secretary, U.S. Department of Homeland Security*, EP-17-CV-00264-DCG, UNITED STATES DISTRICT COURT WESTERN DISTRICT OF TEXAS EL PASO DIVISION (January 28, 2020)" (Doc. No. 310.) In this case law, the U.S. District Court for the Western District of Texas applied the Americans with Disabilities Act to the Secretary of the U.S. Department of Homeland Security.

However, in his April 05, 2021 Order in case No. 3:18-cv-03748-JCS, the Hon. Judge Joseph Spero held that (page 3, lines 5-6), "[The 9th Circuit] affirmed the dismissal of Drevaleva's claims under the Americans with Disabilities Act,"

Therefore, for the purpose of this Case Management Statement, I will apply the provisions of 38 CFR Part 15 - ENFORCEMENT OF NONDISCRIMINATION ON THE

Case Management Statement, Parts 1 and 2; case No. 3:18-cv-03748-JCS

BASIS OF HANDICAP IN PROGRAMS OR ACTIVITIES CONDUCTED BY THE DEPARTMENT OF VETERANS AFFAIRS.

Pursuant to 38 CFR § 15.103, I was a Qualified individual with handicaps and a Qualified handicapped person.

Paragraph 9.

The April 03, 2017 appointment to a full time job at the Raymond G. Murphy VAMC was my first experience being directly employed by the Federal Government. When I started to work at the Raymond G. Murphy VAMC, I didn't know about the VAMC's policies and procedures, I didn't know about the provisions of the AFGE Master Agreement, and I didn't know about my rights pursuant to the Federal laws. I was a very new employee, and I was an ideal subject to be tortured and humiliated for not knowing the laws and the policies.

Paragraph 10.

On April 18, 2017, I approached Manager of 5D (Telemetry) Unit Ms. Dunkelberger (**ER Vol. 1, 286**) and told her that I was 50 yo, I didn't have children, I was married twice but my ex-husbands refused to give me children, that I dated other guys who also didn't want to give me children, that I underwent approximately eight In-Utero Inseminations with donor's sperm at Kaiser Permanente in California but unsuccessfully, that I spent 2.5 years in Russia from 2014 to 2016 for the purpose of undergoing a complete medical examination and undergoing In-Vitro Fertilization (IVF) procedures, that I was in the Registry of the patients of the Ministry of Health of the Novosibirsk Region of the Russian Federation who were eligible for free of charge IVF procedures, that I was waiting for approximately 8 months in order for me to be eligible to undergo another free of charge IVF procedure, that I just relocated from California, that I didn't have relatives in the United States, that I even didn't have a car, and that I would possibly need to request a time off for my trip to Russia to perform another IVF procedure.

Case Management Statement, Parts 1 and 2; case No. 3:18-cv-03748-JCS

Paragraph 11.

On April 18, 2017, I also notified Ms. Dunkelberger that I was taking the medication named "Jeanine" that was in aid of the IVF procedure, that my Russian physician prescribed to me, that I brought from Russia, and that was not available in the United States. On April 18, 2017, I said to Ms. Dunkelberger that I had the supply of this medication for a few months. Ms. Dunkelberger recorded our conversation into the April 18, 2017 Report of Contact (**ER Vol. 1, 286**), "Tatyana Drevaleva told me that she needs to go to Russia in a few months for 4-6 weeks to "make an embryo." **She stated she only had a few months worth of medication** she needed to be on to help her to be able to "make an embryo." Then, after she has saved up enough money she would need to go back to Russia as she would be hiring a surrogate to have a child for her. At this time I explained to her that I would not be able to approve her request at my level of authority due to the length of time she was requesting and that Dr. Prince, Associate Director of Patient Care Services would be the one to approve or deny her request. I explained to her that she does not qualify for FMLA at this time because she has less than 1 year of service. In order to request leave she would need to complete an OPM 71 and provide supporting medical documentation. She stated her doctor was in Russia and that she could ask him to write a letter for her but it would be in Russian. I explained to her that the documentation would need to either written in English or be translated from Russian to English. I also talked to her about possibly finding a doctor in town that may be able to provide her with medical documentation and medication in the event she was not able to get an approved leave of absence until later. Ms. Drevaleva verbalized understanding of the proper procedure to request leave."

Paragraph 12.

After I said to Mr. Dunkelberger about my previous attempts to have a child, Ms. Dunkelberger's face immediately became very unpleased. The first phrase that she said to me was, "I can't pay you while you are not working." She said to me that, because didn't work at the VAMC for 12 months, I was ineligible for a Leave Without Pay (a LWOP) pursuant to the FMLA. She never notified me about my entitlement to apply for a Sick Leave, see the AFGE

Case Management Statement, Parts 1 and 2; case No. 3:18-cv-03748-JCS

Master Agreement, Article 35, Section 4, Subdivision (D), "… hybrid employees are entitled to sick leave when the employee:

    1. Receives medical, dental or optical examination or treatment;

    2. Is incapacitated for the performance of duties by … pregnancy, or childbirth."

    Ms. Dunkelberger never notified me that, even if I didn't accrue enough time to request a Sick Leave, I was eligible for an Advanced Sick Leave. She never notified me about other alternative types of the leave such as the Voluntary Leave Transfer Program. She never notified me about the opportunity to perform a Telework. She never notified me about my rights pursuant to Section 504 and Section 508 of the Rehabilitation Act of 1973 and the Rehabilitation Act Amendments of 1992. She never notified me about the Office of Diversity and Inclusion, about the both the VA Directive 5975 and about the subsequent Handbooks, and she never provided me with any VA forms to request a reasonable accommodation in a form of a leave (whether paid or unpaid) or to request other types of the reasonable accommodations (Telework, etc.) She never notified me about the procedures for obtaining the reasonable accommodations that were described in 38 C.F.R. Part 15 – ENFORCEMENT OF NONDISCRIMINATION ON THE BASIS OF HANDICAP IN PROGRAMS OR ACTIVITIES CONDUCTED BY THE DEPARTMENT OF VETERANS AFFAIRS. She never referred me to the Section 504 and the Section 508 coordinators, she never consulted with the Office of the Inspector General, and she never attempted to think how she can accommodate my needs on a short term basis and on a long term basis. She never informed me about my rights pursuant to the Handbook on Leave and Workplace Flexibilities for Childbirth, Adoption, and Foster Care (Docket 251) such as:

    1) Sick Leave, 5 U.S. Code § 6307, 5 CFR Subpart D - Sick Leave

    2) Advanced Sick Leave, 5 U.S. Code § 6307(d), 5 CFR § 630.402 - Advanced sick leave; 5 CFR Subpart E - Recredit of Leave; 5 CFR § 630.502 - Sick leave recredit

    3) Annual Leave, 5 U.S. Code § 6303, 5 U.S. Code § 6304; 5 CFR Subpart C - Annual Leave

    4) Advanced Annual Leave, 5 U.S. Code § 6302(d),  5 CFR § 630.301(h)(1)(ii);

Case Management Statement, Parts 1 and 2; case No. 3:18-cv-03748-JCS

5) Family and Medical Leave, 5 U.S. Code SUBCHAPTER V— FAMILY AND MEDICAL LEAVE;  5 CFR Subpart L - Family and Medical Leave

6) Leave Sharing Programs

   a) Voluntary Leave Transfer Program, 5 U.S. Code SUBCHAPTER III— VOLUNTARY TRANSFERS OF LEAVE;  5 CFR Subpart I - Voluntary Leave Transfer Program

   b) Voluntary Leave Bank Program, 5 U.S. Code SUBCHAPTER IV— VOLUNTARY LEAVE BANK PROGRAM; 5 CFR Subpart J - Voluntary Leave Bank Program

   c) Emergency Leave Transfer Program, 5 U.S. Code SUBCHAPTER VI— LEAVE TRANSFER IN DISASTERS AND EMERGENCIES;  5 CFR Subpart K - Emergency Leave Transfer Program

   d) Retroactive Substitution of Donated Annual Leave, 5 U.S. Code § 6306; 5 CFR § 630.306 - Time limit for use of restored annual leave, 5 CFR § 630.307 - Time limit for use of restored annual leave - former missing employees; 5 CFR Subpart E - Recredit of Leave; 5 CFR § 630.501 - Annual leave recredit

   e) Set-Aside Accounts

7) Leave Without Pay, 5 U.S. Code § 6382. Leave requirement;  5 CFR § 630.1202 – Definitions (Leave Without Pay)

8) Compensatory Time Off, 5 U.S. Code § 5543. Compensatory time off; see 5 CFR 550.114(e) and 551.531(e) for special rules regarding the administration of compensatory time off to an employee's credit as of May 14, 2007

   a) Compensatory time off in lieu of overtime pay, 5 CFR § 532.504 - Compensatory time off

   b) Compensatory time off for travel, 5 CFR Subpart N - Compensatory Time Off for Travel

Case Management Statement, Parts 1 and 2; case No. 3:18-cv-03748-JCS

9) Alternative Work Schedules, 5 U.S. Code SUBCHAPTER II— FLEXIBLE AND COMPRESSED WORK SCHEDULES; 5 CFR Subpart D - Flexible and Compressed Work Schedules

   a) Compressed Work Schedules,  5 U.S. Code §§6127- 6128; 5 CFR § 610.406 - Holiday for employees on compressed work schedules

   b) Flexible Work Schedules, 5 U.S. Code §§6122- 6126; 5 CFR § 610.405 - Holiday for part-time employees on flexible work schedules

      - **Flexitour** – employees elect start/stop times, which then become fixed

      - **Gliding** – employees may vary start/stop times daily

      - **Variable Day** – employees may vary the length of the workday

      - **Variable Week** – employees may vary the number of hours worked each week

      - **Maxiflex** – employees may work less than 10 workdays biweekly

   c) Credit Hours, 5 U.S. Code § 6126. Flexible schedules; credit hours; accumulation and compensation,  5 CFR § 610.408 - Use of credit hours

10) Telework, 5 U.S. Code CHAPTER 65— TELEWORK; 5 CFR § 630.1605 - Telework and emergency employees

11) Part-time Employment and Job Sharing Arrangements

   a) Part-time between 16 and 32 hours each week (or between 32 and 64 hours a pay period) on a prearranged schedule, and is eligible for benefits, 5 USC Ch. 34: PART-TIME CAREER EMPLOYMENT OPPORTUNITIES or the Federal Employees Part-Time Career Employment Act of 1978; 5 CFR Part 340 - OTHER THAN FULL-TIME CAREER EMPLOYMENT (PART-TIME, SEASONAL, ON-CALL, AND INTERMITTENT)

   b) Job Sharing – a form of part-time employment in which the schedules of two or more part-time employees are arranged to cover the duties of a single full-time position, 5 U.S. Code § 3402(b)(2)(B). Establishment of part-time career

Case Management Statement, Parts 1 and 2; case No. 3:18-cv-03748-JCS

employment programs; 5 USC 6120: Purpose; 5 CFR § 340.101 - Principal statutory requirements.

Paragraph 13.

Ms. Dunkelberger only expressed her deep dissatisfaction by the fact that I would request a time off for the purpose of undergoing an IVF procedure. She asked me whether I would request another time off in the future. I answered that I didn't know whether I would request another time off in the future. I am repeating again that at that time I was a very new employee who worked at the VAMC for only 2.5 weeks, and I didn't know my rights. On April 18, 2017, Ms. Dunkelberger said that, in order for me to request a LWOP, I needed to provide my medical documentation on English language. I responded that the only way for me to do it would be to request my Russian physician to give me this documentation but it would be on Russian language. Ms. Dunkelberger said that the medical documentation should be only on English language, and she said that she would not be able to make a decision on my request for a leave. She also said that I didn't have a right to translate my medical documentation from Russian into English myself. She said that only a certified translator had a right to translate the medical documentation. She said that she would transfer my request for a leave to Director of Nursing Dr. Tina Prince who would make an ultimate decision about whether to grant me with a Leave Without Pay or not. Ms. Dunkelberger said that I needed to obtain the medical documentation on English language and the approval of Dr. Prince prior to the actual leave.

Paragraph 14.

On April 18, 2017, Ms. Dunkelberger introduced me to the VAMC's leave policies and gave me the phone numbers of different Supervisors that I needed to call in order to request an urgent leave. She asked me to sign a Memorandum (unnumbered) (**ER Vol. 2, 463-464**.) Read the plain language of the Memorandum, "Effective 15 November 2015, the following procedures must be adhered to when the need for <u>unplanned leave</u> arises and it is necessary for you to call of for a shift. **Requests for leave must be communicated directly with your Nurse Manager** or

Case Management Statement, Parts 1 and 2; case No. 3:18-cv-03748-JCS

Assistant Nurse Manager during regular hours." Further, the Memorandum contained variable phone numbers of different officials that I needed to call if I couldn't reach the Nurse Manager.

Further, the plain text of the Memorandum said,

"3. Leave Without Pay (LWOP) is an approved temporary non-pay status and absence from duty. Requests must be submitted using form OPM-71, and must be approved by the Service Chief. …Failure to submit a written request for LWOP, from the employee to the Service Chief, will result in AWOL.

4. Upon discovery that a leave request cannot be supported by the employee's leave balance, the request will be annotated as AWOL until an appropriate request is entered by the employee, underline{subject to approval by **unit management** and/or the Service Chief}."

On April 18, 2017, I signed the Memorandum (**ER Vol. 2, 464**) thus acknowledging that I understood the leave policies and that I agreed to follow them. I am emphasizing that the plain language of the Memorandum said that an emergency request for a leave is subject for approval by 1) **the unit management**, and/or 2) the Service Chief.

Paragraph 15.

In the beginning of May 2017, I discovered that I was wrong, and I had only **ten** pills of my medication Jeanine which was **for 10 days**. I couldn't afford to miss a pill. I attempted to find this medication in the United States but I couldn't. I found a Russian pharmacy in New York that advertised this medication on its web-site. When I attempted to contact with this pharmacy over the phone, they didn't return my multiple phone calls. I didn't know whether this pharmacy is real or not. There was no reason for me to enter the numbers of my credit card on the pharmacy's web-site because this pharmacy could be a scam. For me, the only way was to immediately go to Russia and to purchase this medication. Moreover, in the beginning of May 2017, I called my Russian OB/GYN, and I found out that my turn in line for a free IVF attempt had come. Therefore, I needed to go to Russia for two reasons:

1) To refill a prescription of my hormonal pills

2) To perform an IVF attempt.

Case Management Statement, Parts 1 and 2; case No. 3:18-cv-03748-JCS

1      Paragraph 16.

2          In the beginning of May 2017, I approached Ms. Dunkelberger, and I notified her that I

3   had only ten hormonal pills left which was for 10 days, that I called my Russian OB/GYN, and I

4   found out that my turn to perform a free of charge IVF procedure had come, and that I urgently

5   needed to go to Russia to refill a prescription of my hormonal pills and to perform an IVF

6   attempt.

7

8      Paragraph 17.

9          Ms. Dunkelberger recorded our conversation into her Report of Contact that she dated

10  May 16, 2017 (though I believe that my conversation with her occurred earlier) (**ER Vol. 1,**

11  **289**.)  Please, notice that in this Report of Contact Ms. Dunkelberer stated that I had come to her

12  Office on May 25, 2017. It was a typo (**ER Vol. 1, page 460, lines 23-25**, "The Report of

13  Contact includes a typographical error. The date of the conversation was May 15, not May 25,

14  2017.") Please, read the May 16, 2017 Report of Contact (**ER Vol. 1, 289**), "Tatyana Drevaleva

15  came to my office on 5/25/17 to speak about her need to go to Russia. She stated that since

16  Russia offers a Free one time invitro fertilization (1VF) she wanted to try this before she made

17  "an embryo" as previously discussed. She went on to explain that **she made a mistake and only**

18  **has 5 pills left (**that are required to help with IVF) and that **she thought she had more**. These

19  pills were prescribed by her doctor in Russia and **can only be obtained in Russia**. She had

20  found one pharmacy in New York that advertised on the internet they could get this medication.

21  She stated she was planning to contact the pharmacy in New York to see if she could obtain the

22  medication before she ran out and would let me know on May 16th if she was able to get the

23  pills. I reminded her at this time she would need to complete an OPM 71, provide supporting

24  medical documentation to request any time off, and that it had to be approved by by Dr. Prince,

25  Associate Director of Patient Care Services prior to leaving; that I could not approve her request.

26  Ms. Drevaleva verbalized understanding.

27          Ms. Dreveleva did not contact me on 5/16/17 to let me know if she had obtained the

28  medication from New York."

1

Paragraph 18.

2      Therefore, in the beginning of May 2017, Ms. Dunkelberger acknowledged her
3   understanding that I had an **emergency** need to go to Russia to refill a prescription of my
4   hormonal pills that I couldn't obtain in the United States and to perform am IVF procedure.
5   Pursuant to the plain language of the Memorandum (unnumbered) (**ER Vol. 2, 463-464**), Ms.
6   Dunkelberger had an authority to approve my **emergency** request for a leave for the purpose of
7   going to Russia to refill a prescription of my hormonal pills and to perform an IVF procedure.

8

9      Paragraph 19.

10     After Ms. Dunkelberger directed me to give her my medical documentation, I
11  immediately contacted with my Russian OB/GYN, and I requested my medical documentation. I
12  believe that I contacted my Russian OB/GYN on approximately May 10, 2017. It took
13  approximately seven days for my doctor to issue a medical documentation. My doctor notified
14  me that she would email me the document on approximately May 17, 2017. Please, also take into
15  your consideration the time difference between Novosibirsk, Russia and Albuquerque, NM.

16

17     Paragraph 20.

18     On May 17, 2017, Ms. Dunkelberger was out of her office. On that evening, I worked a
19  night shift together with my Russian speaking co-worker Ms. Nadya Das. On May 17, 2017 in
20  the evening, I approached Assistant Manager Mr. Phil Johnson, and I told him the same story
21  about my attempts to have a child (my two unsuccessful marriages, the history of my dating with
22  other guys, my unsuccessful In-Utero Insemination attempts with donor's sperm at Kaiser
23  Permanente in San Francisco, my 2.5 year stay in Russia from 2014 to 2016, and my IVF
24  attempts in Russia.) I said to Mr. Johnson that I had three hormonal pills left, that I would
25  receive the medical document from my doctor within the next few hours, and that I urgently
26  needed to go to Russia to refill a prescription of the hormonal pills and to perform an IVF
27  procedure. I also informed Mr. Johnson about my age. Mr. Johnson gave me an OPM 71 form
28  and asked me to fill it out. He seemed very understandable to my situation. He expressed

Case Management Statement, Parts 1 and 2; case No. 3:18-cv-03748-JCS

compassion, and he said, "If you need to go – go!" Please, see Mr. Johnson's EEO Interrogatory (**ER Vol. 1, 218-219**), "The complaintant came into the office, after business hours, on May 17, 2017 stating **s/he had one pill left** and **was flying to Russia the next day** to have Invitro Fertilization done. The complaintant also stated his/her age to be 50 and that s/he had always wanted to have children and "this may be my last chance." I handed the complaintant the OPM71 paper work and stated that this must be filled out and supporting documentation in English from the doctor must also be supplied. At this time I stated to the complaintant that I could not approve Leave Without Pay but I would turn in the documentation **and if this was that important then s/he should go**."

Paragraph 21.

During my May 17, 2017 conversation with Mr. Johnson. I informed him that I would receive my medical documentation from my Russian OB/GYN within the next few hours. I said to Mr. Johnson that I had only three hormonal pills left, and that I would leave to Russia on May 18, 2017. I said that I didn't have an opportunity to stay in the United States for a longer time in order to find a certified translator and to translate my medical document into English. I said that I would find a certified translator in Russia, translate the document, and I would email the translated document from Russia. Also, I said to Mr. Johnson that I would authorize my Russian speaking co-worker Ms. Nadya Das to informally translate this medical document for Ms. Dunkelberger and Mr. Johnson.

Paragraph 22.

After my conversation with Mr. Johnson, I spoke to Ms. Das, and I informed her that I urgently needed to go to Russia to refill a prescription of my hormonal pills and to perform an IVF attempt, and that Mr. Johnson verbally approved my leave. I filled out the OPM 71 form (**ER Vol. 1, 287**), and I requested a leave **from May 18, 2017 to July 07, 2017**. In my OPM 71 form, I wrote the reason for the leave, "To solve my health issues in Russia." I didn't write that I would go to Russia for the purpose of pregnancy because I didn't know who would read this

form, and I wanted to protect my privacy. However, both Ms. Dunkelberger and Mr. Johnson knew that I would go to Russia to refill a prescription of my hormonal pills and to perform an IVF attempt. I put this OPM 71 form under the door of the Manager's office as Mr. Johnson had directed me.

Paragraph 23.

During my night shift from May 17, to May 18, 2017, I received an email with my medical documentation from Russia. Ms. Das is a witness of this event because we stayed together with her in one cardiac monitoring room, and she observed that I had received an email with my medical documentation from Russia. I immediately attempted to forward this email to both Ms. Dunkelberger and Mr. Johnson from the VAMC's computer but I was unable to do it. Ms. Das made a suggestion that the VAMC's security didn't allow me to forward an email from Russia to Ms. Dunkelberger and Mr. Johnson. I notified Ms. Das that I would send this email to Ms. Dunkelberger and Mr. Johnson in the morning after my night shift from my personal computer. I asked Ms. Das to translate this document for Ms. Dunkelberger and Mr. Johnson until I can get a certified translator in Russia and until I email the translated copy to the VAMC. Ms. Das agreed to translate this document into English.

Paragraph 24.

On May 18, 2017 at 9.02 AM, I sent my medical documentation from my Russian doctor to both Ms. Dunkelberger and Mr. Johnson (**ER Vol. 1, 28-30.**) Please, read the plain language of my document on Russian language (**ER Vol. 1, page 30**),

"Государственное бюджетное учреждение здравоохранения Новосибирской области "Клинический центр охраны здоровья семьи и репродукции"

Поликлиническое отделение

ул. Киевская, 14

г. Новосибирск

Case Management Statement, Parts 1 and 2; case No. 3:18-cv-03748-JCS

1      Выписка из амбулаторной карты Древалёвой Татьяны Евгеньевны 13.10.1966 года

2  рождения

3      Древалёва Т.Е. состоит в реестре проведения процедуры ЭКО по территориальной

4  программе ОМС.

5      Примерные сроки вступления в программу ЭКО с 23.05.2017 до 31.09.2017.

6      Лечащий врач И.Б. Дзуцева

7      Заведующая п/отделением М.П. Опарина

8      17 мая 2017 года."

9

10  Here is a translation on English language (**ER Vol. 1, page 33**),

11  "Public Government-Financed Institution of Public Health of Novosibirsk Region

12  "Clinical Center for the Protection of Family Health and Reproduction"

13  Out-Patient Department

14  Kievskaya st., 14

15  Novosibirsk

16

17  EXTRACT FROM THE MEDICAL HISTORY

18  DREVALEVA, TATYANA EVGENIEVNA, DOB October 13, 1966

19      Drevaleva T.E. is included in the registry for carrying out the extracorporal fertilization

20  procedure according to the Territorial Program of Compulsory Health Insurance.

21      An approximate term of entering the extracorporal fertilization program **from May 23,**

22  **2017** to September 31, 2017.

23  Attending Doctor          I.B. Dzutseva (Signature)

24  Out-Patient Department Head    M.P.Oparina (Signature)

25  **May 17, 2017**

26

27      /Seal: Public Government-Financed Institution of Public Health of Novosibirsk Region

28  "Clinical Center for the Protection of Family Health and Reproduction"/

Case Management Statement, Parts 1 and 2; case No. 3:18-cv-03748-JCS

I, Asya Sergeevna Pisareva, Director of Translation Bureau, Limited Liability Company – State Registration Certificate Series 54 Number 0004157325 State registration number 1095404006720 dd. March 19, 2009, residing in Novosibirsk, Russia, hereby certify that the foregoing is, to the best of my knowledge and belief, a true and accurate English translation of the Russian document made by Eleonora Alexandrovna Pyltseva, an official translator of the English and Russian languages.

[Signature] Asya Sergeevna Pisareva

Translation Bureau, Limited Liability Company

Suite 686, 57 K. Marx Pr., Novosibirsk, Russia

Tel./fax: (383) 210-57-39

e-mail: BNTI@narod.ru "

Paragraph 25.

Please, pay attention to the following facts of the case:

1) The date when my Russian doctor issued the document was May 17, 2017. My Russian doctor didn't issue this document earlier

2) The date of entering to the IVF program in Russia was May 23, 2017

3) I received the document from my Russian doctor via email during my night shift from May 17, 2017 to May 18, 2017. The witness is Ms. Nadya Das

4) The date when I emailed this document on Russian language to Dunkelberger and Johnson is May 18, 2017 at 9.02 AM (**ER Vol. 1, page 29**.)

Paragraph 26.

On May 18, 2017 in the evening, I left to Russia. While being in Russia, I found a certified translator who translated my medical documentation into English. On May 30, 2017, I emailed the translated medical document to both Ms. Dunkelberger and Mr. Johnson (**ER Vol. 1, 31-33**.)

Paragraph 27.

After I arrived at Russia and started my full medical examination, my doctor referred me to an unexpected surgery (the removal of a cervical polyp.) After the surgery, I needed to wait for ten calendar days to obtain a pathology result. Afterwards, my doctor directed me to perform the hormonal blood tests for the levels of the Folliclestimulating Hormone (the FSH) and the Antimullerian Hormone (the AMH) on a definite day of a menstrual cycle. It meant that I needed to stay in Russia for a longer time that I had expected because I needed to obtain the pathology results and to perform my blood hormonal tests on the definite day of a menstrual cycle. I realized that I would not have an opportunity to return back to Albuquerque, NM on July 07, 2017.

Paragraph 28.

On July 01, 2017, I emailed to both Ms. Dunkelberger and Mr. Johnson, and I informed them about my unexpected surgery and about my need to stay in Russia for a longer time to obtain the pathology results and to perform the blood tests for the FSH and the AMH (**ER Vol. 1, 43 and 301**),

"Dear Carla and Phil!

How are you?

I spent time getting fully examined before the IVF procedure. Unpleasantly, a gynecologist found a polyp of the cervical canal, and I got it removed. I waited for the pathology result which was good. Now, the gynecologist wants me to get other blood tests for Folliclestimulating Hormone (FSH) and Antimullerian Hormone (AMH). I will have to do it at the beginning of the next menstrual period which will be in approximately 7-8 days. After I get the results, the gynecologist will let me know if I am eligible for the IVF cycle. I hope I am eligible. However, I will have to stay in Russia for 2-3 more weeks than I expected. Initially, I was planning to return back to the United States on July 7th. I will not be able to do it because I will have to wait until I can get the blood tests done for FSH and AMH. I requested another letter from my gynecologist confirming that currently I am getting examined in Novosibirsk for my

Case Management Statement, Parts 1 and 2; case No. 3:18-cv-03748-JCS

IVF cycle. The gynecologist promised to give me this letter on Thursday next week. As soon as I get the letter, I will get it translated and forward it to you.

Please, allow me to spend other 2-3 weeks in Russia. Please, send me a form that I can fill out and return to you if necessary.

Thank you so much,

Respectfully,

Tanya Drevaleva."


Paragraph 29.

On July 03, 2017 at 1.46 PM, I received an email from Ms. Dunkelberger that informed me that my full time job at the Raymond G. Murphy VAMC had been terminated "due to attendance issues" on June 30, 2017 (**ER Vol. 1, 35-38.**) Prior to receiving this email, I didn't get a Notice, and I was not given an opportunity to be heard.

Please, read the plain language of the Termination Letter (**ER Vol. 1, page 37**),

"2. The Associate Director, Patient Care Services, has recommended that you be terminated front your position for failure to qualify during your probationary period. Your termination is **due to attendance issues**."


Paragraph 30.

On July 03, 2017 at 2.02 PM, I sent an email to Ms. Dunkelberger, and I asked her why she terminated my employment prior to July 07, 2017 (**ER Vol. 1, 44.**) Here is the plain text of my July 03, 2017 email,

"Good afternoon Carla!

Why did you terminate my employment?

I submitted the proof that I would go to Russia to solve my medical problems (to perform an IVF procedure). I submitted the proof (a letter from my Russian physician) that I would be doing an IVF procedure in Russia. I submitted a request form to you where I asked you to allow

Case Management Statement, Parts 1 and 2; case No. 3:18-cv-03748-JCS

me to be absent from work from May 18th, 2017 **to July 7th, 2017**. You terminated my employment **on June 30th, 2017 which is before July 7th, 2017**. Please, give me the answer.

    Thank you,

    Respectfully,

    Tatyana Drevaleva."


    Dunkelberger never responded. I contacted with the EEO Counsel Mr. William Winter.


    <u>Paragraph 31.</u>

    On July 06, 2017, I obtained the second medical documentation from my Russian OB/GYN that confirmed that I needed to stay in Russia for a longer time to undergo a complete medical examination. On July 14, 2017 at 4.05 AM, I emailed a translated version of this second medical documentation to Mr. Winter, Ms. Dunkelberger and Mr. Johnson (**ER Vol. 1, 39-41.**) Here is a plain language of my July 14, 2017 email to Mr. Winter, Ms. Dunkelberger, and Mr. Johnson, "Here is a translated document dated July 6th, 2017 that I needed to spend more time in Russia for additional examination regarding my IVF procedure.

    Respectfully,

    Tatyana Drevaleva."


    Read the plain language of the July 06, 2017 letter from my Russian physician (**ER Vol. 1, page 41**),

    "State Budgetary Public Health Care Institution of Novosibirsk Oblast[2]

    Clinical Centre of Family Health Care and Reproduction

    Outpatient Department

    14 Kievskaya St., Novosibirsk

---

[2]  The Novosibirsk Region, the Russian Federation.

Case Management Statement, Parts 1 and 2; case No. 3:18-cv-03748-JCS

**State Budgetary Public Health Care Institution of Novosibirsk Oblast Clinical Centre for Planned Parenthood and Reproduction**

14 Kievskaya St., Novosibirsk-136, 630136

06 July, 2017

**Medical Assessment Report**

Name: <u>Tatyana</u> Patronymic Name: Evgenievna Surname: Drevaleva

Date of birth: 13/10/1966

Received medical advice on_____

Diagnosis: Primary infertility of combined genesis.

T.E. Drevaleva is currently put in the registry for providing a program for in-vitro fertilization at the expense of the compulsory medical insurance. The queue code number is 147.

According to the Order of the Ministry of Health of the Russian Federation No. 107н dd. 30/08/2012 on Arrangements for the Use of Assisted Reproductive Technologies, Contraindications and Limitations for their Use, the patient T.E. Drevaleva currently has limitations for using the in-vitro fertilization program and require additional follow-up examination.

Head of the Outpatient Department of the Clinic [Signature] M.P. Oparina

Head of the Reproductive Health Department [Signature]

[Seal] State Budgetary Public Health Care Institution of Novosibirsk Oblast

Clinical Centre of Family Health Care and Reproduction

Outpatient Department

For references

Novosibirsk, Russia

Case Management Statement, Parts 1 and 2; case No. 3:18-cv-03748-JCS

I, Denis Alexandrovich Adamov, certify that I am fluent in the English and Russian languages, and that the above document in an accurate translation of the document entitled "Medical Assessment Report." "

Both Dunkelberger and Johnson never responded to my July 14, 2017 email, they never sent me another OPM 71 form, and they never responded to my second medical document and to my request to extend the time in Russia.

Paragraph 32.

On July 20, 2017 at 7.23 PM, I sent another email to Mr. Winter, Ms. Dunkelberger, and Mr. Johnson (**ER Vol. 1, page 45**),

"Good afternoon William, Carla and Phil!

How are you?

Bad news - I was discharged from the IVF protocol yesterday because, despite stimulation for 7 days, follicles were not growing.

1 want to spend 10-14 more days in Novosibirsk and have another pelvic ultrasound examination. If the follicles start growing, I will perform the IVF procedure. If not, I will fly to the USA.

I will let you know the date of my arrival to the USA. I will be happy to have a Mediation process with you and convince you to reinstate me back to work.

Thank you,

Respectfully,

Tatyana Drevaleva."

I never heard back from both Dunkelberger and Johnson.

Case Management Statement, Parts 1 and 2; case No. 3:18-cv-03748-JCS

1    Paragraph 33.

2    On July 27, 2017 at 7.09 PM, I sent another email to Mr. Winter, Ms. Dunkelberger, and

3    Mr. Johnson (**ER Vol. 1, page 46**),

4    "Dear William, Carla and Phil!

5    Good news - my follicles started growing up. I had a pelvic ultrasound examination

6    yesterday. The size of the follicles is 13 millimeters now versus 4 millimeters a week ago. The

7    doctor wants to continue observing the follicles. I will have another pelvic ultrasound

8    examination tomorrow.

9    I will keep you posted.

10   Have a wonderful and blessing day,

11   Tatyana."

12

13   I never heard back from both Dunkelberger and Johnson.

14

15   Paragraph 34.

16   On August 10, 2017 at 5.23 PM, I sent another email to Mr. Winter, Ms. Dunkelberger,

17   and Mr. Johnson (**ER Vol. 1, page 47**),

18   "Dear Mr. Winter, Carla and Phil!

19   I will fly back to the USA on August 17th. Please, schedule a Mediation process as soon

20   as possible to August 17th.

21   Respectfully,

22   Tatyana Drevaleva."

23

24   I never heard back from both Dunkelberger and Johnson.

25

26   Paragraph 35.

27   On August 17, 2017, I arrived at the JFK airport in New York, and I called the Raymond

28   G. Murphy VAMC from the airport. I asked whether the VAMC scheduled the Mediation. I was

Case Management Statement, Parts 1 and 2; case No. 3:18-cv-03748-JCS

told that the Mediation would occur not earlier than in two weeks. For me, it was impossible to fly from New York to Albuquerque, New Mexico because I didn't have a job in New Mexico, I didn't have my own place of living in New Mexico, I didn't have money, and I couldn't pay rent. On August 17, 2017, I flew to California from New York because I was hoping to stay at my friends' places in California. I couldn't do it in New Mexico.

Paragraph 36.

After my arrival at California, the Raymond G. Murphy VAMC emailed me am "Agreement to Mediate and a Confidentiality Agreement" (**ER Vol. 1, pages 49-50**) which I signed on August 30, 2017 (**ER Vol. 1, page 50.**) I was invited to one of the VA facilities in California for the video Mediation. The video Mediation occurred on September 07, 2017.

Paragraph 37.

On that day, during the Mediation, Ms. Dunkelberger said to me that my Request for a LWOP (my OPM 71 form) was denied by Dr. Prince. Therefore, **September 07, 2017** was the first day when I found out that my Request for a LWOP had been denied by Dr.. Prince. It was a big surprise to me because, during my stay in Russia, nobody told me that my Request for a LWOP had been denied by Dr. Prince. Ms. Dunkelberger also said to me that on June 12, 2017 she mailed a letter to my home postal address in Albuquerque, NM with the denial letter, and she requested me to immediately return back to work at the VAMC (**ER Vol. 1, 290**.)

Paragraph 38.

Please, read the plain language of the June 12, 2017 letter (**ER Vol. 1, page 290**),

"6/28/17

501/118

Tatyana E. Drevaleva

431 Alcazar Street, NE

Case Management Statement, Parts 1 and 2; case No. 3:18-cv-03748-JCS

Albuquerque, NM, 87108


Subj: Leave Request Clarification

1. This letter is to notify that on May 17, 2017, you submitted a Leave Without Pay (LWOP) request on an OPM Form 71, Request for Leave or Approved Absence from May 18, 2017 through July 07, 2017. However, your request was disapproved (see attached). You did not submit the required medical documentation, in English, prior to your departure to Russia. As a result of the disapproval. You are required to submit medical documentation, in English, to support your absence. This time period must be covered to avoid being placed in Absent Without Leave (AWOL) status.

2. I am enclosing an OPM 71, Request for Leave or Approved Absence, for your use. In addition, I am enclosing Medical Center Memorandum (MCM) 05-11, Title 5 Leave Policy; MCM 05-24, Voluntary Leave Transfer Program; MCM 05-36, and MCM 05-8 Tours of Duty.

3. Please, contact me **immediately** upon receipt of this letter or no later than (5 days) upon receipt of this letter. I can be reached at (505) 265-1711, extension 4617 or (505) 269-5035. Again, I must stress to you that it is YOUR responsibility to ensure any absences are covered by approved leave requests. Failure to return to duty immediately or comply with the above requirements may result in disciplinary action up to and including your removal from Federal service.

[Signature]  **6/9/17**

Carla J. Dunkelberger

Nurse Manager, 5DT


Certified Mail Receipt

**6/12/17**

Tatyana Drevaleva

431 Alcazar St. NE

Case Management Statement, Parts 1 and 2; case No. 3:18-cv-03748-JCS

ABQ, NM, 87108."

Paragraph 39.

Please, notice the following facts:

1) The letter was mailed on June 12, 2017 to my home postal address in Albuquerque, NM despite Dunkelberger knew that at that time I was in Russia, and that I would not be able to receive this letter and to respond

2) Dunkelberger knew that I had just relocated from California and that I didn't have any relatives in Albuquerque, NM who would be able to receive the letter and to notify me about it

3) The letter was not emailed to me. Please, read Defendants October 26, 2018 [PROPOSED] ORDER GRANTING DEFENDANTS' MOTION TO DISMISS AND GRANTING LIMITED LEAVE TO AMEND (**ER Vol. 2, page 414, lines 15-17**), "While in Russia, plaintiff got the medical document translated and she emailed it to her supervisor on May 30, 2017. Meanwhile, plaintiff's request for leave without pay had been denied and a letter to that effect was sent to her mailing address, **but not emailed to her**."

4) In her letter that Dunkelberger signed on June 09, 2017, Dunkelberger claimed that I had not provided the VAMC with my medical documentation on English language. It was a Libel. On May 30, 2017 at 8.05 AM, I emailed my medical document on English language to both Dunbelberger and Johnson, see (**ER Vol. 1, pages 32-33**.)

Paragraph 40.

During the EEO investigation, the Raymond G. Murphy provided the EEO Investigator Mr. Dennis Hayo with the evidence that on May 30, 2017 both Dunkelberger and Johnson actually received the translated into English language version of my medical documentation (**ER Vol. 1, page 265**.) However, in her letter that was signed on June 09, 2017 and that was mailed

Case Management Statement, Parts 1 and 2; case No. 3:18-cv-03748-JCS

to my home postal address in Albuquerque, NM on June 12, 2017, Dunkelberger claimed that (**ER Vol. 1, page 290**), "You are required to submit medical documentation, in English, to support your absence."

Paragraph 41.

During the September 07, 2017 video Mediation, Dunkelberger said that she had followed the VAMC's policies that instructed her to mail a letter to the home postal address that was on file. I asked Dunkelberger why she didn't email this letter to my email address. Dunkelberger responded that, because this letter was not encrypted, the VAMC's security policies didn't allow to email this letter to me. It was a Libel because the June 30, 2017 Termination Letter was not encrypted, and Dunkelberger emailed this letter to my email address.

Paragraph 42.

The June 12, 2017 letter that was mailed to my home postal address in Albuquerque, NM was unclaimed, and it was returned back to the VAMC, see (**ER Vol. 1, page 291**),

"USPS Tracking Results

Tracking Number: 70141200000081360083

Date & Time: June 13, 2017, 11:12 am

STATUS OF ITEM: Notice Left (No Authorized Recipient Available)

LOCATION: ALBUQUERQUE, NM 87108

We attempted to deliver your item at 11:12 am on June 13, 2017 in ALBUQUERQUE, NM 87108 and a notice was left because an authorized recipient was not available. You may arrange redelivery by using the Schedule a Redelivery feature on this page or may pick up the item at the Post Office indicated on the notice beginning June 14, 2017. If this item is unclaimed by June 28, 2017 then it will be returned to sender."

Case Management Statement, Parts 1 and 2; case No. 3:18-cv-03748-JCS

1

2      Paragraph 43.

3      Regardless, during the September 07, 2017 video Mediation, Dunkelberger accused me in

4    not responding to this letter and not returning back to work. Dunkelberger said that, because I

5    didn't provide her with my medical documentation on English language, because I didn't

6    respond to the June 12, 2017 letter, and because I didn't return back to work, Dunkelberger fired

7    me.

8

9      Paragraph 44.

10     During the Mediation, I said to Dunkelberger that I'd had no idea about the June 12, 2017

11   letter. I said to her that I had emailed her my medical documentation on both Russian and

12   English languages. I asked Dunkelberger to reinstate me back to work. Dunkelberger refused.

13

14     Paragraph 45.

15     On September 18, 2017 at 4.08 PM, I sent a letter to Ms. Cheryl Eliano who is a District

16   10 National Vice President of the American Federation of Government Employees (**ER Vol. 1,**

17   **65-67**) and (**ER Vol. 1, pages 185-187**.) I explained to Ms. Eliano about the termination of my

18   employment from the Raymond G. Murphy VAMC, and I asked to assist me to get reinstated

19   back to work. Please, read the plain language of my letter to Ms. Eliano (**ER Vol. 1, pages 66-**

20   **67**) and (**ER Vol. 1, pages 185-187**),

21     "Dear Cheryl!

22     My name is Tatyana Drevaleva. I was hired as a Monitor Technician at 5D at

23   Albuquerque VAMC on April 3rd, 2017. In May 2017, I informed Manager Mrs. Carla

24   Dunkelberger that I needed to go to Russia for an IVF attempt because I wanted to have children.

25   I also informed Assistant manager Mr. Phil Johnson that I needed to go to Russia for the IVF

26   attempt, I was taking hormonal pills, and I was running out of these pills. It was impossible to

27   obtain these pills in the USA. Mr. Johnson verbally allowed me to go to Russia for the IVF

28   attempt. On May 18th, 2017, I emailed Mrs. Dunkelberger and Mr. Johnson a document from my

     Russian OB/GYN confirming that I was in registry for the IVF attempt in Novosibirsk, Russia,

and I needed to be there to perform the IVF attempt. This document was on Russian language. Also, I filled out the form asking for leave without pay from May 18th, 2017 to July 7, 2017. I left Albuquerque on May 18th, 2017. After I arrived at Novosibirsk, Russia, I got this document from my OB/GYN translated, and I emailed it to Mrs. Dunkelberger and Mr. Johnson.

My IVF attempt in Russia lasted for three months. Initially, my OB/GYN requested me to pass all lab tests, EKG, colposcopy, etc. Later, the doctor found a cervical polyp and requested to remove it. I had surgery on June 13th, 2017. Afterwards, I waited for the pathology result. After I got that result, the OB/GYN requested me to determine the level of hormones FSH (Follicle Stimulating Hormone) and AMH (Anti-Mullerian Hormone) that needed to be done on the second day of my menstrual period. I waited for 14 days for the menstrual period. Afterwards, there was an actual attempt of IVF. Unfortunately, it was unsuccessful.

As soon as I realized that I needed to stay in Russia longer that July 7th, I emailed Mrs. Dunkelberger and Mr. Johnson, and I let them know that my OB/GYN requested additional tests (FSH and AMH), and I needed to stay in Russia for a longer time. I provided Mrs. Dunkelberger and Mr. Johnson with another document from my Russian physician confirming that I needed to stay in Russia for a longer time for additional examinations. However, Mrs. Dunkelberger fired me on June 30th – even before July 7th.

I contacted Mr. William Winter who is an EEO Counselor. He promised to schedule the Mediation date after I arrive back to the USA.

I returned back to the USA on August 18th. I contacted Mr. Winter, and he scheduled the Mediation process on September 7th. I went to the Mediation (the process was on Tele because I was in California. I was unemployed, I didn't have money to pay rent, and this was why I returned back to California to stay with some of my Russian friends). During the Mediation, Mrs. Dunkelberger said that she had submitted my written request for leave without pay to Dr. Prince. Dr. Prince denied my request because, according to Family Medical Leave Act, I qualified for Leave without Pay only after 12 months of working at the VA, and at that time I was working for only 1.5 months. I said that I didn't have an opportunity to wait for 12 months because I was running out of hormonal pills, I couldn't refill this prescription in the USA, and I was in registry

for a free IVF attempt. I waited in line for this IVF attempt for 9 months, and my turn finally came. Mrs. Dunkelberger said that the decision of Dr. Prince was mailed to my Albuquerque home postal address. Mrs. Dunkelberger said that I hadn't come back to work and I hadn't contacted with her after sending Dr. Prince's letter. I answered that there was no chance for me to get and read that mail because I was out of country, and Mrs. Dunkelberger knew it. I asked why she didn't email Dr. Prince's decision to my private email address. Mrs. Dunkelberger said that the letter was not encrypted, and she couldn't have emailed it to me. This was not true because she emailed me the termination Letter which was not encrypted. However, Mrs. Dunkelberger refused to reinstate me back to work.

During the Mediation, Director of Human Resources Mr. Thomas Harris requested my home postal address in California. He gave me his email address which is Thomas.Harris3@va.gov He promised to send me Dr. Prince's decision. On September 8th, 2017 I emailed Mr. Harris, and I provided him with my home postal address in California. He never replied, and I never got any document in mail from him.

I informed Mr. Winter that my intention was to file a formal EEO complaint. Also, I decided to contact with the Union and ask the Union to assist me to get reinstated back to work. From my point of view, I eft Albuquerque VAMC for the medical purpose, and I left with the permission of the Assistant Manager. It is not my fault that Mrs. Dunkelberger didn't inform me via email that my request for leave without pay was denied by Dr. Prince. I feel discriminated, retaliated and unlawfully terminated based on my disability to give birth to children. Also, I feel discriminated against my age (50 yo). Talking to my former colleagues over the phone, I found out that Mrs. Dunkelberger hired two males for the positions of Monitor Technician. Obviously, male employees will not have problems related to pregnancy. Also, the ages of these employees are 30 yo and approximately 35 yo – much younger than I am.

I am asking the Union to assist me to get reinstated back to work.

Please, respond to my private email address tdrevaleva@gmail.com

You may call me any time. My cell phone number is 415-806-9864.

Thank you, have a wonderful day,

Case Management Statement, Parts 1 and 2; case No. 3:18-cv-03748-JCS

Respectfully,

Tatyana."

Paragraph 46.

On September 19, 2017, I filed a formal EEO Complaint No. 200P-0501-2017103883 (**ER Vol. 1, pages 123-125**.) Please, notice that my formal EEO Complaint was a copy of my September 18, 2017 letter to Ms. Eliano. Please, read the plain language of my formal EEO Complaint (**ER Vol. 1, pages 124-125**)[3],

"My name is Tatyana Drevaleva. I was hired as a Monitor Technician at 5D at Albuquerque VAMC on April 3rd, 2017. In May 2017, I informed Manager Mrs. Carla Dunkelberger that I needed to go to Russia for an IVF attempt because I wanted to have children. I also informed Assistant manager Mr. Phil Johnson that I needed to go to Russia for the IVF attempt, I was taking hormonal pills, and I was running out of these pills. It was impossible to obtain these pills in the USA. **Mr. Johnson verbally allowed me to go to Russia for the IVF attempt.** On May 18th, 2017, I emailed Mrs. Dunkelberger and Mr. Johnson a document from my Russian OB/GYN confirming that I was in registry for the IVF attempt in Novosibirsk, Russia, and I needed to be there to perform the IVF attempt. This document was on Russian language. Also, I filled out the form asking for leave without pay from May 18th, 2017 to July 7, 2017. I left Albuquerque on May 18th, 2017. After I arrived at Novosibirsk, Russia, I got this document from my OB/GYN translated, and I emailed it to Mrs. Dunkelberger and Mr. Johnson.

My IVF attempt in Russia lasted for three months. Initially, my OB/GYN requested me to pass all lab tests, EKG, colposcopy, etc. Later, the doctor found a cervical polyp and requested to remove it. I had surgery on June 13th, 2017. Afterwards, I waited for the pathology result. After I got that result, the OB/GYN requested me to determine the level of hormones FSH (Follicle

---

[3] Please, notice that the Office of Resolution Management intentionally and maliciously redacted the plain text of my formal EEO Complaint and removed all information that was related to my disability.

Case Management Statement, Parts 1 and 2; case No. 3:18-cv-03748-JCS

Stimulating Hormone) and AMH (Anti-Mullerian Hormone) that needed to be done on the second day of my menstrual period. I waited for 14 days for the menstrual period. Afterwards, there was an actual attempt of IVF. Unfortunately, it was unsuccessful.

As soon as I realized that I needed to stay in Russia longer that July 7th, I emailed Mrs. Dunkelberger and Mr. Johnson, and I let them know that my OB/GYN requested additional tests (FSH and AMH), and I needed to stay in Russia for a longer time. I provided Mrs. Dunkelberger and Mr. Johnson with another document from my Russian physician confirming that I needed to stay in Russia for a longer time for additional examinations. However, Mrs. Dunkelberger fired me on June 30th – even before July 7th.

I contacted Mr. William Winter who is an EEO Counselor. He promised to schedule the Mediation date after I arrive back to the USA.

I returned back to the USA on August 18th. I contacted Mr. Winter, and he scheduled the Mediation process on September 7th. I went to the Mediation (the process was on Tele because I was in California. I was unemployed, I didn't have money to pay rent, and this was why I returned back to California to stay with some of my Russian friends). During the Mediation, Mrs. Dunkelberger said that she had submitted my written request for leave without pay to Dr. Prince. Dr. Prince denied my request because, according to Family Medical Leave Act, I qualified for Leave without Pay only after 12 months of working at the VA, and at that time I was working for only 1.5 months. I said that I didn't have an opportunity to wait for 12 months because I was running out of hormonal pills, I couldn't refill this prescription in the USA, and I was in registry for a free IVF attempt. I waited in line for this IVF attempt for 9 months, and my turn finally came. Mrs. Dunkelberger said that the decision of Dr. Prince was mailed to my Albuquerque home postal address. Mrs. Dunkelberger said that I hadn't come back to work and I hadn't contacted with her after sending Dr. Prince's letter. I answered that there was no chance for me to get and read that mail because I was out of country, and Mrs. Dunkelberger knew it. I asked why she didn't email Dr. Prince's decision to my private email address. Mrs. Dunkelberger said that the letter was not encrypted, and she couldn't have emailed it to me. This was not true

Case Management Statement, Parts 1 and 2; case No. 3:18-cv-03748-JCS

because she emailed me the termination Letter which was not encrypted. However, Mrs. Dunkelberger refused to reinstate me back to work.

During the Mediation, Director of Human Resources Mr. Thomas Harris requested my home postal address in California. He gave me his email address which is Thomas.Harris3@va.gov He promised to send me Dr. Prince's decision. On September 8th, 2017 I emailed Mr. Harris, and I provided him with my home postal address in California. He never replied, and I never got any document in mail from him.

I informed Mr. Winter that my intention was to file a formal EEO complaint. Also, I decided to contact with the Union and ask the Union to assist me to get reinstated back to work. From my point of view, I eft Albuquerque VAMC for the medical purpose, and I left with the permission of the Assistant Manager. It is not my fault that Mrs. Dunkelberger didn't inform me via email that my request for leave without pay was denied by Dr. Prince. I feel discriminated, retaliated and unlawfully terminated based on my disability to give birth to children. Also, I feel discriminated against my age (50 yo). Talking to my former colleagues over the phone, I found out that Mrs. Dunkelberger hired two males for the positions of Monitor Technician. Obviously, male employees will not have problems related to pregnancy. Also, the ages of these employees are 30 yo and approximately 35 yo – much younger than I am.

Tatyana Drevaleva

September 19, 2017."


Paragraph 47.

On September 21, 2017 at 9.59 PM, I emailed Ms. Eliano the following letter (**ER Vol. 1, page 68**) and (**ER Vol. 1, page 188**),

"Dear Ms. Eliano!

Thank you so much for forwarding my case to Mr. Rael. I got his email today. I filed a formal EEO complaint. I am sending you a copy of that complaint.

Have a good night,

Respectfully,

Case Management Statement, Parts 1 and 2; case No. 3:18-cv-03748-JCS

1   Tanya."

2

3       Paragraph 48.

4       On September 21, 2017, I also emailed Ms. Eliano the PDF files of my formal EEO

5   complaint (**ER Vol. 1, 68**). Please, notice that the Office of Resolution Management included a

6   copy of my September 21, 2017 letter to Ms. Eliano to the Investigative File but the ORM

7   removed the PDF files of my formal EEO claim from this letter (**ER Vol. 1, page 188**.) Please,

8   compare with (**ER Vol. 1, page 68**.)

9

10      Paragraph 49.

11      An AFGE representative Ms. Karen Smith was assigned to assist me. Initially, Ms. Smith

12  communicated with me (**ER Vol. 1, page 69**) and (**ER Vol. 1, pages 163-165**.) Initially, Ms.

13  Smith communicated with me via email and over the phone (**ER Vol. 1, page 183**.)

14  Subsequently, Ms. Smith stopped responding to my emails and phone calls.

15

16      Paragraph 50.

17      On October 20, 2017 at 3.43 PM, Ms. Whitney Stenhouse who is the ORM's EEO

18  Assistant sent an email to Director of the Raymond G. Murphy VAMC Mr. Andrew Welch, to

19  the EEO Program Manager of the Raymond G. Murphy VAMC Mr. Donald Rincon, and to Ms.

20  Amy Shafer (I am not sure what Ms. Shafer's title is) (**ER Vol. 1, page 140**),

21      "Dear Sirs,

22      Please find attached EEO correspondence concerning your facility. If you have questions,

23  please contact the point of contact referenced in the attached correspondence.

24      Respectfully,

25      Whitney Stenhouse

26      EEO Assistant

27      Department of Veterans Affairs

28      Office of Resolution Management

Case Management Statement, Parts 1 and 2; case No. 3:18-cv-03748-JCS

Pacific District

Office: (310) 478-3711 ext.48054

Fax: (310) 268-4089."

Paragraph 51.

On November 07, 2017 at 11.02 AM, the EEO Case Manager Mr. Carlos Funes sent an email to Ms. Any Shafer and the EEO Program Manager Mr. Donald Rincon at the Raymond G. Murphy VAMC (**ER Vol. 1, page 190**),

"Good Morning:

I am the assigned case manager for the case of Tatyana Drevaleva, 200P-0501-2017103883. We need to clarify an issue to properly review and assess her EEO claim.

1. CP claims that she e-mailed or filed a grievance on 9/18/17 with Ms. Cheryl Eliano. Can you please confirm or provide a copy if complainant filed any such grievance as applicable.

 Please provide at your earliest convenience or **by November 13, 2017**. If you have any questions or concerns please feel free to let me know. Thank you for your assistance."

Paragraph 52.

On November 07, 2017 at 10.07 AM[4], Ms. Amy Shafer responded to Mr. Funes (**ER Vol. 1, page 190**), "Cheryl Eliano is not listed in VISTA or Outlook."

Paragraph 53.

On November 07, 2017 at 11.09 AM, the EEO Case Manager Mr. Carlos Funes sent an email to Ms. Any Shafer and the EEO Program Manager Mr. Donald Rincon at the Raymond G. Murphy VAMC (**ER Vol. 1, page 189**), "Good Morning: I will have to follow up and ask complainant but do you have any record of her filing a union grievance? Thanks."

---

[4]  Please, take into your consideration the time difference between Albuquerque, NM and Pittsburgh, PA where  the ORM is located.

Case Management Statement, Parts 1 and 2; case No. 3:18-cv-03748-JCS

1

2      Paragraph 54.

3          On November 15, 2017 at 2.26 PM, the EEO Case Manager Mr. Carlos Funes sent an

4      email to Ms. Amy Shafer and the EEO Program Manager Mr. Donald Rincon at the Raymond G.

       Murphy VAMC (**ER Vol. 1 page 189**),

5          "Good afternoon,

6          1 was following up on this request for information. Please provide the information if

7      available so we can properly review the complaint and if we do not receive we will have to

8      process the complaint with the information on file. Thank you.

9          Carlos Funes

10         EEO Case Manager

11         Department of Veterans Affairs

12         Office of Resolution Management Office:

13         (310) 478-3711 ext. 35819

14         Fax: (31 0) 268-4089"

15

16     Paragraph 55.

17         On November 16, 2017, the ORM emailed me and Ms. Karen Smith (**ER Vol. 1, pages

18     81-92 and 173-174**) a Notice of Acceptance of the EEO Complaint for Tatyana Drevaleva, Case

19     No. 200P-0501-2017103883, filed September 19, 2017, against officials of the VA Medical

20     Center in Albuquerque, NM (**ER Vol. 1, pages 163-165**) and a template form of the

21     Interrogatories (**ER Vol. 1, pages 166-172.**)

22

23     Paragraph 56.

24         Please, read the plain language of the November 16, 2017 at 3.47 PM email of Ms.

25     Eboney Tolliver who is an EEO Program Assistant of the Office of Resolution Management that

26     was sent to me and to Ms. Karen Smith (**ER Vol. 1, pages 81**),

27         "Dear Ms. Smith,

28

Case Management Statement, Parts 1 and 2; case No. 3:18-cv-03748-JCS

Attached, please find a Notice of Acceptance (PR) letter regarding your client's EEO Complaint ending in 103883. If you have any questions, please contact the point of contact referenced in the attached correspondence."

Please, read the plain language of the Notice of Acceptance (**ER Vol. 1, page 166**), "Please complete the document and return it to Karla Malone, Team Lead Investigator **within 15 days of receipt** via encrypted email to: karla.malone@va.gov, or fax to: 727-299-6755 Attn: Karla Malone, Team Lead Investigator. You can also mail your answers to 140 Fountain Parkway N., Suite 620, St. Petersburg, FL 33716-1274."

Paragraph 57.

On November 16, 2017 at 5.45 PM, the ORM emailed the same Interrogatories to the Director of the Raymond G. Murphy VAMC Mr. Andrew Welch and the EEO Program Manager of the Raymond G. Murphy VAMC Mr. Donald M. Rincon and requested to provide the written answers on the Interrogatories "**within 10 days of your receipt of this letter**" (**ER Vol. 1, pages 175-181**.) Please, notice that the EEO Program Manager of the Raymond G. Murphy VAMC Mr. Rincon read this email on November 16, 2017 at 5.48 PM (**ER Vol. 1, page 181**.) Please, notice that Director of the Raymond G. Murphy VAMC Mr. Welch didn't read this email at all (**ER Vol. 1, page 181**.)

Paragraph 58.

Please, read the plain language of the November 16, 2017 at 5.45 PM email (**ER Vol. 1, page 181**),

"Dear Director Welch,

Attached, please find a Notice of Acceptance (PR) letter regarding an EEO case at your facility. EEO regulations require we notify you when this occurs. Questions/concerns regarding this matter should be addressed/sent directly to the point of contact identified in the attached correspondence.

Thank you,

Case Management Statement, Parts 1 and 2; case No. 3:18-cv-03748-JCS

Eboney Tolliver

EEO Program Assistant | Pacific District | Midwest District (MD)

Department of Veterans Affairs Office of Resolution Management-Midwest District (MD) | 12255 Enterprise Drive, Suite 5506 | Westchester, IL 60154

708.236.2800 Office

708.236.2898 Fax"

Paragraph 59.

Specifically, the ORM requested the Raymond G. Murphy VAMC to provide the following documents "**within ten (10) days from receipt of request**" (**ER Vol. 1, pages 178-180**),

"**TERMINATION OF PROBATIONARY OR TEMPORARY OR TERM APPOINTMENT**

[x] Organizational chart for the organization unit in which the complainant was assigned at the time of the action in question.

[x] Breakdown of the organizational unit[3] of the position in question as of the date of the action. Provide name, position (title, series, and grade), type of appointment, and EEO category(s) (s as checked above for all employees and supervisors.

[x] Breakdown of terminations of probationary, temporary, of term appointments made within the organizational unit going back two years from the date of the action in question. Provide employee name, position (title, series, and grade), and EEO category(s), type of appointment, date of appointment, date of termination, reason for termination, and name, position, and EEO category(s) of the agency official(s) initiating the action.

[x] Request for Personnel Actions SF 52 (both sides) and SF 50 requesting and effecting recruitment and termination for position in question.

[x] Vacancy announcement and any other documentation citing conditions of employment for the position in question.

[x] Written notice of termination of probationary, temporary or term appointment.

Case Management Statement, Parts 1 and 2; case No. 3:18-cv-03748-JCS

[x] If termination is conduct related, documentation related to conduct issue(s).

[x] If termination is performance related, complainant's performance standards, performance rating of record and any documents related to counseling sessions.

[x] Regulatory guidelines and local policies and procedures concerning termination of probationary, temporary or term appointments in effect at the time of the action at issue.

[x] Complainant's position description or functional statement for the position from which s/he was terminated.

[x] If the complainant's position was subsequently filled, the name and EEO category(s) of the selectee and date of appointment. If reprisal is a basis, indicate whether the selectee has had prior EEO activity.

[x] Pertinent article(s) of negotiated union agreement, if applicable.

**TIME AND ATTENDANCE**

[x] Organizational chart for the organizational unit to which the complainant is assigned and in which action occurred, if the units are different.

[x] Statistical breakdown of the organizational unit[4] where the action in question occurred as of the date of the action. Provide name, position (tide, series, and grade), and EEO category(s), as checked above, for all employees and supervisors.

[x] Summary data on leave use by employee's in complainant's section who are subordinates of the Responding Management Official (RMO) going back two years from the date of the action as follows:

If time and attendance issue relates to a disciplinary action:

[x] For the two year period prior to the action in question, provide name, position (tide, series, and grade), and EEO category(s) of employee(s) affected, action taken based on leave use, date of action, and name position, and EEO category(s) of the agency official(s) who initiated the action.

Case Management Statement, Parts 1 and 2; case No. 3:18-cv-03748-JCS

If time and attendance issue is **not** related to a disciplinary action:

> [x] For the two year period prior to the action in question, provide name, position (title, series, and grade), and EEO category(s) of employee(s) who requested leave, if the leave was granted or denied, reason for leave denial and name, position, and EEO category(s) of the agency official(s) effecting the decision. Complainant's leave request(s) as well as leave requests for comparable employees.

[x] Documentation of any counseling provided concerning complainant's leave usage or leave usage pattern for complainant and subordinate employees comparable to complainant

[x] Complainant's time and attendance or leave records for the two-year period prior to the action in question.

[x] Pertinent regulatory guidelines and local policies and procedures concerning leave administration in effect at the time of the action in question.

[x] Pertinent article(s) of the negotiated union agreement, if applicable.

[3] Organizational unit is defined as the section where complainant was employed (or sought employment if complaint was filed by an applicant for employment) when the complaint was filed. For example, if the complainant worked for Human Resources Management (FIRM) Service/Division/Product Line in the Labor Relations Section, the organizational unit is the Labor Relations Section.

[4] Organizational unit is defined as the section where complainant was employed (or sought employment if complaint was filed by an applicant for employment) when the complaint was filed. For example, if the complainant worked for Human Resources Management (HRM) Service/Division/Product Line in the Labor Relations Section, the organizational unit is the Labor Relations Section."

Case Management Statement, Parts 1 and 2; case No. 3:18-cv-03748-JCS

Paragraph 60.

The deadline for the Raymond G. Murphy VAMC to provide the ORM with the listed above documents was **November 26, 2017**. I was unable to find in the EEO Investigative File the date when the Raymond G. Murphy VAMC sent the requested documents to the ORM.

Paragraph 61.

Please, notice that the Raymond G. Murphy provided the ORM with only the following completely irrelevant documents that I was able to find in the EEO Investigative file:

1) Associate Director/Patient Care Services Acute Care Service (I guess it is an Organizational Chart) (**ER Vol. 1, page 267**)

2) Functional Statement with the description of the duties of Medical Instrument Technicians (EKG) (**ER Vol. 1, pages 268-273**)

3) Memorandum (unnumbered) with the phone numbers for the unplanned leave and with my April 18, 2017 signature (**ER Vol. 1 pages 261-262**)

4) VA Handbook 5021/6, Chapter 2, Title 5 Probationary/Trial Period Employees (**ER Vol. 1, pages 304-306**)

5) Memorandum 05-48 Employee Courtesy and Conduct (**ER Vol. 1, pages 307-311**)

6) Memorandum 05-11 Title 5 Leave Policy (**ER Vol. 1, pages 312-324**)

7) Memorandum 05-8 Tours of Duty (**ER Vol. 1, pages 325-327.**)

Paragraph 62.

On November 19, 2017 which was within 15 days from receiving the November 16, 2017 letter from the ORM, I responded to the ORM's Interrogatories, see (**ER Vol. 1, pages 202-211**),

"Tatyana E. Drevaleva

10660 Hidden Mesa Place, Monterey, CA, 93940

415-806-9864, tdrevaleva@gmail.com

Case No: 200P-0501-2017103883

Date Filed: September 19, 2017

Case Management Statement, Parts 1 and 2; case No. 3:18-cv-03748-JCS

Interrogatory.

Complainant Name: Tatyana Drevaleva

1.  What is your position, work location and unit?

My position was a Monitor Technician and Nursing Assistant. The location was: Raymond G. Murphy Veterans Affairs Medical Center, Albuquerque, NM, unit 5D.

2.  What is your disability?

My disability is infertility. I can't give birth to children by a natural way. My infertility is based on chronic endometritis, polyposis of endometrium (before, I had 5 surgeries – polypectomies), and a low ovarian reserve which is related to my age. I have a low level of Antimullerian hormone and an increased level of Follicle Stimulating Hormone.

3.  When did the disability develop?

The disability developed over the past 5-7 years. Throughout all these years, I tried to get pregnant but unsuccessful. I had sexual relationships with two men but I didn't get pregnant. I did approximately 7 intra-uterus inseminations at Kaiser Permanente but I didn't get pregnant. I had one polypectomy (the uterine polyp) at Kaiser Permanente in Richmond, CA, two polypectomies (polyps of endometrium) in Russia, and two removals of polyps of cervical canal in Russia. Also, I did three IVF attempts in Russia in 2015 – 2016.

4.  What caused it?

The polyposis of endometrium and cervical canal was caused by genetics. My Mom and my Aunt had polypectomies. Also, polyposis of endometrium and cervical canal was caused by a hormonal misbalance.

The chronic endometritis was caused by numerous polypectomies. I was informed by my Gynecologist that I had the Asherman syndrome, also known as uterine synechiae. It is a

Case Management Statement, Parts 1 and 2; case No. 3:18-cv-03748-JCS

condition characterised by the formation of intrauterine adhesions, which are usually sequela from injury to the endometrium, and is often associated with infertility.

The low ovarian syndrome was caused by my age 50 yo. The number of follicles in my ovaries was significantly low.

5. Is this a permanent disability? If not, then explain how long it is expected to last.

It is a permanent disability. I can't treat this genetic disorder, and I can't decrease my age. I can try to cure chronic endometritis but I haven't been successful yet despite my numerous attempts including antibiotics.

The only way I can have children is IVF with a surrogate Mom.

6. Do you have medical documents about your impairment/medical condition/disability? If so, please provide documentation.

The documentation that I have is in Russian. It confirms the fact of multiple polyp removals as well as the fact of chronic endometritis and the low ovarian reserve. It confirms the levels of AMH and FSH. I can request translating these documents into English at your request. I can also request documentation from Kaiser Permanente confirming the fact that I unsuccessfully tried to get pregnant, and I had multiple IUI attempts in 2012 – 2013. I don't have this documentation with me. I can provide you with a document from my Russian OB/GYN confirming that I was in registry for an IVF attempt through the Ministry of Health of the Novosibirsk Region in Russia.

7. Do you take any medication because of the impairment?

I was taking hormonal pills named Jeanine http://www.dx-health.com/en/jeanine-contraceptive-p-142  to try to save my ovarian reserve. I took these pills without intermission for almost one year since my IVF attempt in 2016. The reason of taking these pills is to turn my menstrual periods off so I wouldn't loose ova. These pills are available in Russia and are not

Case Management Statement, Parts 1 and 2; case No. 3:18-cv-03748-JCS

1   available in the United States. Currently, I am taking other hormonal pills named Femoston 2/10

2   https://www.medicines.org.uk/emc/medicine/15925 for the same reason.

3       I underwent an extensive treatment trying to cure my chronic endometritis. I took a lot of

4   antibiotics in Russia, and I underwent many culture tests from my uterus. The diagnosis of

5   chronic endometritis was confirmed after biopsy of endometrium.

6       Also, currently I am taking Vitrum Prenatal    http://www.unipharmus.com/vitrum-

7   prenatal.html  vitamins and Folic Acid.

8

9       8.   Does the medication have any side effects that impact your ability to perform your

10            duties? If so, please explain.

11       The mentioned above medications do not have any side effects that impact my ability to

12   perform duties of a Monitor Technician and Nursing Assistant.

13

14       9.   Does the impairment/medical condition/disability limit anything you would do

15            normally in everyday life? If yes, what normal life functions are limited and how are

16            they limited?

17       My disability does not limit I would do normally in everyday life.

18

19       10. What are the major duties that you are required to carry out on your job?

20       I was hired as a Monitor Technician. My duty was to observe cardiac monitors. Also, I

21   was assigned to perform duties as a Nursing Assistant. I took vital signs, measured input and

22   output, changed linens, gave patients a shower, and assisted patients the way they needed.

23

24       11. Are you able to perform the major duties of your position, as someone else would

25            normally be able to perform the duties?

26       Yes, I was able to perform all duties of my position. However, I needed reasonable

27   accommodations. In my case, I needed to go to Russia to refill the prescription of Jeanine and to

28   perform an IVF attempt. Because I am a citizen of the Russian Federation, I had a right for a free

Case Management Statement, Parts 1 and 2; case No. 3:18-cv-03748-JCS

of charge IVF attempt. In order for me to have this free IVF attempt, I needed to wait in line for 9 months. In May 2017, I found out that my turn in line finally came. Even if I performed an IVF attempt in Russia for money, the cost would be approximately $2000 – 2500 in comparison to $15000 in the United States. My salary of a Monitor Technician which is approximately $40000 per year does not allow me to perform an IVF attempt in the United States. Health insurance in the USA doesn't cover IVF attempts. Also, I couldn't wait to work for my employer for 12 months because 1) my ovarian reserve is getting lower and lower each month at my age, 2) I ran out of hormonal pills Jeanine that I couldn't obtain in the United States.

    a)  Would you say your ability to perform these duties differs slightly, moderately or significantly from someone else performing the job?

I think my ability to perform my duties would differ from a young female with a good ovarian reserve and a healthy endometrium. This female would not need IVF attempts in order to get pregnant. This female would get pregnant by a natural way. Other than that, I don't see any additional differences between me and other colleagues who are hired for the same position. My infertility would no way affect my ability to observe cardiac monitors and act as a Nursing Assistant taking vital signs and assisting patients.

12. Were you given any restrictions related to performing the duties of your job?

No, I was not given restrictions to performing duties as a Monitor Technician and Nursing Assistant.

13. Explain when and how management became aware of your disability?

In May 2017, I approached Ms. Dunkelberger, and I verbally explained to her what I just explained in this Interrogatory. I said that I was 50 yo and I didn't have children despite I wanted to have children very much. I said that I had been married twice but both husbands refused to give me children. I said that I'd had numerous attempts to get pregnant by a natural way with two boyfriends and using IUI in the USA and IVF in Russia with donor's sperm. I said that in

2016 I had an IVF attempt in Russia, and I created an embryo which is stored frozen in Russia. I said that I couldn't afford the price of IVF in the United States. I said that I was in line for a free IVF attempt in Russia as a citizen of the Russian Federation. I said that I was running out of hormonal pills that were prescribed by a Russian physician and that I couldn't obtain in the United States. I said that I had been waiting for 9 months for a free IVF attempt in Russia, and my turn came in. I said that I couldn't miss this turn, otherwise I would lose a right for a free IVF attempt. I said that OI was 50 yo, and my chances to have a baby from my own ovum were getting smaller and smaller. I also said that my plan was to go to Russia for an IVF attempt, to create an embryo, to freeze it, and to return back to the United States to continue performing my duties as a Monitor Technician. Ms. Dunkelberger's face expressed that she was very much unpleased. She asked me whether I will request another time off in order to go to Russia again to create another embryo. I said that I didn't know because I wasn't sure how this upcoming IVF attempt would be going on. Ms. Dunkelberger said that according to FMLA I would have to work for the VAMC for 12 months to be eligible for a leave without pay. I said that I couldn't wait for 12 months because I had only a few hormonal pills left, and my turn for a free IVF attempt in Russia came in. Ms. Dunkelberger requested a copy of my medical record confirming my intention to perform an IVF attempt. I said that I would request this document from my Russian OB/GYN. Ms. Dunkelberger said that I needed to provide the VAMC with the translated document prior to my departure. I said that I would try my best.

I requested this document from my Russian physician. It took approximately 7-8 days for the Russian office to process this document. There was no way to expedite this process. On May 17th, 2017, Ms. Dunkelberger was out of her office. I approached Assistant Manager of 5D Mr. Phil Johnson, and I said to him exactly what I wrote in this Interrogatory and what I said to Ms. Dunkelberger – that I needed to go to Russia for an IVF attempt, that I couldn't get pregnant by a natural way, that I spent many years trying to get pregnant using UIU and IVF, that I had only 3 hormonal pills left, and I spoke to Ms. Dunkelberger about my medical condition that required a trip to Russia. I said to Mr. Johnson that Ms. Dunkelberger had requested a translated document from my Russian physician prior to my departure. However, because of the delay with a Russian

Case Management Statement, Parts 1 and 2; case No. 3:18-cv-03748-JCS

office, I got this document in Russian only on May 17th, 2017 when I had only 3 hormonal pills left. There was no way to continue staying in the USA and translating the document into English because, if I didn't get hormonal pills, I would be bleeding.

Mr. Johnson verbally allowed me to go to Russia to refill my hormonal pills and to perform an IVF attempt. His exact words were, "If you need to go – you should go!" I said to Mr. Johnson that I will provide Ms. Dunkelberger and him with a translated document as soon as I get to Russia. Mr. Johnson agreed. I said that I trusted my Russian speaking co-worker Ms. Nadya Das who worked as a Monitor Technician at 5D. I verbally authorized Nadya to translate this document into English for my Manager. Ms. Dunkelberger said that I didn't have a right to translate this document myself. Only a certified translator could do it.

Also, Mr. Johnson provided me with a form to request leave without pay. I filled this form out. I didn't know exactly how much time I needed to spend in Russia, so I requested a leave without pay from May 18th, 2017 to July 07th, 2017. Because Ms. Dunkelberger was out of office, I put this document under the door of her office. I don't have a copy of that document.

The witness of all events described above is Ms. Nadya Das who witnessed how I called my Russian physician's office and requested the document, how I called my brother who was in Russia and asked him to go to my doctor's office, how I called the receptionist and requested to email me a copy of that document. Also, I informed Ms. Das that I had talked to Ms. Dunkelberger and Mr. Johnson, and Mr. Johnson verbally allowed me to go to Russia. I also notified Ms. Das verbally that I authorize her to translate this document for Ms. Dunkelberger until I get the official translation.

14. What exactly management know about your disability. Be specific.

The management knew that, despite of my numerous attempts to get pregnant, the only way was only IVF with donor's sperm. Also, the management knew that I was not planning to carry pregnancy. I was going to be absent from work for a relatively short amount of time. I was going to create an embryo, freeze it, and return to work in Albuquerque. Also, read my description above. I emailed Ms. Dunkelberger and Mr. Johnson a copy of the document from

Case Management Statement, Parts 1 and 2; case No. 3:18-cv-03748-JCS

my Russian OB/GYN that I needed to go to Russia for an IVF attempt because I was in registry of patients for a free IVF attempt through the Ministry of Health of the Novosibirsk Region. I emailed this document on Russian language on May 18th, 2017 (prior to my departure) and I emailed the same document on English language from Russia on May 30th, 2017. Both Ms. Dunkelberger and Mr. Johnson never responded and never acknowledged that they received both documents (the original and a translated copy). However, both Ms. Dunkelberger and Mr. Johnson knew my private email address.

15. Please identify the management official for denying your leave request.

After I submitted both an original document and a translated copy to Ms. Dunkelberger and Mr. Johnson, I was not aware what the subsequent process would be. I didn't know whether Ms. Dunkelberger would approve or deny my request or somebody else would do it. During Mediation on September 07, 2017, Ms. Dunkelberger said that my request for leave without pay had been denied by Dr. Prince. So, according to Ms. Dunkelberger, the official who denied my request for leave without pay was Dr. Prince. I don't know whether Ms. Dunkelberger said to Dr. Prince that the purpose of my trip to Russia was an IVF attempt. Personally, I didn't speak directly with Dr. Prince about my infertility disability.

a)   Please describe your working relationship with this individual.

I met Dr. Prince only once during the Orientation. She held a group meeting with new hires. She spoke about our role at the VAMC. Other than that, I didn't have any discussions with Dr. Prince.

b)   How and when did this individual become aware of the protected bases that you believe are the subject of discrimination?

I don't know how and when Ms. Dunkelberger submitted my request for leave without pay to Dr. Prince. I even didn't know that my request would be submitted to Dr. Prince. I don't know what Ms. Dunkelberger said to Dr. Prince about the purpose of my trip to Russia. I don't remember whether I wrote the purpose of an IVF procedure in my request for leave without pay. I don't have a copy of my request.

Case Management Statement, Parts 1 and 2; case No. 3:18-cv-03748-JCS

16. How and when did you become aware that you leave request was denied?

After I emailed an original document and a translated copy to Ms. Dunkelberger and Mr. Johnson, I never heard back from both of them. I was in Russia pursuing my IVF attempt. Nobody let me know that my request was denied and nobody let me know that my request was denied by Dr. Prince. I got a Termination letter from Ms. Dunkelberger on July 03rd, 2017. The first time when I discovered that my request for leave without pay was denied by Dr. Prince was during the Mediation on September 07th, 2017.

17. What justification was provided for denying the leave?

During the Mediation on September 07th, 2017, Ms. Dunkelberger said that my request for leave without pay had been denied by Dr. Prince because I didn't meet the requirements to qualify for this leave under FMLA. I didn't work at the VA for 12 months, and therefore my request was denied. However, Ms. Dunkelberger knew very well that it was impossible for me to wait for 12 months before requesting this leave. I really don't know if Ms. Dunkelberger explained to Dr. Prince about my particular situation – that I was 50 yo, I tried to have children by a natural way and using UIU and IVF, I ran out of my hormonal pills, and I waited for 9 months for a free attempt of IVF in Russia, and my turn finally came in, and if I didn't arrive for this IFV attempt, I would lose this chance.

18. What policy or procedure was identified to support the denial of leave?

Ms. Dunkelberger identified FMLA. I needed to work at the VA for 12 months before requesting leave without pay.

19. Why was denial of leave unacceptable to you?

It was unacceptable because I had no any other chance to try to have a baby. Health insurance in the USA doesn't pay a full price for an IVF attempt. The price of one IVF attempt in the United States is $15000 which I can't afford because of my salary of $40000 per year. Even

Case Management Statement, Parts 1 and 2; case No. 3:18-cv-03748-JCS

if my request for leave without pay was denied, Ms. Dunkelberder was supposed to immediately let me know. She didn't let me know when I was in Russia. Prior to my termination, I didn't know what my request for leave without pay was denied. During the Mediation on September 07, 2017, Ms. Dunkelberger said that she had mailed the denial letter to my home postal address in Albuquerque, NM. Ms. Dunkelberger knew very well that at that time I was out of country, I was in Russia, and I had no way to get and respond this letter. Ms. Dunkelberger never emailed this letter to me even though she knew my private email address. During the Mediation on September 07th, 2017, Ms. Dunkelberger said that she couldn't have emailed me this denial letter because it was not encrypted. I think this is a lie and an attempt to find an excuse. Ms. Dunkelberger emailed me the termination letter which was not encrypted. Ms. Dunkelberger never offered me to communicate with her via the phone, never called me and never informed me that my request for leave without pay had been denied by Dr. Prince.

20. Did you discuss the leave denial with any management officials?

Yes, I asked Ms. Dunkelberger in my email dated July 03, 2017 why she terminated me. She never responded. Again, she never let me know that my request for leave without pay was denied by Dr. Prince.

a)  Who and when

The first time I asked Ms. Dunkelberger why she terminated my employment. I requested a leave without pay until July 07th, 2017, and Ms. Dunkelberger terminated my employment prior to this date – on June 30th, 2017. I was informed on July 03rd, 2017. The second time I asked Ms. Dunkelberger why she terminated my employment during the Mediation on September 07th, 2017. Ms. Dunkelberger said that my request had been denied by Dr. Prince. I requested to speak with Dr. Prince directly but I never got any answer.

b)  What was discussed and what was the outcome of the discussion?

I asked why I had never been informed that my request for leave without pay was denied. Ms. Dunkelberger said that she had mailed the denial letter to my home postal address in Albuquerque, NM. I said that I was out of country at that time, and I never got the denial letter. I

Case Management Statement, Parts 1 and 2; case No. 3:18-cv-03748-JCS

also said that Ms. Dunkelberger knew that I was out of country but she never informed me via email, never called me, and never requested me to give her a call. Also, she never answered my emails when I sent my documents to her. Ms. Dunkelberger said that because I didn't respond to the letter that she sent to my home postal address in Albuquerque, NM, she fired me. I said that I had never gotten that letter, I didn't know that my request for leave without pay was denied, and I asked Ms. Dunkelberger to reinstate me back to work. Ms. Dunkelberger refused. I requested to speak with Dr. Prince but I never got any answer.

21. Why do you believe that the protected basis or bases outlined in this complaint was/were factors(s) in the denial of leave?

I remember how unpleasant Ms. Dunkelberger seemed when I first informed her about my intention to have a baby. She seemed very irritated. She asked me if I would request a leave again to create another embryo. I think she also asked whether I was planning to be absent from work in case if the baby is born. She never responded to my emails after I sent her an original document from my Russian OB/GYN and a translated copy. She never sent me a denial letter of Dr. Prince. She terminated my employment even before July 07th, 2017. She refused to reinstate me back to work. Afterwards, speaking over the phone to Ms. Nadya Das, I discovered that Ms. Dunkelberger hired two male Monitor Technicians to substitute me. Obviously, male employees will not have problems related to pregnancy. Also, I found out that these employees are much younger than I am. They are 30 and 35 yo in comparison to my age 51 yo now. Also, I found out that at least one of these employees is stable in his marriage and already has children.

22. Are you aware of a coworker who was not denied leave in similar circumstances?

No, I am not aware of coworkers who were not denied leave in similar circumstances (related to pregnancy).

I am aware of a coworker who was not terminated her employment at 5D despite she attended a nursing school and couldn't have full time employment at the VA during her study.

Case Management Statement, Parts 1 and 2; case No. 3:18-cv-03748-JCS

She was allowed to work only 1 time per month at 5D observing cardiac monitors. Her employment was not terminated because she was absent from work.

a)  Please identify by full name and title.

I think her name is Melanie. She is a Registered Nurse at ICU.

b)  Please identify this by their protected basis(es) as outlined above in your complaint.

I said to Ms. Dunkelberger and Mr. Johnson that I would spend approximately 6 weeks in Russia for my IVF attempt. I said that I did not intend to become pregnant myself. I said that I would create an embryo and return back to the United States to work at the VA. My employment was terminated. Melanie, who couldn't have worked full time during her study for 2 years at a nursing school, was allowed to work at the VA one time per month, and her employment was not terminated. It confirms my statement that I was discriminated due to my disability, retaliated and unlawfully terminated.

c)  Please explain how they were treated differently than you.

Melanie's employment was not terminated even though she couldn't have worked full time. Melanie was allowed to work once a month for 2 years. After I was absent from work for 5 weeks due to my disability, my employment was terminated. I was never informed that my leave without pay was denied.

Another individual who was treated differently that I is Ms. Chelsea Casey, a newly hired Registered Nurse at 5D. She was hired at the same time when I was hired. Ms. Casey was a new grad from a nursing school. Ms. Casey said that prior to getting employed by the Raymond G. Murphy VAMC she got approximately 5 phone calls from Ms. Dunkelberger who offered her to apply for a job opening of a Registered Nurse and who was inviting her to work at the VA. Ms. Dunkelberger called Ms. Casey five times to invite her to work but didn't call me even one time when my request for leave without pay had been denied.

d)  Please describe your working relationship with this individual.

I worked with Melanie maybe twice when she observed cardiac monitors. I really like Melanie. She is a very conscientious lady. I also like Ms. Casey very much. She is a good friend and a good coworker. She worked as a Monitor Technician for 5 years, and she knows EKG very

well. I showed her Torsades de Pointes when the patient had it (not all other nurses agreed to see it). She gave me rides to work and from work because I don't have a car. She gave me a ride to the airport when I left Albuquerque to Russia despite it was late and her daughters were sleeping. She took one of the daughters with her to give me a ride to the airport. She wished me to have a good trip. She knew the purpose of my trip.

    e)  How and when did this individual become aware of the protected bases that you outlined above?

I let Ms. Casey know that I wanted to have children, and therefore I was going to go to Russian for an IVF attempt. Also, while being in Russia, I communicated via email with Ms. Michelle Tirado who was also hired at the same time when I was hired. Ms. Tirado is a Nursing Manager. I shared the details of my stay in Russia with Ms. Tirado. I didn't know Ms. Casey's private email address, therefore I didn't have a correspondence with her from Russia.

23. Please identify the management official responsible for terminating you.

In the Termination Letter dated June 30th, 2017, it is written, "The Associate Director, Patient Care Services, has recommended that you be terminated from your position for failure to qualify during your probationary period. Your termination is due to attendance issues." This is a complete libel. During my employment starting April 2nd to May 18th, 2017, I didn't miss even one day of work, and I was never late to work. I was verbally allowed to go to Russia by Assistant Manager Mr. Johnson, and I requested a leave without pay from May 18th, 2017 to July 07th, 2017.

24. What justification was provided for your termination?

The justifications that were provided for my termination were: 1) probationary period, 2) attendance issues.

25. What policy or procedure was identified to support the termination?

Case Management Statement, Parts 1 and 2; case No. 3:18-cv-03748-JCS

"The decision to terminate you immediately in lieu of a two (2) week notice is due to your absent without leave (AWOL) status since May 21, 2017". Again, this is a libel. I left the VA with a verbal permission of Assistant Manager Mr. Johnson. When my request for leave without pay was denied, nobody notified me.

26. Why was the termination unacceptable to you?

I was happy and proud that I was privileged to serve Veterans. I really loved the VA and my job. I wanted to have a child, and I left to Russia for a relatively short amount of time with a permission of an Assistant Manager. I also informed a Manager in detail why I needed a trip to Russia and why I couldn't perform an IVF attempt in the United States. I anticipated returning back to my duties at the VA after I create an embryo. Manager Ms. Dunkelberger never let me know that my request for leave without pay had been denied by Dr. Prince. Ms. Dunkelberger never responded to my emails after I sent her documents from my Russian physician. Ms. Dunkenbelger mailed the denial letter to my home postal address in Albuquerque, NM even though she knew that I had no chance to read this letter. Ms. Dunkelberger accused me in being absent from work even though she knew that 1) I got Mr. Johnson's permission to go to Russia, 2) I never missed any day of work, and I was never late to work. Ms. Dunkelberger didn't care about my knowledge of EKG. I passed the EKG test with a score of 100%. I was good interpreting cardiac rhythms because I like it. Ms. Dunkelberger didn't care that I would be a real benefit to the hospital because of my EKG knowledge. Now, when I am fired from the probationary period for "absence", who will hire me? The guess is that I will have problems with all subsequent potential employers who will think that I was terminated from the VA from being absent. I was even denied Unemployment Insurance benefits because Ms. Dunkelberger said that I had been fired for being absent. This is totally unacceptable, and this is a libel. Therefore, I demand to overturn Ms. Dunkelbergers decision and reinstate me back to work with a backpay.

27. Did you discuss the termination with any management officials? Yes, I did.

a) Who and when?

Case Management Statement, Parts 1 and 2; case No. 3:18-cv-03748-JCS

I discussed my termination with Ms. Dunkelberger. First time, I asked her in writing in my email to her dated July 03rd, 2017. I asked her why she fired me. She never responded. The second time I asked Ms. Dunkelberger why she fired me during the Mediation on September 07th, 2017.

b)   What was discussed and what was the outcome of the discussion?

During the Mediation on September 07th, 2017, I said to Mediators and to Ms. Dunkelberger that I had gone to Russia with a verbal permission of Mr. Johnson. Ms. Dunkelberger said that she had emailed me the denial letter to my home postal address in Albuquerque, NM. I said that there was no way to receive that letter because I was in Russia, and Ms. Dunkelberger knew it. I asked why she didn't email me this letter. Ms. Dunkelberger said that the letter was not encrypted. I said that I had gotten a Termination letter which was not encrypted. Also, I said that Ms. Dunkelberger knew my private email address but never answered my emails. I asked Ms. Dunkelberger to reinstate me back to work. She refused.

28. Why do you believe that you were discriminated against because of the protected bases that you outlined above when you were terminated?

I was discriminated against my disability to give birth to children. I was also discriminated against my age. Ms. Dunkelberger knew that I went to Russia with a permission of Assistant Manager Mr. Johnson but she accused me in being absent. She never responded my emails when I sent her documents about my health condition. She never informed me that my request for leave without pay was denied. She never called me to let me know that my request was denied, and she never sent me an email. She terminated my employment prior to July 07th, 2017. She refused to reinstate me back to work after I arrived at the USA. She hired two male employees who will not have problems related to pregnancy. She hired much younger employees that I am. Dr. Prince never responded to my request to speak with her in person. In contrast, Melanie was allowed to work for only once a month for 2 years when she was in a nursing school. Ms. Casey got 5 phone calls from Ms. Dunkelberger when this Manager offered her employment at the VA.

Case Management Statement, Parts 1 and 2; case No. 3:18-cv-03748-JCS

29. Are you aware of a coworker who was not subjected to **termination** in similar circumstances?

No, I am not aware.

The above information has furnished without a pledge of confidence and I understand that it may be shown to the interested parties of this complaint.

This statement is made under penalty of perjury, this November 19th, 2017.

___Tatyana E. Drevaleva_____

(Affiant's signature)"

Paragraph 63.

Also, please, read my November 19, 2017 letter to Ms. Karla Malone (**ER Vol. 1, page 212**),

"To Ms. Karla Malone

My name is Tatyana Evgenievna Drevaleva.

Date: November 19th, 2017.

The complaint above outlines the specific basis or bases that you have identified as the subject of discrimination in your complaint. Please provide identifying information for the applicable basis or bases identified above in your complaint:

Age: _yes __ Sex: _yes (pregnancy)_ Disability: _yes __ "

Paragraph 64.

On November 17, 2017 at 2.51 PM, Ms. Amy Shafer sent an email to Ms. Dunkelberger and Mr. Donald Rincon (**ER Vol. 1, page 276**),

"**Subject**: Request for documents.

**Importance**: High.

Case Management Statement, Parts 1 and 2; case No. 3:18-cv-03748-JCS

1    Good afternoon

2    The Office of Resolution Management (ORM) is requesting the documents listen on the

3    attachment in the Tatyana Drevaleva complaint, case number 2000P-0501-2017103883.

4    Please send the documents to the EEO office as soon as possible.

5    Thankyou

6    Amy."

7

8    Paragraph 65.

9    On November 17, 2017 at 4.06 PM, Ms. Amy Shafer sent an email to Mr. Andrew

10   Salazar-Ruiz (I don't know the title of Mr. Salazar-Ruiz) and sent the copies of Ms.

11   Dunkelberger and Mr. Rincon (**ER Vol. 1, page 276**),

12   "I received an out of office from Carla – not sure how long she will be gone (???) Can

13   you help with this??

14

15   Paragraph 66.

16   On November 20, 2017 at 10.43 AM, Ms. Dunkelberger sent an email to Ms. Amy

17   Shafer, Mr. Donald Rincon, Mr. Andrew Salazar-Ruiz, and Ms. Allean Bonin (**ER Vol. 1, page**

18   **275**),

19   "1. Organizational chart – see attached.

20   2. Breakdown of organizational unit for position in question (Medical Instrument

21   Technician), EEO categories unknown.

22   a. Tatyana Drevaleva, Medical Instrument Technician, GS-649-**07**, full time.

23   b. Nadzeya Das, Medical Instrument Technician, GS-0649-**06**, full time.

24   c. David Williams, Medical Instrument Technician, GS-0649-**06**, full time.

25   d. David Trujillo, Medical Instrument Technician, GS-0649-**05**, full time.

26   e. Vacant position, Medical Instrument Technician, GS-0649, full time.

27   3. Functional Statement –see attached.

28

Case Management Statement, Parts 1 and 2; case No. 3:18-cv-03748-JCS

4. If complainant's position subsequently filled… - **As of today, November 20, 2017, this position has not been filled.**

5. Summary data on leave use… - As of today, November 20, 2017, **there have been no time and attendance issues for those employees in the Medical Instrument Technician role in the exception of the complainant Ms. Drevaleva**

6. Documentation on any counseling provided concerning leave usage. - As of today, November 20, 2017, I have not issued any "counseling" to the complainant or other Medical Instrument Technicians concerning leave usage.

7. Complainants time and attendance on leave records… - I no longer have access to this information. I would suggest contacting Payroll or HR.


Carla Dunkelberger…"


Paragraph 67.

Please, pay attention to the following facts of Ms. Dunkelberger's November 20, 2017 at 10. 43 AM email (**ER Vol. 1, page 275**):

1) I was a Medical Instrument Technician with the highest grade GS7. All other Medical Instrument Technicians had lower grades GS6 and GS5. It means that I was unprofitable for Ms. Dunkelberger because she needed to pay me approximately 4 (four) thousand U.S. dollars per year more for my grade GS7. No doubt Ms. Dunkelberger wanted to fire me and to hire the Medical Instrument Technicians with lower grades.

2) Ms. Dunkelberger lied that, as of November 20, 2017, nobody had been hired to substitute my employment. In fact, on June 12, 2017 Ms. Dunkelberger hired Mr. David Williams to substitute my employment. Please, see Doc. No. 202, October 28, 2019, Supplemental Brief "Direct Evidence of Discrimination"

3) Ms. Dunkelberger continued to put dirt on me and to accuse me in being absent without leave

Case Management Statement, Parts 1 and 2; case No. 3:18-cv-03748-JCS

4) Despite Ms. Dunkelberger kept accusing me in being absent without leave. She acknowledged that there was no counseling to me regarding leave usage.

Paragraph 68.

On November 20, 2017 at 11.13 AM, Ms. Dunkelberger sent another email to Ms. Amy Shafer, Mr. Donald Rincon, Mr. Andrew Salazar-Ruiz, and Ms. Allean Bonin (**ER Vol. 1, page 274**),

"I would like to add the following to #6.

- On April 18, 2017 Ms. Drevaleva signed for, was given a copy of, and verbalized understanding of MCM 05-11 Title 5 Duty and Leave Policy, MCM 05-8 Tours of Duty, MCM 05-48 Employee Courtesy and Conduct, and a memo for established phone numbers and unplanned leave

- Ms. Drevaleva was sent a Leave Request Clarification Memo on June 12, 2017 letting her know her request for leave without pay was disapproved and that she needed to contact her supervisor to appropriately request leave.

Carla Dunkelberger…"

Paragraph 69.

Please, pay attention to the following facts of Ms. Dunkelberger's November 20, 2017 at 11.13 AM letter:

1) Ms. Dunkelberger didn't mention a wide variety of paid leave options for pregnancy

2) Ms. Dunkelberger mentioned that the June 12, 2017 letter had been sent to me but she failed to clarify that this letter was mailed to my home postal address in Albuquerque, NM where I had no opportunity to receive it and to respond. Ms. Dunkelberger failed to mention that this letter was never emailed to me.

Case Management Statement, Parts 1 and 2; case No. 3:18-cv-03748-JCS

1      Paragraph 70.

2      The Office of Resolution Management had 180 days to finish the investigation of this

3 Complaint (**ER Vol. 1, page 165**.) The Office of Resolution Management's deadline to finish the

4 investigation of my EEO Complaint was March 18, 2018. Investigator Mr. Dennis Hayo was

5 assigned to investigate my EEO claim. On March 02, 2018, Mr. Hayo asked me to extend the

6 deadline for investigating my EEO claim for 30 days (**ER Vol. 1, page 160**),

7      "RE: Tatyana Drevaleva

8      EEO Claim #103883

9      Good Afternoon Ms. Drevaleva,

10      It was good to speak to today. As you know I am the EEO Investigator assigned to

11 investigate your claim of workplace discrimination. The case was assigned to me February 28

12 and is due March 18, 2018. Mr. Phil Johnson is on leave until March 12. I am requesting a 30

13 day extension to complete the investigation. I have attached an Extension Request for you to

14 consider. Please feel free to call me if you have any questions.

15      Regards,

16      Denis Hayo."

17

18      Paragraph 71.

19      Please, notice that on March 02, 2018 Investigator Mr. Hayo asked me for a 30 (thirty)

20 day extension (**ER Vol. 1, page 160**) but on February 28, 2018 the Lead EEO Administrative

21 Assistant Ms. Rena M. Wollmann emailed me a request for extension of time for 60 (sixty) days

22 to investigate my EEO claim (**ER Vol. 1, pages 161-162**.) Ms. Wollman assured me that (**ER**

23 **Vol. 1, page 161**), "ORM strives to complete every investigation in an efficient and effective

24 manner. Unfortunately, we have been unable to assign your client's case for investigation until

25 now. We plan on completing the investigation as efficiently and effectively as possible. Would

26 you consider providing Mr. Hayo with an extension to complete the investigation into the

27 complaint of discrimination? I have attached the extension request form to this email, you can fill

28

Case Management Statement, Parts 1 and 2; case No. 3:18-cv-03748-JCS

that out or simply respond to this email, if you are agreeable to an extension in your client's case. Thank you for your consideration."

On March 05, 2018, I granted the ORM's request for extension of time for 60 (sixty) days to investigate my EEO claim (**ER Vol. 1, page 159**.) I wrote, "I am giving you sixty days per your request. Please, try to finish the investigation as soon as you can."

Paragraph 72.

Afterwards, on March 13, 2018 Assistant Manager of the Raymond G. Murphy VAMC Mr. Phil Johnson issued his response to the ORM's EEO Interrogatories. Please, notice that, pursuant to the November 16, 2017 letter of the EEO (**ER Vol. 1, page 166**) that directed the Raymond G. Murphy VAMC to respond to the Interrogatories **within 15 days**, the deadline for the Raymond G. Murphy VAMC to respond to the Interrogatories was December 01, 2017. Please, notice that Mr. Johnson issued his response to the EEO Interrogatories on March 13, 2018 which was **in 3.5 months outside the deadline**.

Paragraph 73.

Please, read the March 13, 2018 EEO statement of Mr. Johnson (**ER Vol. 1, pages 213-222),**

**"The accepted claim(s) under investigation are:**

**A. Whether Complainant was discriminated against based on age, sex (female) and disability, when from May 18, 2017, complainant was terminated during her probationary period.**

**B. Whether complainant was discriminated against based on age, sex (female) and disability, when on June 30, 2017, complainant was terminated during her probationary period.**

I, **Phil Johnson**, solemnly swear/affirm that the responses and documents I provide in response to the following questions are true and complete to the best of my knowledge and belief. Please write your full legal name. Phillip Leroy Johnson

**Please answer the following questions:**

1. Please identify the VA facility where you are employed.

   *Raymond G. Murphy Medical Center*

2. For what period of time have you been employed there? *Since June 2003*

3. What unit or section of the facility do you work in? *5D Telemetry*

4. Please identify your position and grade at the facility where you are employed.

   *Assistant Nurse Manager; Nurse 2*

5. Please identify your first line supervisor during that period. *Carla Dunkelberger*

6. Please identify your second line supervisor during that period. *Allean Bonin*

7. Please describe your working relationship with the complainant, Tatyana Drevaleva, during that period. *I was an Assistant Nurse Manager*

8. Where did the complainant fall in your chain of command? *N/A*

   a. If the complainant was in your chain of command how long was she there? *N/A*

9. What is the complainant's position and grade? The complainant's position was Medical Instrument Technician. *Grade was GS7*

10. Was the complainant a probationary employee? *Yes*

   If yes, please explain the dates of her probationary employment and what probationary employment means.

   *Probation period started at time of expected appointment on April 2, 2017. The first year of employment is subject to a probationary period. The probationary period is a period of time in which supervisors are required to study an employ[yee's] potential closely to determine whether s/he is suited for successful government work.*

11. What unit or section is the complainant assigned to? 5D Telemetry, Nursing service

12. What was your working relationship with the complainant? *The complaintaint was orienting to the position and I was a supervisor and helped with orientation to the Telemetry monitors.*

13. What is your sex? *Male*

14. When did you first become aware of the complainant's sex?

Case Management Statement, Parts 1 and 2; case No. 3:18-cv-03748-JCS

*I am not aware of the complaintants sex. Ther complaintant referred to self as female.*

15. How did you become aware of the complainant's sex?

*I am not aware of the complaintants sex. Ther complaintant referred to self as female.*

16. What is your month and year of birth? *April 1956*

17. When did you first become aware of the complainant's age? *May 17, 2017*

18. How did you become aware of the complainant's age?

*Complainant stated age during our discussion about leaving for Russia.*

19. Do you have a disability? *Yes*

   a.  If yes, would you like to share your disability for the record? *Hearing Impaired*

20. Are you aware of the complainant's disability he describes as being infertile to the point of needing In Vitro Fertilization?

*The complainant did not state that s/he had a disability or that s/he was infertile.*

   a.  If yes, please describe your knowledge of **her disability of being infertile**? *N/A*

21. How and when did you become aware of the complainant's disability? *N/A*

22. How long has the complainant had this disability? *N/A*

23. How long is it expected to continue? *N/A*

24. Please, describe which of complainant's normal life functions to your knowledge that was substantially limited because of her disability.

*The complainant did not state that s/he had a disability.*

25. Please describe in detail how the normal life functions identified above were substantially limited by the complainant's impairment/disability. *N/A*

26. Did the complainant use medication and/or assistive devices for his disability? If yes,

   a.  Identify and describe their purpose.

     *The complainant did not state that s/he had a disability.*

27. To your knowledge did the complainant's medication and/or assistive devices affected any of the complainant's normal life functions? If yes,

Case Management Statement, Parts 1 and 2; case No. 3:18-cv-03748-JCS

a.   Describe the normal life function. *N/A*

28. Describe the degree to which the function is affected. *N/A*

29. Was the complainant able to perform the essential duties of her position? *Complaintant did not complete orientation and, therefore, was unable to perform independently in the Medical Instrument Technician role.*

30. If not, please identify the duty or duties the complainant was unable to perform. *Because the complaintant did not complete orientation s/he was unable to perform independently in the Medical Instrument Technician role*.

31. Indicate how the disability impacted accomplishing these duties. *Complaintant did not state s/he had a disability*

32. Have you received training on EEO policy and procedure? *Yes*

33. If yes, when? *11/30/2015, 7/21/2016 and 1/9/2018*

**A. Whether Complainant was discriminated against based on age, sex (female) and disability, when from May 18, 2017, complainant was terminated during her probationary period.**

**B. Whether complainant was discriminated against based on age, sex (female) and disability, when on June 30, 2017, complainant was terminated during her probationary period.**

1.   Please identify the individual responsible for terminating the complainant?
   *Complaintant's conduct resulted in termination*.

2.   The complainant claims that in May 2017 she told Ms. Dunkelberger that she wanted to have children but was running out of time because she was 50 years old. She told Ms. Dunkelberger that she planned to go to Russia for an IVF attempt. Ms. Dunkelberger's face expressed she was very much unpleased and Ms. Dunkelberger told her that according to FMLA she would have to work for the VAMC for 12 months to be eligible for leave without pay. She told Ms. Dunkelberger that she could not wait for 12 months because it was her turn for a free IVF attempt in Russia. Ms.

Case Management Statement, Parts 1 and 2; case No. 3:18-cv-03748-JCS

Dunkelberger requested a copy of her medical records confirming her intention to perform an IVF. She told Ms. Dunkelberger that she would request the medical documents from her Russian OB/GYN. Ms. Dunkelberger stated she needed the documents prior to her departure. On May 17, 2017 Ms. Dunkelberger was out of the office. She told Assistant Manager, Phil Johnson, the same thing she told Ms. Dunkelberger. She told him on May 17, 2017 she received the Russian medical documents which were written in Russian. She only had 3 hormonal pills left and she would start bleeding if she did not go to Russia. There was no time to translate the medical documents. Mr. Johnson told her that if she needed to go she should go. She told Mr. Johnson that she would provide him with a translated document as soon as she got to Russia and Mr. Johnson agreed. She told Mr. Johnson that a Russian co-worker could translate the document until she could get an official translation. She filled out a Request for Leave Without Pay form for the period from May 18, 2017 through July 7, 2017 and slipped in under Ms. Dunkelberger's door, since she was not in the office. On May 30, 2017, she emailed, from Russia, her Russian OB/GYN medical documentation of her need for IVF in the English language. She received no response. When she left she did not know if her Request for Leave Without Pay would be approved or denied by Ms. Dunkelberger. On July 3, 2017 she received a termination letter. This was the first time she found her Leave Without Pay Request had been denied. Ms. Dunkelberger mailed the termination letter to her home in NM instead of emailing it to her in Russia. The justification provided in the termination letter was that she was on probationary period and attendance issues. What was your role and the circumstances surrounding this event?

*The complainant came into the office, after business hours, on May 17, 2017 stating s/he had one pill left and was flying to Russia the next day to have Invitro Fertilization done. The complainant also stated his/her age to be 50 and that s/he had always wanted to have children and "this may be my last chance". I handed the complainant the OPM71 paper work and stated that this must be filled out and*

Case Management Statement, Parts 1 and 2; case No. 3:18-cv-03748-JCS

*supporting documentation in English from the doctor must also be supplied. At this time I stated to the complainant that I could not approve Leave Without Pay but I would turn in the documentation **and if this was that important then s/he should go.***

3.  What was your justification for your actions when the complainant when these events occurred and the complainant was terminated? *Do not understand the question*

4.  Did you discuss this with the complainant? *Cannot answer the question*

    1. If yes, when? *N/A*

    2. What was discussed? *N/A*

    3. What was the outcome of the discussion? *N/A*

    4. Did you discuss this with Ms. Dunkelberger? *N/A*

    5. If yes, when was it discussed? *N/A*

    6. What was discussed? *N/A*

    7. Did you consult with H.R. or any other management officials regarding the termination? *No*

    8. If so, who did you discuss it with? *N/A*

    9. When was is discussed? *N/A*

    10. What was discussed? *N/A*

    11. What policy or regulation supports terminating the complainant in these circumstances? (Please provide that policy to the investigator for the record). *MCM 05-11 Title 5 Leave Policy, MCM 05-8 tours of Duty, MCM 05-48 Employee Courtesy and Conduct, Master Agreement berween the Department of Veterans Affairs and the American Federation of Government Employees  (2011) Article 35 Section 10, Leave Without Pay (LWOP).*

    12. The complainant claims that, Melonie, an ICU Registered Nurse was a Similarly Situated Employee that was treated more favorably that she was when her Leave Without Pay was denied. Melanie was not terminated when she attended nursing school and was allowed to work 1 time per month observing cardiac monitors. When Melanie was absent from work she was not terminated even though she couldn't have

Case Management Statement, Parts 1 and 2; case No. 3:18-cv-03748-JCS

worked full time. For this reason she was discriminated against because of her disability. *I have no Knowledge of a "Melonie"*

13. What is Melonie's last name? *N/A*

14. What was Melonie's position and grade? *N/A*

15. Where did Melonie fall in your chain of command? *N/A*

16. What is Melonie's sex? *N/A*

17. What is Melonie's age? *N/A*

18. Does Melonie have a disability? *N/A*

19. Do you believe Melonie is a Similarly Situated Employee? *N/A*

20. What was your justification for not terminating Melonie under the above circumstances? *N/A*

21. The complainant claims that two young males were hired to replace her position because they would not have pregnancy issues. How do you respond? *The position was open to either Female or Male and the qualified applicants were hired.*

22. Was the complainant's disability of **being infertile** a factor when this occurred? *The complaintant did not state s/he had a disability*

23. Was the complainant's **age** a factor when this occurred? *No*

   a. If yes, please explain how? *N/A*

24. Was the complainant's **sex** a factor when this occurred? *I am not aware of the complaintant's sex*

   b. If yes, please explain how? *N/A*

25. Was the complainant's **disability** a factor when this occurred? *The complaintant did not state s/he had a disability*

   c. If yes, please explain how? *N/A*

26. Did you discriminate against the complainant because of her age, race or disability when this occurred? *No*

27. Did the complainant tell you that he felt that she was being discriminated when this occurred? *Do not understand the question*

Case Management Statement, Parts 1 and 2; case No. 3:18-cv-03748-JCS

28. If yes, when? *N/A*

29. What was discussed and what was the outcome of the discussion? *N/A*

30. Do you have anything to offer the complainant in resolution of this claim? *No*

31. Is there anything else pertinent to these specific events that we have not discussed? *No*

**PLEASE NOTE THAT ORM RESERVES THE RIGHT TO SUPPLEMENT OR ASK ADDITIONAL QUESTIONS AS THE INVESTIGATION REQUIRES.**

**The above information has been furnished without a pledge of confidence and I understand that it may be shown to any interested party[ies] with a need to know for this complaint. This includes but is not limited to VA, EEOC, contracting officials with a need to know during the course and scope of the informal and formal EEO process including administrative procedures and litigation as applicable and mandated by law.**

This statement is made under penalty of perjury on this _13_day of _March, 2018.

<u>Phil Johnson RN, 5DT ANM</u>

Phil Johnson."

<u>Paragraph 74.</u>

On March 08, 2018, Ms. Carla Dunkelberger issued her Response to the ORM's EEO Interrogatories. Please, notice that this response was **in over 3 months** after the December 01, 2017 deadline to answer the Interrogatories. Now, please, read the March 08, 2018 response of Ms. Carla Dunkelberger to the ORM's EEO Interrogatories (**ER Vol. 1, pages 223-232**),

""**The accepted claim(s) under investigation are:**

**A. Whether Complainant was discriminated against based on age, sex (female) and disability, when from May 18, 2017, complainant was terminated during her probationary period.**

Case Management Statement, Parts 1 and 2; case No. 3:18-cv-03748-JCS

**B. Whether complainant was discriminated against based on age, sex (female) and disability, when on June 30, 2017, complainant was terminated during her probationary period.**

I, **Carla Dunkelberger**, solemnly swear/affirm that the responses and documents I provide in response to the following questions are true and complete to the best of my knowledge and belief.

Please write your full legal name. *Carla Jahns Dunkelberger*

**Please answer the following questions:**

1. Please identify the VA facility where you are employed.

   *Raymond G. Murphy Medical Center*

2. For what period of time have you been employed there? *Since October 2012*

3. What unit or section of the facility do you work in? *5D Telemetry, Nursing Service*

4. Please identify your position and grade at the facility where you are employed. *5D Telemetry Nurse Manager; Nurse 3*

5. Please identify your first line supervisor during that period. *Allean Bonin*

6. Please identify your second line supervisor during that period. *Dr. Tina Prince*

7. Please describe your working relationship with the complainant, Tatyana Drevaleva, during that period. *I was the complainants direct supervisor*

8. .Where did the complainant fall in your chain of command? *N/A*

   a. If the complainant was in your chain of command how long was she there? *N/A*

9. What is the complainant's position and grade? The complainants complainants position and grade was: *Medical Instrument Technician;GS7*

10. Was the complainant a probationary employee? *Yes*

    a. If yes, please explain the dates of her probationary employment and what probationary employment means.

    *Probation period started at time of excepted appointment on April 2, 2017. The first year of employment is subject to a probationary period. The probationary*

Case Management Statement, Parts 1 and 2; case No. 3:18-cv-03748-JCS

*period is a period of time in which supervisors are required to study an employee's potential closely to determine whether s/he is suited for successful government work.*

11. What unit or section is the complainant assigned to? *5D Telemetry, Nursing service*

12. What was your working relationship with the complainant? *I was the complainants direct supervisor.*

13. What is your sex? *Female*

14. When did you first become aware of the complainant's sex?

   *I am not aware of the complainants sex. The complainant referred to self as a female.*

15. How did you become aware of the complainant's sex?

   *I am not aware of the complainants sex. The complainant referred to self as a female.*

16. What is your month and year of birth? *May 1973*

17. When did you first become aware of the complainant's age? *I am not aware of the complainants age.*

18. How did you become aware of the complainant's age? *I am not aware of the complainants age.*

19. Do you have a disability? *no*

   b. If yes, would you like to share your disability for the record? *N/A*

20. Are you aware of the complainant's disability he describes as being **infertile to the point of needing In Vitro Fertilization**?

   *The complainant did not state that s/he had a disability or that s/he was infertile. On May 15, 2017 the complainant stated that since Russia offers a free one time invitro fertilization and that the complainant wanted to try this.*

   a. If yes, please describe your knowledge of **her disability of being infertile**? *N/A*

21. How and when did you become aware of the complainant's disability? *N/A*

22. How long has the complainant had this disability? *N/A*

23. How long is it expected to continue? *N/A*

Case Management Statement, Parts 1 and 2; case No. 3:18-cv-03748-JCS

24. Please, describe which of complainant's normal life functions to your knowledge that was substantially limited because of her disability.

    *The complainant did not state that s/he had a disability.*

25. Please describe in detail how the normal life functions identified above were substantially limited by the complainant's impairment/disability. *N/A*

26. Did the complainant use medication and/or assistive devices for his disability? If yes,

    a.  Identify and describe their purpose.

        *The complainant did not state that s/he had a disability.*

27. To your knowledge did the complainant's medication and/or assistive devices affected any of the complainant's normal life functions? If yes,

    a.  Describe the normal life function. *N/A*

28. Describe the degree to which the function is affected. *N/A*

29. Was the complainant able to perform the essential duties of her position? *Complainant did not complete orientation*

30. If not, please identify the duty or duties the complainant was unable to perform. *The complainant was unable to perform independently in the Medical Instrument Technician role due to not completing orientation.*

31. Indicate how the disability impacted accomplishing these duties. *The complainant did not state that s/he had a disability.*

32. Have you received training on EEO policy and procedure? *Yes*

33. If yes, when? *11/24/2016 and 7/30/2015 (see supporting documentation).*


   **A. Whether Complainant was discriminated against based on age, sex (female) and disability, when from May 18, 2017, complainant was terminated during her probationary period.**

   **B. Whether complainant was discriminated against based on age, sex (female) and disability, when on June 30, 2017, complainant was terminated during her probationary period.**

Case Management Statement, Parts 1 and 2; case No. 3:18-cv-03748-JCS

1. Please identify the individual responsible for terminating the complainant? *The complainant's conduct resulted in termination.*

2. The complainant claims that in May 2017 she told Ms. Dunkelberger that she wanted to have children but was running out of time because she was 50 years old. She told Ms. Dunkelberger that she planned to go to Russia for an IVF attempt. Ms. Dunkelberger's face expressed she was very much unpleased and Ms. Dunkelberger told her that according to FMLA she would have to work for the VAMC for 12 months to be eligible for leave without pay. She told Ms. Dunkelberger that she could not wait for 12 months because it was her turn for a free IVF attempt in Russia. Ms. Dunkelberger requested a copy of her medical records confirming her intention to perform an IVF. She told Ms. Dunkelberger that she would request the medical documents from her Russian OB/GYN. Ms. Dunkelberger stated she needed the documents prior to her departure. On May 17, 2017 Ms. Dunkelberger was out of the office. She told Assistant Manager, Phil Johnson, the same thing she told Ms. Dunkelberger. She told him on May 17, 2017 she received the Russian medical documents which were written in Russian. She only had 3 hormonal pills left and she would start bleeding if she did not go to Russia. There was no time to translate the medical documents. <u>Mr. Johnson told her that if she needed to go she should go.</u> She told Mr. Johnson that she would provide him with a translated document as soon as she got to Russia and Mr. Johnson agreed. She told Mr. Johnson that a Russian co-worker could translate the document until she could get an official translation. She filled out a Request for Leave Without Pay form for the period from May 18, 2017 through July 7, 2017 and slipped in under Ms. Dunkelberger's door, since she was not in the office. On May 30, 2017, she emailed, from Russia, her Russian OB/GYN medical documentation of her need for IVF in the English language. She received no response. When she left she did not know if her Request for Leave Without Pay would be approved or denied by Ms. Dunkelberger. On July 3, 2017 she received a termination letter. This was the first time she found her Leave Without Pay Request

Case Management Statement, Parts 1 and 2; case No. 3:18-cv-03748-JCS

had been denied. Ms. Dunkelberger mailed the termination letter to her home in NM instead of emailing it to her in Russia. The justification provided in the termination letter was that she was on probationary period and attendance issues. What was your role and the circumstances surrounding this event?

*On May 15, 2017, the complainant told me that since Russia offered free one time invitro fertilization that s/he wanted to try this and that s/he would need to leave to go to Russia soon and that s/he would let me know on May 16,2017 when s/he needed to leave. I reminded the complainant that s/he did not qualify for FMLA due to less than 1 year of service, would need to complete an OPM71, provide supporting medical documentation in English, and that it had to be submitted for approval to the ADPCS for approval prior to leaving for Russia; that I could not approve the request. The complainant verbalized understanding.*

*On June 12, 2017 the complainant was mailed a memo with notification that the complainants request for Leave Without Pay (LWOP) from May 18, 2017 through July 7, 2017 was denied. The memo was mailed to the complainants home of record as required by Human Resources.*

*The complainants termination letter was mailed to the complainants home of record as required by HR. In addition, a copy of the termination letter was e-mailed to the complainant on July 3, 2017 as a courtesy.*

3. What was your justification for your actions when the complainant when these events occurred and the complainant was terminated? *Do not understand the question*

4. Did you discuss this with the complainant? *Unable to answer based on not understanding previous question.*


[Number 4.] If yes, when? *N/A*

5. What was discussed? *N/A*

6. What was the outcome of the discussion? *N/A*

7. Did you discuss this with Mr. Johnson? *N/A*

Case Management Statement, Parts 1 and 2; case No. 3:18-cv-03748-JCS

8. If yes, when was it discussed? *N/A*

9. What was discussed? *N/A*

10. Did you consult with H.R. or any other management officials regarding the termination? *Yes*

11. If so, who did you discuss it with? *Rhonda Anderson*

12. When was is discussed? *June 9, 2017*

13. What was discussed?

*We discussed that the complainants request for LWOP from May 18, 2017 through July 7, 2017 was denied, that the complainant had been in AWOL status since May 21, 2017, and that a Leave Request Clarification Memo notifying the complaint of this should be mailed to the complainants home of record; per Human Resource rules and regulations.*

14. What policy or regulation supports terminating the complainant in these circumstances? (Please provide that policy to the investigator for the record). *MCM 05-11 Title 5 Leave Policy, MCM 05-8 Tours of Duty, MCM 05-48 Employee Courtesy and Conduct, Master Agreement between the Department of Veterans Affairs and the American Federation of Government Employees (2011), Article 35 Section 10, Leave Without Pay (LWOP), and memo for established phone numbers and unplanned leave.*

15. The complainant claims that, Melonie, an ICU Registered Nurse was a Similarly Situated Employee that was treated more favorably that she was when her Leave Without Pay was denied. Melanie was not terminated when she attended nursing school and was allowed to work 1 time per month observing cardiac monitors. When Melanie was absent from work she was not terminated even though she couldn't have worked full time. For this reason she was discriminated against because of her disability. *I have no knowledge of a "Melonie"*

16. What is Melonie's last name? *I have no knowledge of a "Melonie"*

17. What was Melonie's position and grade? *N/A*

Case Management Statement, Parts 1 and 2; case No. 3:18-cv-03748-JCS

18. Where did Melonie fall in your chain of command? *N/A*

19. What is Melonie's sex? *N/A*

20. What is Melonie's age? *N/A*

21. Does Melonie have a disability? *N/A*

22. Do you believe Melonie is a Similarly Situated Employee? *N/A*

23. What was your justification for not terminating Melonie under the above circumstances? *N/A*

24. The complainant claims that two <u>young males</u> were hired to replace her position because they would not have pregnancy issues. How do you respond? *Two vacancies for the Medical Instrument Technician position have been filled since the complainants termination. One vacancy was filled by a male and the other by a female.*

25. Was the complainant's disability of **being infertile** a factor when this occurred? *The complainant did not state s/he had a disability*

26. Was the complainant's **age** a factor when this occurred? *I am not aware of the complainants age.*

    a.   If yes, please explain how?

27. Was the complainant's **sex** a factor when this occurred? *I am not aware of the complainants sex. The complainant referred to self as a female.*

    b.   If yes, please explain how?

28.  Was the complainant's **disability** a factor when this occurred? *The complainant did not state s/he had a disability*

    c.   If yes, please explain how?

29.  Did you discriminate against the complainant because of her age, race or disability when this occurred? *No*

30. Did the complainant tell you that he felt that she was being discriminated when this occurred? *Do not understand the question; specifically what "this" is referring to.*

31. If yes, when? *N/A*

Case Management Statement, Parts 1 and 2; case No. 3:18-cv-03748-JCS

32. What was discussed and what was the outcome of the discussion? *N/A*

33.  Do you have anything to offer the complainant in resolution of this claim?

*The complainant was terminated during probationary status as a result of not following proper leave policies and procedures.*

34. Is there anything else pertinent to these specific events that we have not discussed?

*The complainant's AWOL status negatively impacted patient care and delayed completion of the complainants orientation. Staff morale is negatively affected as a result of a coworker not showing up for scheduled tours.*

*The complainant signed, was given a copy of, and verbalized understanding of MCM 05-11 Title 5 Duty and Leave Policy, MCM 05-8 Tours of Duty, and MCM 05-48 Employee Courtesy and Conduct, and a memo for established phone numbers and unplanned leave on April 18, 2017 (see supporting documentation).*

*The complainant was notified on multiple occasions the process to appropriately request leave for an extended period of time and that the unit level management team did not have the approval to grant such leave.*


**PLEASE NOTE THAT ORM RESERVES THE RIGHT TO SUPPLEMENT OR ASK ADDITIONAL QUESTIONS AS THE INVESTIGATION REQUIRES.**

**The above information has been furnished without a pledge of confidence and I understand that it may be shown to any interested party[ies] with a need to know for this complaint. This includes but is not limited to VA, EEOC, contracting officials with a need to know during the course and scope of the informal and formal EEO process including administrative procedures and litigation as applicable and mandated by law.**

This statement is made under penalty of perjury on this _8TH___day of _March_____, 2018.

 _Carla Dunkelberger, RN MSN MBA_____

Carla Dunkelberger."

Case Management Statement, Parts 1 and 2; case No. 3:18-cv-03748-JCS

Paragraph 75.

Please, notice that Ms. Dunkelberger and Mr. Johnson provided **the identical answers** on the EEO Interrogatories. Please, see the table below. Please, notice that Mr. Johnson literally copies and pasted Ms. Dunkelberger's answers with the minor variations.

| Row No. | Questions | Carla Dunkelberger March 08, 2018 | Phil Johnson March 13, 2018 |
|---|---|---|---|
| 1 | 14. When did you first become aware of the complainant's sex? | I am not aware of the complainants sex. The complainant referred to self as a female. | I am not aware of the complaintants sex. Ther complaintant referred to self as female. |
| 2 | 15. How did you become aware of the complainant's sex? | I am not aware of the complainants sex. The complainant referred to self as a female. | I am not aware of the complaintants sex. Ther complaintant referred to self as female. |
| 3 | 17. When did you first become aware of the complainant's age? | I am not aware of the complainants age. | May 17, 2017 |
| 4 | 18. How did you become aware of the complainant's age? | I am not aware of the complainants age. | Complaintant stated age during our discussion about leaving for Russia. |
| 5 | 20. Are you aware of the complainant's disability he describes as being infertile to the point of needing In Vitro Fertilization? | The complainant did not state that s/he had a disability or that s/he was infertile. On May 15, 2017 the complainant stated that since Russia offers a | The complaintant did not state that s/he had a disability or that s/he was infertile. |

Case Management Statement, Parts 1 and 2; case No. 3:18-cv-03748-JCS

| | | | |
|---|---|---|---|
| | | free one time invitro fertilization and that the complainant wanted to try this. | |
| 6 | a. If yes, please describe your knowledge of her disability of being infertile? | N/A | N/A |
| 7 | 21. How and when did you become aware of the complainant's disability? | The complainant did not state that s/he had a disability. | N/A |
| 8 | 22. How long has the complainant had this disability? | N/A | N/A |
| 9 | 23. How long is it expected to continue? | N/A | N/A |
| 10 | 24. Please describe which of complainant's normal life functions, to your knowledge that was substantially limited because of her disability. | The complainant did not state that s/he had a disability. | The complaintant did not state that s/he had a disability. |
| 11 | 25. Please describe in detail how the normal life functions identified above | N/A | N/A |

Case Management Statement, Parts 1 and 2; case No. 3:18-cv-03748-JCS

| | | | |
|---|---|---|---|
| | were substantially limited by the complainant's impairment/disability. | | |
| 26. Did the complainant use medication and/or assistive devices for his disability? If yes,<br><br>a. Identify and describe their purpose. | The complainant did not state that s/he had a disability. | The complaintant did not state that s/he had a disability. |
| 27. To your knowledge did the complainant's medication and/or assistive devices affect any of the complainant's normal life functions? If yes,<br>a. Describe the normal life function. | N/A | N/A |
| 28. Describe the degree to which the function is affected. | N/A | N/A |
| 29. Was the complainant able to perform the essential duties of her position? | Complainant did not complete orientation. | Complaintant did not complete orientation and, therefore, was unable to perform independently in the Medical Instrument Technician role. |
| 30. If not, please identify the duty or duties the | The complainant was unable to perform | Because the complaintant did not complete orientation |

Case Management Statement, Parts 1 and 2; case No. 3:18-cv-03748-JCS

| | | | |
|---|---|---|---|
| | complainant was unable to perform. | independently in the Medical Instrument Technician role due to not completing orientation. | s/he was unable to perform independently in the Medical Instrument Technician role. |
| 17 | 31. Indicate how the disability impacted accomplishing these duties. | The complainant did not state that s/he had a disability. | Complainant did not state s/he had a disability |
| 18 | 32. Have you received training on EEO policy and procedure? | Yes | Yes |
| 19 | 33. If yes, when? | 11/24/2016 and 7/30/2015 (see supporting documentation). | 11/30/2015, 7/21/2016 and 1/9/2018 |
| 20 | **B. Whether complainant was discriminated against based on age, sex (female) and disability, when on June 30, 2017, complainant was terminated during her probationary period.** | | |
| 21 | 1. Please identify the individual responsible for terminating the complainant? | The complainants conduct resulted in termination. | Complainants' conduct resulted in termination. |
| 22 | 2. The complainant claims that in May 2017 she told Ms. Dunkelberger that she wanted to have children but was running out of time because she was 50 years old. She told Ms. Dunkelberger that she planned to go to Russia for | On May 15, 2017, the complainant told me that since Russia offered free one time invitro fertilization that s/he wanted to try this and that s/he would need to leave to go to Russia soon and that s/he would | The complainant came into the office, after business hours, on May 17, 2017 stating s/he had one pill left and was flying to Russia the next day to have Invitro Fertilization done. The complainant also stated his/her age to |

Case Management Statement, Parts 1 and 2; case No. 3:18-cv-03748-JCS

an IVF attempt. Ms. Dunkelberger's face expressed she was very much unpleased and Ms. Dunkelberger told her that according to FMLA she would have to work for the VAMC for 12 months to be eligible for leave without pay. She told Ms. Dunkelberger that she could not wait for 12 months because it was her turn for a free IVF attempt in Russia. Ms. Dunkelberger requested a copy of her medical records confirming her intention to perform an IVF. She told Ms. Dunkelberger that she would request the medical documents from her Russian OB/GYN. Ms. Dunkelberger stated she needed the documents prior to her departure. On May 17, 2017 Ms. Dunkelberger was out of the office. She told Assistant Manager, Phil Johnson, the same thing she told Ms.

let me know on May 16, 2017 when s/he needed to leave. I reminded the complainant that s/he did not qualify for FMLA due to less than 1 year of service, would need to complete an OPM71, provide supporting medical documentation in English, and that it had to be submitted for approval to the ADPCS for approval prior to leaving for Russia; that I could not approve the request. The complainant verbalized understanding. On June 12, 2017 the complainant was mailed a memo with notification that the complainants request for Leave Without Pay (LWOP) from May 18, 2017 through July 7, 2017 was denied. The memo was mailed to the complainants home of record as required by Human Resources. The

be 50 and that s/he had always wanted to have children and "this may be my last chance". I handed the complainant the OPM71 paper work and stated that this must be filled out and supporting documentation in English from the doctor must also be supplied. At this time I stated to the complainant that I could not approve Leave Without Pay but I would turn in the documentation and if this was that important then s/he should go.

Case Management Statement, Parts 1 and 2; case No. 3:18-cv-03748-JCS

Dunkelberger. She told him on May 17, 2017 she received the Russian medical documents which were written in Russian. She only had 3 hormonal pills left and she would start bleeding if she did not go to Russia. There was no time to translate the medical documents. Mr. Johnson told her that if she needed to go she should go. She told Mr. Johnson that she would provide him with a translated document as soon as she got to Russia and Mr. Johnson agreed. She told Mr. Johnson that a Russian co-worker could translate the document until she could get an official translation. She filled out a Request for Leave Without Pay form for the period from May 18, 2017 through July 7, 2017 and slipped in under Ms. Dunkelberger's door, since she was not in the office. On May 30, 2017 she emailed, from Russia,

complainants termination letter was mailed to the complainants home of record as required by HR. In addition, a copy of the termination letter was e-mailed to the complainant on July 3, 2017 as a courtesy.

Case Management Statement, Parts 1 and 2; case No. 3:18-cv-03748-JCS

| | | | |
|---|---|---|---|
| | her Russian OB/GYN medical documentation of her need for IVF in the English language. She received no response. When she left she did not know if her Request for Leave Without Pay would be approved or denied by Ms. Dunkelberger. On July 3, 2017 she received a termination letter. This was the first time she found her Leave Without Pay Request had been denied. Ms. Dunkelberger mailed the termination letter to her home in NM instead of emailing it to her in Russia. The justification provided in the termination letter was that she was on probationary period and attendance issues. What was your role and the circumstances surrounding this event? | | |
| 23 | 3. What was your justification for your actions when the complainant when these | Do not understand the question. | Do not understand the question |

Case Management Statement, Parts 1 and 2; case No. 3:18-cv-03748-JCS

| | | | |
|---|---|---|---|
| | events occurred and the complainant was terminated? | | |
| 24 | 4. Did you discuss this with the complainant? | Unable to answer based on not understanding previous question. | Cannot answer the question |
| 25 | 4. If yes, when? | N/A | N/A |
| 26 | 5. What was discussed? | N/A | N/A |
| 27 | 6. What was the outcome of the discussion? | N/A | N/A |
| 28 | 7. Did you discuss this with Mr. Johnson? | N/A | |
| 29 | 4. Did you discuss this with Ms. Dunkelberger? | | N/A |
| 30 | 8. If yes, when was it discussed? | N/A | N/A |
| 31 | 9. What was discussed? | N/A | N/A |
| 32 | 10. Did you consult with H.R. or any other management officials regarding the termination? | yes | No |
| 33 | 11. If so, who did you discuss it with? | Rhonda Anderson | N/A |
| 34 | 12. When was is discussed? | June 9, 2017 | N/A |
| 35 | 13. What was discussed? | We discussed that the complainants request for LWOP from May 18, 2017 through July 7, 2017 | N/A |

Case Management Statement, Parts 1 and 2; case No. 3:18-cv-03748-JCS

| | | was denied, that the complainant had been in AWOL status since May 21, 2017, and that a Leave Request Clarification Memo notifying the complaint of this should be mailed to the complainants home of record; per Human Resource rules and regulations. | |
|---|---|---|---|
| 36 | 14. What policy or regulation supports terminating the complainant in these circumstances? (Please provide that policy to the investigator for the record). | MCM 05-11 Title 5 Leave Policy, MCM 05-8 Tours of Duty, MCM 05-48 Employee Courtesy and Conduct, Master Agreement between the Department of Veterans Affairs and the American Federation of Government Employees (2011), Article 35 Section 10, Leave Without Pay (LWOP), and memo for established phone numbers and unplanned leave. | MCM 05-11 Title 5 Leave Policy, MCM 05-8 tours of Duty, MCM 05-48 Employee Courtesy and Conduct, Master Agreement between the Department of Veterans Affairs and the American Federation of Government Employees (2011) Article 35 Section 10, Leave Without Pay (LWOP). |
| 37 | 15. The complainant claims that, Melonie, an ICU Registered Nurse was a Similarly Situated | I have no knowledge of a "Melonie." | I have no Knowledge of a "Melonie." |

Case Management Statement, Parts 1 and 2; case No. 3:18-cv-03748-JCS

| | | | |
|---|---|---|---|
| | Employee that was treated more favorably that she was when her Leave Without Pay was denied. Melanie was not terminated when she attended nursing school and was allowed to work 1 time per month observing cardiac monitors. When Melanie was absent from work she was not terminated even though she couldn't have worked full time. For this reason she was discriminated against because of her disability. | | |
| 38 | 16. What is Melonie's last name? | I have no knowledge of a "Melonie." | N/A |
| 39 | 17. What was Melonie's position and grade? | N/A | N/A |
| 40 | 18. Where did Melonie fall in your chain of command? | N/A | N/A |
| 41 | 19. What is Melonie's sex? | N/A | N/A |
| 42 | 20. What is Melonie's age? | N/A | N/A |
| 43 | 21. Does Melonie have a disability? | N/A | N/A |
| 44 | 22. Do you believe Melonie is a Similarly Situated | N/A | N/A |

Case Management Statement, Parts 1 and 2; case No. 3:18-cv-03748-JCS

| | | | |
|---|---|---|---|
| | Employee? | | |
| 45 | 23. What was your justification for not terminating Melonie under the above circumstances? | N/A | N/A |
| 46 | 24. The complainant claims that two <u>young males</u> were hired to replace her position because they would not have pregnancy issues. How do you respond? | Two vacancies for the Medical Instrument Technician position have been filled since the complainants termination. One vacancy was filled by a male and the other by a female. | The position was open to either Female or Male and the qualified applicants were hired. |
| 47 | 25. Was the complainant's disability of **being infertile a** factor when this occurred? | The complainant did not state that s/he had a disability. | The complaintant did not state s/he had a disability |
| 48 | 26 Was the complainant's **age** a factor when this occurred? | I am not aware of the complainants age. | No |
| 49 | a. If yes, please explain how? | No answer | N/A |
| 50 | 27 Was the complainant's **sex** a factor when this occurred? | I am not aware of the complainants sex. The complainant referred to self as a female. | I am not aware of the complaintant's sex. |
| 51 | b. If yes, please explain how? | No answer | N/A |
| 52 | 28 Was the complainant's **disability** a factor when this | The complainant did not state that s/he had a | The complaintant did not state s/he had a disability |

Case Management Statement, Parts 1 and 2; case No. 3:18-cv-03748-JCS

| | | disability. | |
|---|---|---|---|
| 53 | c. If yes, please explain how? | No answer | N/A |
| 54 | 29 Did you discriminate against the complainant because of her **age, race or disability** when this occurred? | No | No |
| 55 | 30 Did the complainant tell you that he felt that she was being discriminated when this occurred? | Do not understand the question; specifically what "this" is referring to. | Do not understand the question |
| 56 | 31 If yes, when? | N/A | N/A |
| 57 | 32 What was discussed and what was the outcome of the discussion? | N/A | N/A |
| 58 | 33 Do you have anything to offer the complainant in resolution of this claim? | The complainant was terminated during probationary status as a result of not following proper leave policies and procedures. | No |
| 59 | 34 Is there anything else pertinent to these specific events that we have not discussed? | The complainant's AWOL status negatively impacted patient care and delayed completion of the complainants orientation. Staff morale is negatively affected as a result of a coworker not showing up | No |

Case Management Statement, Parts 1 and 2; case No. 3:18-cv-03748-JCS

| | | for scheduled tours. The complainant signed, was given a copy of, and verbalized understanding of MCM 05-11 Title 5 Duty and Leave Policy, MCM 05-8 Tours of Duty, and MCM 05-48 Employee Courtesy and Conduct, and a memo for established phone numbers and unplanned leave on April 18, 2017 (see supporting documentation). The complainant was notified on multiple occasions the process to appropriately request leave for an extended period of time and that the unit level management team did not have the approval to grant such leave. | |

Paragraph 76.

Please, notice that both Dunkelberger and Johnson provided the following common answers:

1) They both stated that they were not aware about my sex (rows No. 1 and 2)

2) They both claimed that I hadn't stated that I had a disability (rows No. 5-14, 17, 47)

Case Management Statement, Parts 1 and 2; case No. 3:18-cv-03748-JCS

3) They both fraudulently avoided to answer the Investigator's question about whether I was able to perform the essential functions of the job. They both answered that I hadn't completed an orientation (rows No. 15-16.) But it was not the Investigator's question. The Investigator was specifically asking whether I was able to perform the essential functions of the job as a Medical Instrument Technician due to my disability. Both Dubkelberger and Johnson substituted the Investigator's question about the essential functions of the job by a completely different answer about the orientation.

4) Both Dunkelberger and Johnson received a formal EEO training (row No. 19.) Moreover, Dunkelberger was aware about the VAMC's paid leave policies such as the Voluntary Leave Transfer Program, see Dunkelberger's June 12, 2017 letter to me (**ER Vol. 1, page 290**)

5) They accused me in violating the VAMC's leave policies, they identified the same leave policies that I allegedly violated (MCM 05-11 Title 5 Leave Policy, MCM 05-8 Tours of Duty, MCM 05-48 Employee Courtesy and Conduct, Master Agreement between the Department of Veterans Affairs and the American Federation of Government Employees (2011), Article 35 Section 10, Leave Without Pay (LWOP), and memo for established phone numbers and unplanned leave) but they failed to specify **how exactly** I allegedly violated these leave policies (row No. 36)

6) They stated that my conduct had resulted in termination but they failed to specify what exactly conduct I exhibited that resulted in termination (row No. 21)

7) Dunkelberger pretended not to be aware about my age. However, during our April 18, 2017 conversation, I told her that I was 50 yo at that time (row No. 4)

8) Johnson was more honest and he stated that he had been aware about my age (row No. 4)

9) Dunkelberger lied under the oath that a male and a female had been hired to substitute my employment. However, Dunkelberger failed to identify the names of the male and the female (row No. 46)

Case Management Statement, Parts 1 and 2; case No. 3:18-cv-03748-JCS

10) Johnson avoided answering the question about whether two males had been hired to substitute my employment. Johnson stated that the qualified candidates had been hired (row No. 46)

11) Both Dubkelberger and Johnson answered that they didn't understand the investigator's question about how they justified the fact of the termination of my employment and whether they discussed it with me (rows No. 23-27, 55)

12) Both Dunnelberger and Johnson refused to give a direct answer about whether they spoke to each other prior to terminating my employment (rows No. 28-31)

13) Dunkelberger acknowledged that she had spoken to the HR official Mr. Rhonda Anderson about the termination of my employment (row No. 32-35)

14) Johnson acknowledged that I had an emergency need to go to Russia because I "had one [hormonal] pill left" (row No. 22)

15) Dunkelberger intentionally lied that, since Russia offers a one time free of charge in-vitro fertilization I "wanted to try this" (row No. 22)

16) Johnson confirmed that she had allowed me to go to Russia (row No. 22)

17) Dunkelberger mentioned about the June 12, 2017 letter but intentionally failed to disclose that this letter was mailed to my home postal address in Albuquerque, NM instead of being emailed to me to enable me to read it when I was in Russia (row No. 22)

18) Both Dunkelberger and Johnson denied their knowledge of a similarly situated employee "Melonie" (rows No. 37-45)

19) I believe that both Dunkelberger and Johnson intentionally and maliciously prevented the EEO Investigator to speak to similarly situated employees Nurses Melanie and Chelsea whom I identified in my EEO claim

20) Dunkelberger lied under the oath that my age had not been a factor for the termination of my employment (row No. 48-49)

21) Johnson denied the fact that my age was a factor for the termination of my employment (row No. 48-49)

Case Management Statement, Parts 1 and 2; case No. 3:18-cv-03748-JCS

22) Both Dunkelberger and Johnson denied the fact that my sex was a factor for firing me (row No. 50-51)

23) Both Dunkelberger and Johnson claimed that I hadn't stated that I had a disability, and therefore they claimed that my disability was not the factor for firing me (row No. 52-53)

24) Both Dunkelberger and Johnson pretended not to understand the Investigator's question about whether I told them that I had been discriminated (rows No. 55-57)

25) Dunkelberger actively accused me in being absent without leave (the AWOL) and for violating the VAMC's leave policies (rows No. 58-59.) Both Dunkelberger and Johnson refused to offer me anything.


Paragraph 77.

Please, see a direct evidence of discrimination against my disability that is Robinson's Opposition to my Motion for Preliminary Injunction (**ER Vol. 2, from page 454, line 26 to page 455, line 9**), "Here, Plaintiff has stated only "the agency failed to provide [her] with reasonable accommodations to go to Russia for an IVF attempt" and that she was terminated because of her disability. Dkt. 39 at 2, 4. These sparse, conclusory allegations do not even suffice to show that she has a disability within the meaning the Rehabilitation Act, let alone the other threshold elements. Even if she had shown the threshold elements, whether a particular accommodation— **in her case long-term and repeated leave and possibly benefits under the Family Medical Leave Act** so that she could "attempt to have a baby"—is reasonable "depends on the individual circumstances of each case" and "requires a fact-specific, individualized analysis of the disabled individual's circumstances and the accommodations that might allow him to meet the program's standards." *Wong*, 192 F.3d at 818. **Plaintiff has not, on the current record, shown that the accommodation would have been reasonable or possible**. Thus, the current record does not favor, much less clearly favor, Plaintiff on her disability discrimination claim."

Therefore, Robinson confirmed that the U.S. Department of Veterans Affairs had attempted to avoid giving me a "long term repeated leave." Also, Robinson maliciously denied the fact that I was disabled. Following Robinson's fraud, Mr. Alsup wrote in his July 11, 2019

Order, page 8, footnote *, "Insofar as plaintiff fails to plausibly allege that she was denied reasonable accommodation, this order need not and does not address whether plaintiff's infertility is a cognizable disability under the ADA." Also, in his July 11, 2019 Order, Mr. Alsup, a District Judge with 45 years of experience, stated that (page 7, lines 14-16), "Plaintiff thus appears to allege that defendants violated the Rehabilitation Act of 1973 when they failed to give plaintiff — a federal employee with an allegedly cognizable disability under the ADA — reasonable accommodation **in the form of sick leave**." In my post-July 11, 2019 Judgment filings, I demonstrated that the scope of the reasonable accommodations was not the Sick Leave. The scope of the reasonable accommodations was giving me flexible working time, giving me a time off to go to Russia, and providing me with Telework.

Paragraph 78.

On March 08, 2018 at 8.02 PM, Investigator Mr. Dennis Hayo sent an email to Ms. Dunkelberger with additional questions (**ER Vol. 1, pages 233-234.**) On March 12, 2018, Ms. Dunkelberger answered these questions (**ER Vol. 1, pages 233-234**),

"Good Evening Dr. Dunkelberger, I have a couple of more questions for you to clarify the claim. You may simply answer on this email. **Please remember you are still under oath**.

1. You testified that you told the complainant that she did not qualify for FMLA due to less than 1 year service and would need to complete an OPM71 and provide medical documentation in English and would need to be submitted to the Assistant Director of Patient Care Services prior to leaving for Russia. You told the complainant that you could not approve the request. The complainant verbalized that she understood. When was this? *April 18, 2017 and May 15, 2017*

2. When was the first date that the complainant was AWOL after this above conversation? *May 21, 2017*

3. Did the complainant ever tell you that she felt she was being discriminated against? *No*

4. If yes, when and what was discussed? *N/A*."

Case Management Statement, Parts 1 and 2; case No. 3:18-cv-03748-JCS

1    <u>Paragraph 79.</u>

2        Please, notice that Dunkelberger fraudulently placed me on the Absent Without Leave

3    status (the AWOL) starting May 21, 2017 without notifying me.

4

5        Please, see (**ER Vol. 1, page 297**),

6

7    ```
     DREVALEVA, TATYANA E              T&L 221  Telework Ind: None        
     ```
     

8
     ```
             Date      TW  Scheduled Tour         Tour Exceptions
     ------------------------------------------------------------------------
     Sun 14-May-17         07:30P-08:00A
     Mon 15-May-17         07:30P-08:00A
     Tue 16-May-17         07:30P-08:00A
     Wed 17-May-17         11:30P-08:00A
     Thu 18-May-17         Day Off
     Fri 19-May-17         Day Off
     Sat 20-May-17         Day Off
     Sun 21-May-17         07:30P-08:00A          07:30P-08:00A    WP LWOP
                                                  AWOL
             INAPPROPRIATE LEAVE REQUEST
     Mon 22-May-17         07:30P-08:00A          07:30P-08:00A    WP LWOP
                                                  AWOL
             INAPPROPRIATE LEAVE REQUEST
     Tue 23-May-17         07:30P-08:00A          07:30P-08:00A    WP LWOP
                                                  AWOL
             INAPPROPRIATE LEAVE REQUEST
     Wed 24-May-17         Day Off
     Thu 25-May-17         Day Off
     Fri 26-May-17         Day Off
     Sat 27-May-17         Day Off
     ```

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Case Management Statement, Parts 1 and 2; case No. 3:18-cv-03748-JCS

1

Please, see (**ER Vol. 1, page 298**),

2

```
OREVALEVA, TATYANA E          T&L 221  Telework Ind: None    ████████

     Date     TW  Scheduled Tour        Tour Exceptions
   --------------------------------------------------------------
un 28-May-17    11:30P-08:00A       11:30P-08:00A    WP LWOP
                                    AWOL
        INAPPROPRIATE LEAVE REQUEST
lon 29-May-17   Day Off
'ue 30-May-17   07:30A-04:00P       07:30A-04:00P    WP LWOP
                                    AWOL
        INAPPROPRIATE LEAVE REQUEST
Wed 31-May-17   07:30A-04:00P       07:30A-04:00P    WP LWOP
                                    AWOL
        INAPPROPRIATE LEAVE REQUEST
Thu  1-Jun-17   07:30P-08:00A       07:30P-08:00A    WP LWOP
                                    AWOL
        INAPPROPRIATE LEAVE REQUEST
Fri  2-Jun-17   Day Off
Sat  3-Jun-17   Day Off
Sun  4-Jun-17   07:30P-08:00A       07:30P-08:00A    WP LWOP
                                    AWOL
        INAPPROPRIATE LEAVE REQUEST
Mon  5-Jun-17   07:30P-08:00A       07:30P-08:00A    WP LWOP
                                    AWOL
        INAPPROPRIATE LEAVE REQUEST
Tue  6-Jun-17   07:30P-08:00A       07:30P-08:00A    WP LWOP
                                    AWOL
        INAPPROPRIATE LEAVE REQUEST
Wed  7-Jun-17   11:30P-08:00A       11:30P-08:00A    WP LWOP
                                    AWOL
        INAPPROPRIATE LEAVE REQUEST
Thu  8-Jun-17   Day Off
Fri  9-Jun-17   Day Off
Sat 10-Jun-17   Day Off
```

Case Management Statement, Parts 1 and 2; case No. 3:18-cv-03748-JCS

1

Please, see (**ER Vol. 1, page 299**),

2

3

```
DREVALEVA, TATYANA E              T&L 221  Telework Ind: None
```


4

```
     Date      TW  Scheduled Tour        Tour Exceptions
-------------------------------------------------------------------
```

5

```
un 11-Jun-17      Day Off
```

6

```
on 12-Jun-17      Day Off
ue 13-Jun-17      Day Off
```

7

```
ed 14-Jun-17      11:30P-08:00A          11:30P-08:00A      WP LWOP
                                         AWOL
```

8

```
            INAPPROPRIATE LEAVE REQUEST
hu 15-Jun-17      07:30P-08:00A          07:30P-08:00A      WP LWOP
                                         AWOL
```

9

10

```
            INAPPROPRIATE LEAVE REQUEST
ri 16-Jun-17      07:30P-08:00A          07:30P-08:00A      WP LWOP
                                         AWOL
```

11

```
            INAPPROPRIATE LEAVE REQUEST
Sat 17-Jun-17     11:30P-08:00A          11:30P-08:00A      WP LWOP
                                         AWOL
```

12

13

```
            INAPPROPRIATE LEAVE REQUEST
Sun 18-Jun-17     Day Off
Mon 19-Jun-17     07:30A-04:00P          07:30A-04:00P      WP LWOP
                                         AWOL
```

14

15

```
            INAPPROPRIATE LEAVE REQUEST
Tue 20-Jun-17     07:30A-04:00P          07:30A-04:00P      WP LWOP
                                         AWOL
```

16

17

```
            INAPPROPRIATE LEAVE REQUEST
Wed 21-Jun-17     07:30A-04:00P          07:30A-04:00P      WP LWOP
                                         AWOL
```

18

```
            INAPPROPRIATE LEAVE REQUEST
Thu 22-Jun-17     07:30A-04:00P          07:30A-04:00P      WP LWOP
                                         AWOL
```

19

20

```
            INAPPROPRIATE LEAVE REQUEST
Fri 23-Jun-17     07:30A-04:00P          07:30A-04:00P      WP LWOP
                                         AWOL
```

21

```
            INAPPROPRIATE LEAVE REQUEST
Sat 24-Jun-17     Day Off
```

22

23

24

25

Paragraph 80.

26

Please, also notice that the Raymond G. Murphy VAMC provided Investigator Mr.

27

Dennis Hayo with four non-readable documents from the Human Resources. Please, notice that

28

Case Management Statement, Parts 1 and 2; case No. 3:18-cv-03748-JCS

Investigator Mr. Hayo failed to request the readable versions of these documents, and Hayo included the non-readable versions into the Investigative File.

Document No. 1 (**ER Vol. 1, page 295**),

Case Management Statement, Parts 1 and 2; case No. 3:18-cv-03748-JCS

Document No. 2 (**ER Vol. 1, page 296**),

Standard Form 52                                                    Page 1 of 2



Document No. 3 (**ER Vol. 1, page 277**)

Standard Form 52                                                    Page 1 of 2

Case Management Statement, Parts 1 and 2; case No. 3:18-cv-03748-JCS

Document No. 4 (**ER Vol. 1, page 303**),



Please, notice that the fact that the Raymond G. Murphy VAMC provided the EEO Investigator with four non-readable versions of the documents about the termination of my employment confirms the fact that it was an **_intentional_** discrimination.

Paragraph 81.

On March 15, 2018, Investigator Mr. Hayo conducted a phone conversation with Dr. Tina Prince (**ER Vol. 1, pages 235-249**),

"REPORTER'S TRANSCRIPT OF EXAMINATION OF DR. TINA PRINCE Transcription of proceedings in the above entitled cause of the telephonic examination of DR. TINA PRINCE, before EEO INVESTIGATOR DENNIS HAYO, at 11:30 a.m., MST, on March 15, 2018.

Reported by: Shannon L. Marcos, C.S.R. 8348

PROCEEDINGS

INVESTIGATOR HAYO: We are now on the record. Today is the 15th day of March 2018. It is 2:31 p.m., Eastern Standard Time. I am Dennis Hayo and I'm an EEO investigator with the Department of Veterans Affairs, Office of Resolution Management. I will be recording the testimony of Dr. Tina Prince, T-i-n-a, last name P-r-i-n-c-e, in the matter of a complaint of discrimination filed by Tatyana Drevaleva. I'll spell first name T-a-t-y-a-n-a. Last name D-r-e-v-

Case Management Statement, Parts 1 and 2; case No. 3:18-cv-03748-JCS

a-l-e-v-a. Against the New Mexico VA Health Care System. The complaint number is 200P-0501-2017103883.

Dr. Prince, do you solemnly swear or affirm that the information given in response to the following questions is true and complete to the best of your knowledge and belief?

THE WITNESS: I do.

INVESTIGATOR HAYO: Please note that this oath is issued without a pledge of confidence. This means that parties with the need no know will have access to other information contained within this investigative report.

It should be noted that to the extent you use names of employees or other witnesses, including veterans and beneficiaries, this investigator will redact the names and substitute an identifier before making the transcript part of the EEO file to the fullest extent possible.

Would you like a copy of your affidavit to review and to keep as part of your record with respect to this complaint?

THE WITNESS: Yes.

INVESTIGATOR HAYO: Do you have a representative?

THE WITNESS: No. I am in my office alone.

INVESTIGATOR HAYO: Is it okay to proceed?

THE WITNESS: Yes.

INVESTIGATOR HAYO: The accepted claims under investigation are:

A. Whether complainant was discriminated against based on age, sex (female), and disability when from through May 18th, 2017, complainant was terminated during her probationary period.

And B. Whether complainant was discriminated against based on age, sex (female), and disability when on June 30th, 2017, complainant was terminated during her probationary period.


EXAMINATION

BY INVESTIGATOR HAYO:

**Q Dr. Prince, please identify the VA facility 4 where you are presently employed?**

Case Management Statement, Parts 1 and 2; case No. 3:18-cv-03748-JCS

1  A I work at the New Mexico VA Health Care System in Albuquerque, New Mexico.

2  **Q How long have you been employed there?**

3  A From March 5th, 2016 to present.

4  **Q What unit or section of the facility do you work in?**

5  A I'm a Pentad member reporting to the director.

6  **Q When you say "Pentad," what does Pentad mean?**

7  A That is the five associate directors that report to our director. It's the Executive

8  Leadership Team.

9  **Q Please identify your position and grade at the facility where you're employed.**

10  A I am the Associate Director of Patient Care Services, Nurse Executive. I am a Nurse 5,

11  Step 6.

12  **Q Where does Carla Dunkelberger fall in your chain of command?**

13  A She is the nurse manager of an acute care telemetry unit and she falls under Raneta, R-

14  a-n-e-t-a, Bonin, B-o-n-i-n, who is the Chief Nurse of Acute Care Nursing Service. Raneta

15  reports to me.

16  **Q And did you have a working relationship with the complainant Tatyana**

17  **Drevaleva?**

18  A No, sir.

19  **Q Was the complainant in your chain of command?**

20  A She would have fallen in my chain of command as an employee of by detailing the

21  medical telemetry unit with nurse manager Carla Dunkelberger. So she is in my chain of

22  command, yes.

23  **Q What is your sex?**

24  A Female.

25  **Q When did you first become aware of the complainant's sex?**

26  A I don't remember. I don't even -- I don't remember.

27  **Q What is your month and year of birth?**

28  A May 1959.

Case Management Statement, Parts 1 and 2; case No. 3:18-cv-03748-JCS

1     **Q Are you aware of the complainant's age?**

2     A No, sir.

3     **Q Are you aware of the complainant's disability she describes as being infertile to**

4     **the point of needing in vitro fertilization?**

5     A No, sir. This is the first I have seen that information.

6     **Q In regards to the claim -- I'm going to go ahead and read the claim again just to**

7     **refresh your memory. Okay?**

8     A Hello?

9     **Q Go ahead.**

10    A Okay.

11    **Q All right. The complaint reads:**

12    **A. Whether complainant was discriminated against based on age, sex (female), and**

13    **disability, when from May 18th, 2017, complainant was terminated during her**

14    **probationary period.**

15    **And B. Whether complainant was discriminated against based on age, sex (female),**

16    **and disability, when on June 30th, 2017, complainant was terminated during her**

17    **probationary period.**

18    **Please identify the individual responsible for terminating the complainant. And that would**

19    **be the management official from the VA responsible for terminating.**

20    A Yes, sir. That would be myself.

21    **Q Okay.**

22    A The nurse manager completed -- the nurse manager compiled the evidence packet, was

23    reviewed by our HR advisors, and concurred by her chief nurse. And then –

24    **Q Okay. Can I stop you for a moment, please?**

25    A Yes. Yes.

26    **Q Your nurse manager, again, could you just –**

27    A Carla. Carla Dunkelberger.

28    **Q Okay.**

Case Management Statement, Parts 1 and 2; case No. 3:18-cv-03748-JCS

1   A And she would receive concurrence from the acute care chief nurse Raneta Bonin.

2   **Q Okay.**

3   A I don't know -- I don't remember who the HR advisors were that reviewed the packet.

4   We have several teams that work with us, and I have no recollection of which one it was.

5   I do know we do not issue a termination without HR reviewing and advisement. That is a

6   standard.

7   **Q Okay. I'm going to –**

8   A Can I ask you -- can we go off the record a minute?

9   **Q Yes. We're now off the record.**

10  **(Off the record.)**

11  **BY INVESTIGATOR HAYO:**

12  **Q The complainant claims that in May 2017, she told Mrs. Dunkelberger that she**

13  **wanted to have children but was running out of time because she was 50 years old. She told**

14  **Mrs. Dunkelberger that she planned to go to Russia for an in vitro fertilization attempt.**

15  **Mrs. Dunkelberger's face expressed she was very much unpleased. And Ms. Dunkelberger**

16  **told her, according to FMLA she would have to work for the VA Medical Center for 12**

17  **months to be eligible for leave without pay.**

18  **She told Ms. Dunkelberger that she could not wait for 12 months because it was her**

19  **turn for a free IVF attempt in Russia.**

20  **Mrs. Dunkelberger requested a copy of her medical records confirming her**

21  **intention to perform IVF. She told Ms. Dunkelberger that she would request the medical**

22  **documents from her Russian OB-GYN. Ms. Dunkelberger stated she needed the documents**

23  **prior to her departure.**

24  **On May 17th, 2017, Ms. Dunkelberger was out of the office. She told assistant**

25  **manager Phil Johnson the same thing she told Mrs. Dunkelberger. She told him on May**

26  **17th, 2017, she received the Russian medical documents which were written in Russian. She**

27  **had only three hormonal pills left and she would start bleeding if she did not go to Russia.**

28

Case Management Statement, Parts 1 and 2; case No. 3:18-cv-03748-JCS

There was no time to translate the medical documents. <u>Mr. Johnson told her that she needed to go -- that she needed to go and she should go if she needed to go.</u>

<u>She told Mr. Johnson that she would provide him with the translated documents as soon as she got to Russia and Mr. Johnson agreed. She told Mr. Johnson that a Russian coworker could translate the documents until she could get an official translation.</u>

She filled out a request for leave without pay form for the period of May 18th, 2017 through July 7th, 2017, and slipped it under Ms. Dunkelberger's door since she was not in the office.

On May 30th, 2017, she emailed, from Russia, her Russian OB-GYN medical documentation of her need for IVF in the English language. She received no response.

When she left, she did not know if her request for leave without pay would be approved or denied by Mrs. Dunkelberger.

On July 3rd, 2017, she received a termination letter. <u>This was the first time she found her leave without pay request had been denied.</u>

Ms. Dunkelberger mailed the termination letter to her home in New Mexico instead of emailing it to Russia.

Justification provided in the termination letter was that she was on probation period -- she was on probation during this period and had attendance issues.

What was your role in the circumstances surrounding this event?

A My role would have been to review the evidence packet with Ms. Dunkelberger and Ms. Bonin and to concur with the requested termination.

Q Okay. What was your justification for your actions when these events occurred and the complainant was terminated?

A From what I remember, the evidence packet was pretty solid as far as the AWOLs, the attempt to contact, the letters sent to the only address we had, because our HR requires we send certified letters to the address of record. That was completed with no response; and therefore, I supported the request for termination during probation.

Case Management Statement, Parts 1 and 2; case No. 3:18-cv-03748-JCS

1  **Q  Did  you  discuss  the  termination  with  the  complainant  prior  to  her  being**
2  **terminated?**

3  A No, sir.

4  **Q  Besides the HR person that you've already identified or you could not remember,**
5  **was there anybody, any other manager, besides Ms. Dunkelberger, was there any other**
6  **manager that you discussed this with?**

7  A No, sir.

8  **Q  Do  you  believe  that  the  policies  and  procedures  regarding  termination  were**
9  **followed by the facility and agency in this particular circumstance?**

10  A Yes.

11  **Q Was the complainant's disability of being infertile a factor when this occurred?**

12  A No. I had no knowledge that that was her concern that she was missing work for.

13  **Q Was the complainant's age a factor when this occurred?**

14  A No, sir. I have no idea what her age is.

15  **Q Was the complainant's sex a factor when this occurred?**

16  A No, sir.

17  **Q  Did  you  discriminate  against  the  complainant  because  of  her  age,  race,  sex,  or**
18  **disability?**

19  A No, sir.

20  **Q  Did  the  complainant  tell  you  that  she  felt  she  was  being  discriminated  against**
21  **when this occurred?**

22  A No, sir. I've never had a conversation with this employee -- former employee.

23  **Q Do you have anything to offer the complainant in resolution of this claim?**

24  A No, sir.

25  **Q  Is there anything else pertinent to the specific events that we have not discussed**
26  **that you would like to discuss now?**

27  A No, sir.

28

Case Management Statement, Parts 1 and 2; case No. 3:18-cv-03748-JCS

INVESTIGATOR HAYO: We can go off the record. (Whereupon the proceedings were adjourned at 11:47 a.m., Mountain Standard Time.)

I, DR. TINA PRINCE, declare under penalty of perjury that the foregoing is true and correct; that I have read my interview under oath and have made the necessary corrections, additions, or changes to my answers that I deem necessary. Executed on this_____day of _____, 2018.

_____

DR. TINA PRINCE."

Paragraph 82.

"**My objections** (also, please, read my Supplemental Brief "Objections to Dr. Prince's statements in the Investigation File", case No. 3:18-cv-03748-JCS, Doc. No. 190, August 31, 2019)**.**

1. **Q When did you first become aware of the complainant's sex?**

A I don't remember. I don't even -- I don't remember.

My objection.

I believe that Dr. Prince was lying. She read and signed a May 18, 2017 letter written my Mr. Johnson. In this letter, Mr. Johnson used the word "she" (meaning that I am a female) six times. Therefore, Dr. Prince knew that I am a female.

2. **Q Are you aware of the complainant's age?**

A No, sir.

My objection.

I believe that Dr. Prince was not aware of my age.

Case Management Statement, Parts 1 and 2; case No. 3:18-cv-03748-JCS

**3.  Q Are you aware of the complainant's disability she describes as being infertile to the point of needing in vitro fertilization?**

A No, sir. This is the first I have seen that information.

My objection.

Dr. Prince read and signed Mr. Johnson's May 18, 2017 letter. In this letter. Mr. Johnson wrote that I had requested a time off for the purpose of going to Russia for a medical procedure. Mr. Johnson didn't write that this procedure was In-Vitro (IVF) Fertilization. Therefore, Dr. Prince might have not had knowledge of my disability of being infertile to the point of needing the IVF. However, Dr. Prince was aware of my intention to go to Russia to perform a medical procedure. Therefore, Dr. Prince night have had an indirect knowledge of my disability.

**4.  Please identify the individual responsible for terminating the complainant. And that would be the management official from the VA responsible for terminating.**

A Yes, sir. That would be myself.

**Q Okay.**

A The nurse manager completed -- the nurse manager compiled the evidence packet, was reviewed by our HR advisors, and concurred by her chief nurse.

My objection.

Dr. Prince didn't have any authority to solely decide to terminate my employment. Pursuant to Article 33 of the AFGE Master Agreement, probationary Title 38 employees may be terminated after a Summary Board Review is conducted. I had a right to be represented by a representative of my choice.

Read Article 33 of the AFGE Master Agreement (Exhibit 47 to Doc. No. 190, August 31, 2019),

Section 3 - Title 38

Case Management Statement, Parts 1 and 2; case No. 3:18-cv-03748-JCS

"5. Probationary Title 38 employees may be terminated <u>after a Summary Board Review</u> <u>is conducted</u>… The employee, on request, will be furnished a copy of the summary report of the Professional Standards Board proceedings, along with a transcript of any verbatim recording.

6. An employee who is subject to Summary Board Review may be represented by the representative of his/her choice…"

On May 18, 2017, Dr. Prince, being misled by Mr. Phil Johnson regarding the reasons of my trip to Russia and not knowing the fact that I provided my medical documentation to Ms. Dunkelberger and Mr. Johnson, denied my request for a LWOP. Afterwards, Ms. Dunkelberger didn't inform me that my request for the LWOP had been denied, and placed me on an AWOL status. Afterwards, Ms. Dunkelberger compiled the "evidence" packet, talked to the HR, said to them that I was on the AWOL status, and convinced them to mail a letter to my home postal address in Albuquerque, NM. Ms. Dunkelberger knew that I would not be able to receive this letter and to respond. The letter was unclaimed and was returned back to the Agency by the USPS. The Agency recklessly disregarded the fact that the letter was returned back. Ms. Dunkelberger reported to Dr. Prince that I had been on the AWOL status, I didn't respond to the letter that was mailed to my home postal address in Albuquerque, NM, I didn't return back to work, and Ms. Dunkelberger obtained Dr. Prince's permission to fire me.

**5.   Q Okay. Can I stop you for a moment, please?**

A Yes. Yes.

**Q Your nurse manager, again, could you just –**

A Carla. Carla Dunkelberger.

**Q Okay.**

A And she would receive concurrence from the acute care chief nurse Raneta Bonin.

**Q Okay.**

A I don't know -- I don't remember who the HR advisors were that reviewed the packet. We have several teams that work with us, and I have no recollection of which one it was.

Case Management Statement, Parts 1 and 2; case No. 3:18-cv-03748-JCS

1   I do know we do not issue a termination without HR reviewing and advisement. That is a

2   standard.

3   …………..

4   **What was your role in the circumstances surrounding this event?**

5   A My role would have been to review the evidence packet with Ms. Dunkelberger and

6   Ms. Bonin and to concur with the requested termination.

7   **Q Okay. What was your justification for your actions when these events occurred**

8   **and the complainant was terminated?**

9   A From what I remember, the evidence packet was pretty solid as far as the AWOLs, the

10   attempt to contact, the letters sent to the only address we had, because our HR requires we send

11   certified letters to the address of record. That was completed with no response; and therefore, I

12   supported the request for termination during probation.

13   **Q Did you discuss the termination with the complainant prior to her being**

14   **terminated?**

15   A No, sir.

16   **Q Besides the HR person that you've already identified or you could not remember,**

17   **was there anybody, any other manager, besides Ms. Dunkelberger, was there any other**

18   **manager that you discussed this with?**

19   A No, sir.

20

21   <u>My objections</u>.

22   On May 18, 2017, Dr. Prince read the Letter that was written by Mr. Phil Johnson.

23   Reading this Letter, Dr. Prince learned that my intention was to go to Russia for a medical

24   procedure. Afterwards, Dr. Prince concurred with Ms. Dunkelberger, Allean Bonin, and the

25   Human Resources in terminating my employment. Approving the termination of my

26   employment, Dr. Prince didn't take into her consideration the fact that I was going to go to

27   Russia <u>for a medical procedure</u>. Approving the termination of my employment, Dr. Prince even

28   didn't question Ms. Dunkelberger whether I left to Russia for a medical procedure or whether I

Case Management Statement, Parts 1 and 2; case No. 3:18-cv-03748-JCS

remained in the United States. Also, Dr. Prince even didn't question the Human Resources whether I received the June 12, 2017 certified piece of mail or whether this piece of mail was returned back to the Agency. Also, Dr. Prince failed to personally speak to me and to review the medical documentation that I provided to the Agency on May 18 and May 30, 2017.

Concurring with Ms. Dunkelberger and Allean Bonin, and terminating my employment, Dr. Prince violated the following laws:

1) 5 U.S. Code §2302(b)(2)(A)-(B) because Dr. Prince issued her decision without the personal knowledge of the records that Ms. Dunkelberger provided to her.

Read 5 U.S.C.§2302,

"(b) Any employee who has authority to take, direct others to take, recommend, or approve any personnel action, shall not, with respect to such authority—

(2) solicit or consider any recommendation or statement, oral or written, with respect to any individual who requests or is under consideration for any personnel action unless such recommendation or statement is based on the personal knowledge or records of the person furnishing it and consists of—

(A) an evaluation of the work performance, ability, aptitude, or general qualifications of such individual; or

(B) an evaluation of the character, loyalty, or suitability of such individual."

2) 5 U.S. Code §7513(b), 5 CFR § 752.403, and 5 CFR § 752.404 because Dr. Prince didn't provide me with a 30 day Notice and an opportunity to be heard.

Read 5 U.S. Code §7513,

"(b) An employee against whom an action is proposed is entitled to—

(1) at least 30 days' advance written notice, unless there is reasonable cause to believe the employee has committed a crime for which a sentence of

Case Management Statement, Parts 1 and 2; case No. 3:18-cv-03748-JCS

imprisonment may be imposed, stating the specific reasons for the proposed action;

(2) a reasonable time, but <u>not less than 7 days, to answer orally and in writing</u> and to furnish affidavits and other documentary evidence in support of the answer;

(3) <u>be represented by an attorney or other representative</u>; and

(4) <u>a written decision and the specific reasons</u> therefor at the earliest practicable date."

Read 5 CFR § 752.403 - Standard for action.

"(a) An agency may take an adverse action, including a performance-based adverse action or an indefinite suspension, under this subpart only for such cause as will promote the efficiency of the service.

(b) An agency may not take an adverse action against an employee on the basis of any reason prohibited by 5 U.S.C. 2302."

Read 5 CFR § 752.404 - Procedures.

"(a) Statutory entitlements. An employee against whom action is proposed under this subpart is entitled to the procedures provided in 5 U.S.C. 7513(b).

(b) Notice of proposed action.

(1) An employee against whom an action is proposed is entitled to at least 30 days' advance written notice unless there is an exception pursuant to paragraph (d) of this section. The notice must state the specific reason(s) for the proposed action, and inform the employee of his or her right to review the material which is relied on to support the reasons for action given in the notice.

(2) When some but not all employees in a given competitive level are being furloughed, the notice of proposed action must state the basis for

Case Management Statement, Parts 1 and 2; case No. 3:18-cv-03748-JCS

selecting a particular employee for furlough, as well as the reasons for the furlough.

(3) Under ordinary circumstances, an employee whose removal or suspension, including indefinite suspension, has been proposed will remain in a duty status in his or her regular position during the advance notice period. In those rare circumstances where the agency determines that the employee's continued presence in the workplace during the notice period may pose a threat to the employee or others, result in loss of or damage to Government property, or otherwise jeopardize legitimate Government interests, the agency may elect one or a combination of the following alternatives:

(i) Assigning the employee to duties where he or she is no longer a threat to safety, the agency mission, or to Government property;

(ii) Allowing the employee to take leave, or carrying him or her in an appropriate leave status (annual, sick, leave without pay, or absence without leave) if the employee has absented himself or herself from the worksite without requesting leave;

(iii) Curtailing the notice period when the agency can invoke the provisions of paragraph (d)(1) of this section; or

(iv) Placing the employee in a paid, nonduty status for such time as is necessary to effect the action.

(c) Employee's answer.

(1) An employee may answer orally and in writing except as provided in paragraph (c)(2) of this section. The agency must give the employee a reasonable amount of official time to review the material relied on to support its proposed action, to prepare an answer orally and in writing, and to secure affidavits, if the employee is in an active duty status. The agency may require the employee to furnish any answer to the proposed action,

and affidavits and other documentary evidence in support of the answer, within such time as would be reasonable, but not less than 7 days.

(2) The agency will designate an official to hear the employee's oral answer who has authority either to make or recommend a final decision on the proposed adverse action. The right to answer orally in person does not include the right to a formal hearing with examination of witnesses unless the agency provides for such hearing in its regulations. Under 5 U.S.C. 7513(c), the agency may, in its regulations, provide a hearing in place of or in addition to the opportunity for written and oral answer.

(3) If the employee wishes the agency to consider any medical condition which may contribute to a conduct, performance, or leave problem, the employee must be given a reasonable time to furnish medical documentation (as defined in § 339.104 of this chapter) of the condition. Whenever possible, the employee will supply such documentation within the time limits allowed for an answer.

(d) Exceptions.

(1) Section 7513(b) of title 5, U.S. Code, authorizes an exception to the 30 days' advance written notice when the agency has reasonable cause to believe that the employee has committed a crime for which a sentence of imprisonment may be imposed and is proposing a removal or suspension, including indefinite suspension. This notice exception is commonly referred to as the "crime provision." This provision may be invoked even in the absence of judicial action.

(2) The advance written notice and opportunity to answer are not required for furlough without pay due to unforeseeable circumstances, such as sudden breakdowns in equipment, acts of God, or sudden emergencies requiring immediate curtailment of activities.

Case Management Statement, Parts 1 and 2; case No. 3:18-cv-03748-JCS

(e) Representation. Section 7513(b)(3) of title 5, U.S. Code, provides that an employee covered by this part is entitled to be represented by an attorney or other representative. An agency may disallow as an employee's representative an individual whose activities as representative would cause a conflict of interest or position, or an employee of the agency whose release from his or her official position would give rise to unreasonable costs or whose priority work assignments preclude his or her release.

(f) <u>Agency review of medical information</u>. When medical information is supplied by the employee pursuant to paragraph (c)(3) of this section, the agency may, if authorized, require a medical examination under the criteria of § 339.301 of this chapter, or otherwise, at its option, offer a medical examination in accordance with the criteria of § 339.302 of this chapter. If the employee has the requisite years of service under the Civil Service Retirement System or the Federal Employees' Retirement System, the agency must provide information concerning disability retirement. <u>The agency must be aware of the affirmative obligations of the provisions of 29 CFR 1614.203, which require reasonable accommodation of a qualified individual with a disability</u>.

(g) Agency decision.

(1) In arriving at its decision, the agency will consider only the reasons specified in the notice of proposed action and any answer of the employee or his or her representative, or both, made to a designated official and any medical documentation reviewed under paragraph (f) of this section.

(2) The notice must specify in writing the reasons for the decision and advise the employee of any appeal or grievance rights under § 752.405 of this part. The agency must deliver the notice of decision to the employee on or before the effective date of the action.

(h) Applications for disability retirement.Section 831.1204(e) of this chapter provides that an employee's application for disability retirement need not delay

any other appropriate personnel action. Section 831.1205 and § 844.202 of this chapter set forth the basis under which an agency must file an application for disability retirement on behalf of an employee."

3) 5 CFR 315.803 and 5 CFR 315.804 because being absent is not a valid reason for terminating employment. The probationary employment may be terminated only for the <u>work performance or conduct</u> that fails to demonstrate the employee's fitness or qualifications for continued employment.

Read 5 CFR 315.803, Agency action during probationary period (general).

"(a) The agency shall utilize the probationary period as fully as possible to determine the fitness of the employee and shall terminate his services during this period if he fails to demonstrate fully his qualifications for continued employment.

(b) Termination of an individual serving a probationary period must be taken in accordance with subpart D of part 752 of this chapter if the individual has completed one year of current continuous service under other than a temporary appointment limited to 1 year or less and is not otherwise excluded by the provisions of that subpart."

Read 5 CFR § 315.804 - Termination of probationers for unsatisfactory performance or conduct.

"(a) Subject to § 315.803(b), when an agency decides to terminate an employee serving a probationary or trial period <u>because his work performance or conduct during this period fails to demonstrate his fitness or his qualifications for continued employment</u>, it shall terminate his services by notifying him in writing as to why he is being separated and the effective date of the action. The information in the notice as to why the employee is being terminated shall, as a minimum, consist of the agency's conclusions as to the inadequacies of his performance or conduct.

Case Management Statement, Parts 1 and 2; case No. 3:18-cv-03748-JCS

(b) Probation ends when the employee completes his or her scheduled tour of duty on the day before the anniversary date of the employee's appointment. For example, when the last workday is a Friday and the anniversary date is the following Monday, the probationer must be separated before the end of the tour of duty on Friday since Friday would be the last day the employee actually has to demonstrate fitness for further employment.

[*33 FR 12418, Sept. 4, 1988, as amended at 60 FR 53505, Oct. 16, 1995; 73 FR 7188, Feb. 7, 2008.*]"

4)   Article 33 of the AFGE Master Agreement (Exhibit 47),

Section 3 - Title 38

"5. Probationary Title 38 employees may be terminated <u>after a Summary Board Review is conducted</u>. The employee will normally be given <u>15 calendar days notice</u>, but the notice period may be shortened if necessary to effect the separation before completion of the probationary period. The employee, on request, will be furnished a copy of the summary report of the Professional Standards Board proceedings, along with a transcript of any verbatim recording."

6.   An employee who is subject to Summary Board Review may be represented by the representative of his/her choice; the representative's role is limited to assisting the employee in exercising the right to reply orally and/or in writing to the reasons for the review. Because summary reviews deal with issues <u>related to professional competence or conduct and peer review</u>, a union representative is not entitled to be present at a summary review except when serving as the employee's personal representative."

Therefore, Dr. Prince didn't have an authority to concur with Ms. Dunkelberger, Allean Bonin, and the Human Resources in terminating my employment. My employment could have

been terminated <u>only after the Summary Board Review was conducted</u>. During the Summary Board Review, I had a right to be represented by a representative of my choice. The Agency failed to conduct the Summary Board Review. The Agency didn't have any right to terminate my employment <u>for being absent</u> after I obtained a verbal permission of Assistant manager Mr. Johnson to go to Russia to refill a prescription of the hormonal pills and to perform an IVF attempt and after I provided the Agency with the medical documentation from my doctor on both Russian and English languages. The Agency was obligated to give me a 15 calendar day Notice, and the Agency failed to notify me about my right to receive a copy of the summary report of the Professional Standards Board proceedings, along with a transcript of any verbatim recording. Also, the Agency had a right to terminate my employment only for issues arising from the professional competence, the conduct, or the peer review.

**6.  Q Do you believe that the policies and procedures regarding termination were followed by the facility and agency in this particular circumstance?**

A Yes.

<u>My objection</u>.

Dr. Prince alleged that the facility's policies were followed. However, Dr. Prince failed to identify the specific policies that were "followed" and how my conduct violated these policies. As I explained many times before, I followed all policies. I approached both manager Ms. Dunkelberger and Assistant Manager Mr. Johnson, I informed them about my previous attempts to get pregnant, about my urgent need to go to Russia to refill a prescription of the hormonal pills and to perform an IVF attempt, I got a verbal permission of Assistant Manager Mr. Johnson, and I provided medical documentation on both Russian and English languages. There was nothing else I could have done. The Agency failed to provide me with a mandatory Advanced Sick Leave because I am a Title 38 employee, withheld the information from me about other available types of the leave (a Voluntary Leave Transfer Program, a Voluntary Leave Bank Program, etc.), fraudulently forced me to submit a request for a LWOP, withheld the information from Dr.

Prince that I was requesting a time off for the purpose of pregnancy, lied to Dr. Prince that I didn't provide medical documentation, didn't recommend Dr. Prince to approve my request for a LWOP even though Mr. Johnson had verbally approved it, lied in its June 12, 2017 letter that I didn't provide medical documentation, mailed the June 12, 2017 letter to my home postal address in Albuquerque, NM, recklessly disregarded the fact that the letter was returned back to the Agency, didn't provide me with a 30 day Notice and an opportunity to be heard, and threw me out of job.

In fact, the Agency committed a crime of discrimination and unlawful termination. The Agency violated the 5 U.S. Code §2302; 5 U.S. Code §7513; 5 CFR § 752.403; 5 CFR § 752.404; 5 CFR 315.803; 5 CFR 315.804; Articles 33 and 35 of the AFGE Master Agreement, the Memorandum (unnumbered), the MCM 05-11, the MCM 05-8, the MCM 05-48, the VA Handbook for the Title 5 Probationary Trial Period Employees, and the Handbook on Leave and Workplace Flexibilities for Childbirth, Adoption, and Foster Care of the Office of the Personnel Management (OPM) of the VA system where it is written that new employees who are not formally eligible for LWOP under the FMLA shall be granted with a FMLA-like benefit for the purpose of pregnancy.


**7.  Q Do you have anything to offer the complainant in resolution of this claim?**
A No, sir.


My objection.

The Agency committed a crime of intentional discrimination and unlawful termination. After Dr. Prince learned that I had gone to Russia to perform an IVF procedure, she refused to offer me "anything in resolution of this claim," she refused to reinstate me back to work, and she refused to award me with my both lost salary and benefits.


8.  I, DR. TINA PRINCE, declare under penalty of perjury that the foregoing is true and correct; that I have read my interview under oath and have made the necessary

Case Management Statement, Parts 1 and 2; case No. 3:18-cv-03748-JCS

corrections, additions, or changes to my answers that I deem necessary. Executed on this_____day of _____, 2018.

_____

DR. TINA PRINCE

My objection.

Dr. Prince failed to declare under penalty of perjury that the foregoing is true and correct (**ER Vol. 1, page 249**.) Her testimony is hearsay and shall be dismissed with prejudice.

**Conclusion**.

The Agency committed the intentional crime of discrimination and unlawful termination. I didn't violate any of the Agency's policies. The Agency violated all applicable provisions of the U.S. Code, the Code of Federal Regulations, the AFGE Master Agreement, its internal Memoranda, the VA Handbook for the Title 5 Probationary Trial Period Employees, and the Handbook on Leave and Workplace Flexibilities for Childbirth, Adoption, and Foster Care of the Office of the Personnel Management (OPM) of the VA system.

The Government is not immune for being sued for intentional discrimination and unlawful termination."

Paragraph 83.

On March 02, 2018, employee of the Employee Relations of the Raymond G. Murphy VAMC Mr. Clifford Speakman issued his responses to the EEO Interrogatories (**ER Vol. 1, pages 250-257**.) On March 09, 2018, Mr. Speakman issued an additional response to the EEO Interrogatories (**ER Vol. 1, pages 258-259**.) Please, notice that I have no idea who Mr. Speakman is and why the Raymond G. Murphy VAMC assigned this individual to respond to the EEO Interrogatories.

Case Management Statement, Parts 1 and 2; case No. 3:18-cv-03748-JCS

Paragraph 84.

Please, read Mr. Speakman's March 02, 2018 responses to the EEO Interrogatories (**ER Vol. 1, pages 250-257**), also, please, read my Supplemental Brief "Objections to Mr. Speakman's statement", case No. 3:18-cv-03748-JCS, Doc. No. 191, August 31, 2019,

"**The accepted claim(s) under investigation are:**

**A. Whether Complainant was discriminated against based on age, sex (female) and disability, when from May 18, 2017, complainant was terminated during her probationary period.**

**B. Whether complainant was discriminated against based on age, sex (female) and disability, when on June 30, 2017, complainant was terminated during her probationary period.**

I, **Clifford Speakman**, solemnly swear/affirm that the responses and documents I provide in response to the following questions are true and complete to the best of my knowledge and belief.

Please write your full legal name.

[blank]

**Please answer the following questions:**

1. Please identify the VA facility where you are employed.

   Albuquerque NMVAHCS

2. For what period of time have you been employed there?

   October 18, 2015

3. What unit or section of the facility do you work in?

   Employee Relations

4. Please identify your position and grade at the facility where you are employed.

   Employee Relations Specialist GS-12

5. Please describe your working relationship with the complainant, Tatyana Dreyaleva, during that period.

   Do not know Tatyana Dreyaleva

Case Management Statement, Parts 1 and 2; case No. 3:18-cv-03748-JCS

6. Where did the complainant fall in your chain of command?

Employee Relations Specialist

7. What is the complainant's position and grade?

Medical Instrument Technician GS-07

8. Was the complainant a probationary employee?

Yes

a. If yes, please explain the dates of her probationary employment and what probationary

employment means.

Station Entrance on Duty was April 2, 2017, and was terminated on June 30,

2017. Probationary period is 1 year

9. What unit or section is the complainant assigned to?

Nursing Servive

10. What is your sex?

Male

11. When did you first become aware of the complainant's sex?

3/1/2018

12. How did you become aware of the complainant's sex?

I reviewed the record on 3/1/2018

13. What is your month and year of birth?

Year is 1963 You have no need for Month

14. When did you first become aware of the complainant's age?

When I reviewed the record 3/1/2018

15. How did you become aware of the complainant's age?

Stated in record

16. Do you have a disability?

Yes

a.   If yes, would you like to share your disability for the record? No

Case Management Statement, Parts 1 and 2; case No. 3:18-cv-03748-JCS

17. Are you aware of the complainant's disability she describes as being **infertile to the point of needing In Vitro Fertilization**?

No

    a.   If yes, please describe your knowledge of her disability of being infertile?

       [no answer]

18. How and when did you become aware of the complainant's disability?

When I reviewed record 3/1/2018.

19. How long has the complainant had this disability?

Unknown to me

20. How long is it expected to continue?

Unknown to me

21. Please describe which of complainant's normal life functions, to your knowledge that was substantially limited because of her disability.

Unknown to me

22. Please describe in detail how the normal life functions identified above were substantially limited by the complainant's impairment/disability.

Unknown to me

23. Did the complainant use medication and/or assistive devices for his disability?

If yes,

a. Identify and describe their purpose.

    Unknown to me

24. To your knowledge did the complainant's medication and/or assistive devices affect any of the complainant's normal life functions?

If yes,

    a.   Describe the normal life function.

       Unknown to me

25. Describe the degree to which the function is affected.

Unknown to me

Case Management Statement, Parts 1 and 2; case No. 3:18-cv-03748-JCS

26.  Was the complainant able to perform the essential duties of her position?

Unknown to me

27.  If not, please identify the duty or duties the complainant was unable to perform.

Unknown to me

28.  Indicate how the disability impacted accomplishing these duties.

Unknown to me

29. Have you received training on EEO policy and procedure?

No

30. If yes, when?

N/A

**A. Whether Complainant was discriminated against based on age, sex (female) and disability, when from May 18, 2017, complainant was terminated during her probationary period.**

**B. Whether complainant was discriminated against based on age, sex (female) and disability, when on June 30, 2017, complainant was terminated during her probationary period.**

1.  Please identify the individual responsible for terminating the complainant?

[*No answer – T.D.*]

2.  The complainant claims that in May 2017 she told Ms. Dunkelberger that she wanted to have children but was running out of time because she was 50 years old. She told Ms. Dunkelberger that she planned to go to Russia for an IVF attempt. Ms. Dunkelberger's face expressed she was very much unpleased and Ms. Dunkelberger told her that according to FMLA she would have to work for the VAMC for 12 months to be eligible for leave without pay. She told Ms. Dunkelberger that she could not wait for 12 months because it was her turn for a free IVF attempt in Russia . Ms. Dunkelberger requested a copy of her medical records confirming her intention to perform an IVF. She told Ms. Dunkelberger that she would request the medical

Case Management Statement, Parts 1 and 2; case No. 3:18-cv-03748-JCS

documents from her Russian O8/GYN. Ms. Dunkelberger stated she needed the documents prior to her departure. On May 17, 2017 Ms. Dunkelberger was out of the office. She told Assistant Manager, Phil Johnson, the same thing she told Ms. Dunkelberger. She told him on May 17, 2017 she received the Russian medical documents which were written in Russian . She only had 3 hormonal pills left and she would start bleeding if she did not go to Russia. There was no time to translate the medical documents. Mr. Johnson told her that if she needed to go she should go. She told Mr. Johnson that she would provide him with a translated document as soon as she got to Russia and Mr. Johnson agreed. She told Mr. Johnson that a Russian co-worker cculd translate the document until she could get an official translation. She filled out a Request for Leave Without Pay form for the period from May 18, 2017 through July 7, 2017 and slipped in under Ms. Dunkelberger's door, since she was not in the office. On May 30, 2017 she emailed, from Russia, her Russian OB/GYN medical documentation of her need for IVF in the English language. She received no response. When she left she did not know if her Request for Leave Without Pay would be approved or denied by Ms. Dunkelberger. On July 3, 2017 she received a termination letter. This was the first time she found her Leave Without Pay Request had been denied. Ms. Dunkelberger mailed the termination letter to her home in NM instead of emailing it to her in Russia. The justification provided in the termination letter was that she was on probationary period and attendance issues. What was your role and the circumstances surrounding this event?

None

3. Did you discuss this with the complainant? No

4. If yes, when? N/A

5. What was discussed? N/A

6. What was the outcome of the discussion? N/A

7. Did you discuss this with Ms. Dunkelberger? No

8. If yes, when was it discussed? N/A

Case Management Statement, Parts 1 and 2; case No. 3:18-cv-03748-JCS

9. What was discussed? N/A

10. Did you discuss this with Mr. Johnson? No

11. If yes , when was it discussed? N/A

12. What was discussed? N/A

13. What policy or regulation supports terminating the complainant in these circumstances? (Please provide that policy to the investigator for the record).
MCM-05-11, MCM 05-8 and MCM 05-48

14. Where the Agency and Facility policies regarding termination followed in this instance?
Agency web page in the MCM library
   a. If no, please explain why? N/A

15. Did you discriminate against the complainant because of her **age, race or disability** when this occurred? ***No***

16. Did the complainant tell you that he felt that she was being discriminated when this occurred? No

17. lf yes, when? N/A

18. What was discussed and what was the outcome of the discussion?
Unknown to me

19. Do you have anything to offer the complainant in resolution of this claim? No

20. ls there anything else pertinent to these specific events that we have not discussed? No

**PLEASE NOTE THAT ORM RESERVES THE RIGHT TO SUPPLEMENT OR ASK ADDITIONAL QUESTIONS AS THE INVESTIGATION REQUIRES. The above information has been furnished without a pledge of confidence and I understand that it may be shown to any interested party[ies] with a need to know for this complaint. This includes but is not limited to VA, EEOC, contracting officiaJ.s with a need to know during**

Case Management Statement, Parts 1 and 2; case No. 3:18-cv-03748-JCS

the course and scope of the informal and formal EEO process including administrative procedures and litigation as applicable and mandated by law.

This statement is made under penalty of perjury on this 2nd day of March 2018.

Signature: Clifford Speakman."

Paragraph 85.

Please, read Mr. Speakman's **Supplemental Affidavit**, March 09, 2018 (**ER Vol. 1, pages 259-259**),

1. "What is the Agency's justification for terminating the complainant?

    Absent Without Leave

2. Who was responsible for terminating the complainant?

    Service request the action/Due to the employee being on Trial/Probation the HRO approves the action

3. What specific Agency/Facility policy supports termination in instances such as this?

    Title 5 Leave Policy MCM 05-11 / Tours of duty MCM 05-8 / Employee courtesy and Conduct MCM 05-48

4. Where the Agency/Facility policy's followed when this termination occurred? Yes

5. Is there anything else you would like to add? No

This statement is made under penalty of perjury on this 9th day of March 2018.

Signature: Clifford Speakman.

Paragraph 86.

**My objections.**

I have no idea who Mr. Speakman is and how he is related to the process of the termination of my employment. I never met Mr. Speakman in person. From what I understood, Mr. Speakman is a Human Resources specialist. Mr. Speakman never received an EEO training.

Case Management Statement, Parts 1 and 2; case No. 3:18-cv-03748-JCS

However, for whatever reason, he was authorized to make a decision in terminating my employment. Mr. Speakman did the following:

1) was misled by Ms. Dunkelberger regarding the AWOL status, didn't know that Mr. Johnson had verbally approved my leave

2) didn't speak to both Ms. Dunkelberger and Mr. Johnson about the circumstances of my case and about my health condition

3) didn't review the medical documentation that I emailed to both Ms. Dunkelberger and Mr. Johnson

4) recklessly disregarded the fact that the June 12, 2017 letter that was mailed to my home postal address in Albuquerque, NM was returned back to the Agency

5) recklessly disregarded Article 33 of the AFGE Master Agreement that said that Title 38 probationary employees may be terminated only after a Summary Board Review is conducted and after being given both a 15 day Notice and an opportunity to be represented by a representative of their choice

6)  approved Ms. Dunkelberger's proposal to terminate my employment

7) claimed that the reason of the termination of my employment was "Absent Without Leave"

8) claimed that the Agency's policies were followed, and cited Title 5 Leave Policy MCM 05-11 / Tours of duty MCM 05-8 / Employee courtesy and Conduct MCM 05-48 while not being able to explain how exactly my "conduct" allegedly violated these policies

9) never contacted with me and never questioned me about the reasons of being absent from work

10) refused to offer me any remedy after he learned that, in fact, I went to Russia to perform an IVF procedure, and my trip was verbally approved by Mr. Johnson

11) was unable to provide the name and the title of the person who was responsible for terminating my employment

12) was inconsistent and discrepant in his answers:

Case Management Statement, Parts 1 and 2; case No. 3:18-cv-03748-JCS

1    "17. Are you aware of the complainant's disability she describes as being **infertile to**

2    **the point of needing In Vitro Fertilization**? No

3    18. How and when did you become aware of the complainant's disability?

4        When I reviewed record 3/1/2018."

5    Therefore, Mr. Speakman denied his knowledge about my disability of being infertile

6    but immediately stated the date when he learned about this disability.

7

8    **Conclusion.**

9        The Agency discriminated me against my sex, against my desire to get pregnant, against

10    my age, and against my disability that was related to taking a time off to go to Russia to refill a

11    prescription of the hormonal pills and to perform an IVF attempt. The Agency placed me on the

12    AWOL status and assigned a Human Resources (HR) specialist to approve the termination of my

13    employment. This HR specialist didn't receive an EEO training. Without getting into the details,

14    without speaking to me, without speaking to both Ms. Dunkelberger and Mr. Johnson, without

15    reviewing the medical documentation, and disregarding the fact that the June 12, 2017 letter was

16    retuned back to the Agency, Mr. Speakman approved the termination of my employment. Doing

17    this, the Agency violated Article 33 of the AFGE Master Agreement that said that the

18    probationary Title 38 employees may be terminated only after the Summary Board Review is

19    conducted and after being given both a 15 day Notice and an opportunity to be represented by a

20    representative of their choice. Mr. Speakman was unable to explain how my conduct violated the

21    following Agency's policies:  Title 5 Leave Policy MCM 05-11, Tours of Duty MCM 05-8, and

22    Employee Courtesy and Conduct MCM 05-48."

23

24    Paragraph 87.

25        On March 27, 2018, the EEO Investigator Mr. Dennis Hayo issued the following Report

26    (**ER Vol. 1, pages 194-201**), read from (**ER Vol. 1, page 196**),

27    "**V. Summary**

28

Case Management Statement, Parts 1 and 2; case No. 3:18-cv-03748-JCS

INVESTIGATOR'S NOTE: The age of the complainant, RMO's and witnesses is their age on the date of the first claim of the event of the claim which is May 18, 2017.

**Summary**

The witnesses testified to the following:

The **complainant** (Sex: Female; Age: 51; Disability: Yes) was hired by the Albuquerque VAMC as a Monitor Technician on April 3, 2017. Her disability is Infertility. She does not have any children. For the past 5-7 years she has been unable to get pregnant. It is caused by genetics, hormonal misbalance and age. It is permanent and she cannot be treated for it. She was taking hormonal pills for the condition. The pills were available in Russia. She is currently taking other hormonal pills named Femoston. She was in Russia when she was taking antibiotics. These medications do not have any side effects that impact her ability to perform her duties. Her disability does not limit anything that would normally be done in everyday life. Her duties included observing cardiac monitors, taking vital signs, changing linens, giving patients showers and assisting patients. She was able to perform all her duties. Because of a reduced cost for treatment she needed to go to Russia to refill prescriptions and receive In Vitro Fertilization (IVF) as a citizen of the Russian Federation. She could not afford the price of IVF in the U.S. Other than being able to get pregnant she does not see any additional differences between her and other female colleagues who are hired for the same position and duties. Ms. Dunkelberger became aware of her disability in May 2017 when she explained that she wanted children. Her date of birth is March 3, 1966. Her sex is female. (7-1, pp. 1-3, 7-8, 7-9 and 7-14)

The **complainant**, in May 2017, told Ms. Dunkelberger that she wanted to have children but was running out of time because she was 50 years old. She told Ms. Dunkelberger that she planned to go to Russia for an IVF attempt. Ms. Dunkelberger' s face expressed she was very much unpleased and Ms. Dunkelberger told her that according to FMLA she would have to work for the VAMC for 12 months to be eligible for leave without pay. She told Ms. Dunkelberger that she could not wait for 12 months because it was her turn for a free IVF attempt in Russia.

Ms. Dunkelberger requested a copy of her medical records confirming her intention to perform an IVF. She told Ms. Dunkelberger that she would request the medical documents from her Russian OB/GYN. Ms. Dunkelberger stated she needed the documents prior to her departure. On May 17, 2017 Ms. Dunkelberger was out of the office. She told Assistant Manager, Phil Johnson, the same thing she told Ms. Dunkelberger. She told him on May 17, 2017 she received the Russian medical documents which were written in Russian. She only had 3 hormonal pills left and she would start bleeding if she did not go to Russia. There was no time to translate the medical documents. Mr. Johnson told her that if she needed to go she should go. She told Mr. Johnson that she would provide him with a translated document as soon as she got to Russia and Mr. Johnson agreed. She told Mr. Johnson that a Russian co-worker could translate the document until she could get an official translation. She filled out a Request for Leave Without Pay (LWOP) form for the period from May 18, 2017 through July 7, 2017 and slipped in under Ms. Dunkelberger' s door, since she was not in the office. On May 30, 2017 she emailed, from Russia, her Russian OB/GYN medical documentation of her need for IVF in the English language. She received no response. When she left she did not know if her Request for LWOP would be approved or denied by Ms. Dunkelberger. On July 3, 2017 she received a termination letter. This was the first time she found her Leave LWOP Request had been denied. Ms. Dunkelberger mailed the termination letter to her home in NM instead of emailing it to her in Russia. The justification provided in the termination letter was that she was on a probationary period and attendance issues. (7-1, pp. 3-5, 7-13 and 7-16)

During mediation on September 7, 2017 Ms. Dunkelberger said that her Leave Without Pay had been denied by Dr. Prince because she didn't meet the requirements to qualify for this leave under FMLA by working at the VA for 12 months. She did not discuss this with Dr. Prince. She has no working relationship with Dr. Prince other than when she had a group meeting with him when she was a new hire. Ms. Dunkelberger stated she sent the termination letter to her home instead of emailing it to her because it was not encrypted. She never received a phone call from Ms. Dunkelberger. This was unacceptable because she received verbal

permission to go to Russia from Mr. Johnson and she was 50 years old and this was the only chance she had to get her hormonal pills and a free IVF. It was her turn and if she missed it she would lose this chance. (7-1, pp. 5-7, 7-8, 7-13, 7-15 and 7-17 through 7-20)

The **Complainant** identified Melanie, an ICU Registered Nurse as a Similarly Situated Employee that was treated more favorably that she was when her LWOP was denied. She is unaware of Melanie's last name. Melanie was not terminated when she attended nursing school and was allowed to work 1 time per month observing cardiac monitors. When Melanie was absent from work she was not terminated even though she couldn't have worked full time. For this reason she was discriminated against because of her disability. (7-1, p. 7)

The **complainant** believes that she was discriminated against because of her disability of not being able to have children and her age. She found that Ms. Dunkelberger hired two, younger, male employees to replace her position. Male employees would not have problems related to pregnancy. Melonie was allowed to work for only once a month while in nursing school but was not terminated. (7-1, p. 7, pp. 9)

**Phillip Johnson**, RMO (Sex: Male; Age: 61; Disability; Yes) has been assigned to the Raymond G. Murphy Medical Center. He is the Assistant Nurse Manager in 5D Telemetry. His first line supervisor is Carla Dunkelberger. He did have a working relationship with the complainant as the Nurse Manager by helping the complaint orient to her position to Telemetry Monitors. The complainant started employment on April 2, 2017 and was in a probationary period for one year. Probationary periods are times when supervisors are required to study and employee's potential to determine whether they are suited for successful government work. He is unaware of the complainant's sex but she refers to herself as female. He became aware of the complainant's age, on May 17, 2017, during a discussion about her leaving for Russia. The complainant never stated that she was disabled or infertile. He is unaware of her disability. He has received training in EEO policy and procedure. (7-2, pp. 2-5)

Case Management Statement, Parts 1 and 2; case No. 3:18-cv-03748-JCS

**Phillip Johnson**, RMO testified that on May 17, 2017, after business hours, the complainant came to his office and stated she had one pill left and was flying to Russia the next day to have In Vitro Fertilization done. She stated she was 50 years old, wanted to have children and this may be her last chance. He handed her the OPM71 paperwork and stated that this must be filled out and supporting documentation, from the doctor, in English, must be supplied. He told the complainant that he could not approve Leave Without Pay (LWOP) and that he would turn in the documentation and if this was that important then she should go. He has no knowledge of a "Melonie" who was treated more favorably than the complainant and was absent from work and was not terminated. When the complainant was terminated her position was open and a Female and Male qualified applicants were hired. (7-2, pp. 6-8 and 7-17 through 7-20)

The complainant's race, age and disability were not factors when this occurred. He did not discriminate against the complainant. (7-2, p. 9)

**Dr. Carla Dunkelberger**, RMO (Sex: Female; Age: 44; Disability: No) is a 5D Telemetry Nurse Manager in the Nursing Service Unit at the Raymond G. Murphy Medical Center and has been employed there since October of 2012. Her second line supervisor is Dr. Tina Prince. She was the complainant's direct supervisor. The complainant was a GS-7 Medical Instrument Technician and was a probationary employee. Her probationary period began on April 2, 2017. This is a period of time in which supervisors are required to study an employee's potential to determine whether she is suited for successful government work. The complainant was assigned to 5D Telemetry, Nursing Service. She is female and was born in May 1973. She is unaware of the complainant's sex. The complainant identified herself as female and she is unaware of the complainant's age. The complainant never said she was infertile or that she had a disability. On May 15, 2017, the complainant stated that since Russia offers a free one time IVF that she wanted to try this. She was unable to observe if the complainant was able perform her

Case Management Statement, Parts 1 and 2; case No. 3:18-cv-03748-JCS

duties because the complainant did not complete orientation. She has received training in EEO policy and procedure. (7-3, pp. 2-6, 7-9 and 7-14)


On April 18, 2017 she told the complainant that she did not qualify for FMLA due to less than 1 year service and would need to complete an OPM71 and provide medical documentation in English and would need to be submitted to the Assistant Director of Patient Care Services prior to leaving for Russia. She told the complainant that she could not approve the request. The complainant verbalized that she **understood**. On May 15, 2017, the complainant wanted leave to go to Russia soon for IVF and the complainant would let her know on May 16, 2017 when she needed the leave. She reminded the complainant she did not qualify for FMLA due to less than 1 year service and would need to complete an OPM71 and provide medical documentation in English and would need to be submitted to the Assistant Director of Patient Care Services prior to leaving for Russia. The complainant was told she could not approve the request. The complainant verbalized that she understood. The complainant was Absent Without Leave (AWOL) beginning May 21, 2017. On June 12, 2017 the complainant was mailed a memo with notification that her LWOP request from May 18, 2017 through July 7, 2018 was denied. The memo was mailed to the complainant's home of record by Human Resources. On July 3, 2017 a letter of termination was mailed to the complainant's home of record and a copy of the termination letter was emailed to the complainant as a courtesy. The complainants AWOL negatively impacted patient care and delayed completion of the complainant's orientation. The complainant was terminated during her probationary period because she did not follow the proper leave policies and procedures. The policies that support terminating the complainant are in the Title 5 Leave policy MCM 05-11, Tours of Duty Policy MCM 05-8, Employee Courtesy and Conduct Policy MCM 05-48, Master Agreement between the Department of VA and American Federation of Government Employees (2011) Article 35 Section 10, LWOP, and memo for established phone number and unplanned leave. She has no knowledge of a "Melonie" that is a Similarly Situated Employee that was treated more favorably than the complainant. Two vacancies for Medical Instrument Technician position have been filled since the complainant's

Case Management Statement, Parts 1 and 2; case No. 3:18-cv-03748-JCS

termination. One vacancy was filled by a male and the other by a female. (7-3, pp. 6-9, p. 11, 7-6, 7-7, 7-10, 7-11, 7-15 and 7-17 thought 7-20)

    INVESTIGATOR NOTE: The Termination Letter from the Facility to the complainant dated June 30, 2017 indicated that the termination was due to attendance issues while in a probationary period. (7-13)

    The complainant was notified on multiple occasions the process to request leave for an extended period of time and that unit level management team did not have the approval to grant such leave. The complainant's disability was not a factor when this occurred because she was unaware the complainant had a disability. The complainant did not state she had a disability. The complainant's sex was not a factor when this occurred because she is unaware of the complainant's sex. She did not discriminate against the complainant when this occurred. The complainant did not tell her she felt she was being discriminated against when this occurred. (7-3, pp. 9-11)

    **Dr. Tina Prince**, RMO (Sex: Female; Age: 58) has been employed at the New Mexico VA Health Care System in Albuquerque NM since March 5, 2016. She is the Associate Director of Patient Care Services, Nurse Executive and reports to the Director. Carl Dunkelberger is the Nurse Manager of Acute Care Telemetry Unit and Ms. Dunkelberger falls two levels below her in her chain of command. The complainant reported to Ms. Dunkelberger. She had no working relationship with the complainant. She does not recall when she became aware of the complainant's sex. She is unaware of the complainant's age. She first became aware of the complainant's disability of In Vitro Fertilization when she was notified of this claim. (7-4, pp. 4-5)

    She is the individual responsible for terminating the complainant's employment at the VA. Carla Dunkelberger completed the evidence packet reviewed by her Chief Nurse, Raneta

Bonin, and was reviewed by Human Resources. She cannot remember who, in H.R. reviewed the file. Her role was that she reviewed the evidence packet and found that it was pretty solid as far as the AWOL's, the attempt to contact, the certified letters sent to the address of record. There was no response. Therefore she supported the request for termination during probation. She did not discuss the termination with the complainant. She believes the facility and agency policies were followed when this occurred.

(7-4, pp. 6-10 and 7-6 and 7-17 through 7-20)

She is the individual responsible for terminating the complainant's employment at the VA. Carla Dunkelberger completed the evidence packet reviewed by her Chief Nurse, Raneta Bonin, and was reviewed by Human Resources. She cannot remember who, in H.R. reviewed the file. Her role was that she reviewed the evidence packet and found that it was pretty solid as far as the AWOL's, the attempt to contact, the certified letters sent to the address of record. There was no response. Therefore she supported the request for termination during probation. She did not discuss the termination with the complainant. She believes the facility and agency policies were followed when this occurred.

(7-4, pp. 6-10 and 7-6 and 7-17 through 7-20)

The complainant's age, sex and disability were not factors when this occurred. The complainant did not tell her that she felt she was being discriminated against when this occurred. She did not discriminate against the complainant when this occurred. (7-4, p. 11)

**Clifford Speakman**, SME (Sex: Male; Age: 44; Disability; Yes) has been employed at the Albuquerque NMVAHCS as an Employee Relations Specialist GS-12 since October of 2015. He does not know the complainant. She was a GS-7 Medical Instrument Technician at the Facility. She was hired on April 2, 2017 and terminated on June 20, 2017. She was hired as a probationary employee for 1 year. He is a male, born in 1963 and has a disability. He became aware of the complainant's sex and age on March 1, 2018 and is unaware of her disability. The

Case Management Statement, Parts 1 and 2; case No. 3:18-cv-03748-JCS

agency justification for terminating the complainant was that she was AWOL. The Service requested the action due to the complainant being on Trial/Probation and the Human Resource Officer approved the action. He had no role in the complainant being terminated. The Agency/Facility policy that supports termination in this instance is found in Title 5 Leave Policy MCM 05-11, Tours of Duty MCM 05-8 and Employee Courtesy and Conduct MCM 05-48. (7-5, pp. 2-4, 7-5a, pp. 2 and 7-17 through 7-10)

The information in this report was obtained from witness testimonies and documentation provided by the Complainant and/or the Agency.

Date: March 27, 2018

Investigator Mr. Dennis Hayo [original signature]

EEO Investigator."

Paragraph 88.

The Office of Resolution Management never issued a Determination (**ER Vol. 1, pages 328-334**), and the Agency never responded to my Notice of Intention to File a Lawsuit (**ER Vol. 1, pages 335-340**.)

Paragraph 89.

On June 25, 2018, I filed a complaint for employment Discrimination No. 3:18-cv-03748-JCS at the U.S. District Court for the Northern District of California (**ER Vol. 1, pages 2-27.**)

Paragraph 90.

During the litigation of my lawsuit No. 3:18-cv-03748-JCS, I found out that on May 18, 2017 Mr. Phil Johnson submitted a letter to Dr. Tina Prince who was the VAMC's Supervisor who was responsible for approving my Request for a LWOP (**ER Vol. 1, 288**.) In this letter, Mr. Johnson wrote the following, "Tatyana Drevaleva was hired as a Telemetry Technician On April

Case Management Statement, Parts 1 and 2; case No. 3:18-cv-03748-JCS

2, 2017 and participated in NEO[5] on April 3, 2017. She is currently orienting as a telemetry technician on the night shift. While attending the NEO class in April Tatyana informed Carla Dunkelberger (Manager 5DT) that she needed to take extended leave of six weeks and go to Russia **for a medical procedure**. At that time, Carla informed Tatyana that since she just started she was not eligible for FMLA and she had not accrued enough leave to support a week week absence. Tatyana was also told that medical documentation, in English, would be needed prior to approval of Leave Without Pay. On the morning of May 17, 2017 Tatyana informed the 5D management team that she was leaving to Russia on Thursday May 18, 2017 for six weeks. On May 17, 2017 an OPM 71 was given to Tatyana and she filled it out providing no supporting medical documentation.

At this time, I do not recommend approval of Tatyana Drevaleva's request for Leave Without Pay."


Paragraph 91.

Please, notice that Mr. Johnson was lying to Dr. Prince. First, Mr. Johnson wrote that I hadn't provided my medical documentation. In fact, on May 18, 2018, I emailed my medical documentation to Ms. Dunkelberger and Mr. Johnson at 9.02 AM (**ER Vol. 1, 28-30**.) Also, Mr. Johnson wrote that he didn't recommend Dr. Prince to approve my Request for a LWOP. In fact, on May 17, 2017 Mr. Johnson verbally approved my Request for a LWOP. His exact words were, "If you need to go – go!" During the EEO investigation, Mr. Johnson confirmed in his Interrogatories that he had verbally approved my request for a LWOP. Please, see (**ER Vol. 1, 219**), "At this time I stated to the complainant that I could not approve Leave Without Pay but I would turn in the documentation **and if this was that important then s/he should go**."

---

[5]  The New Employee's Orientation.

Case Management Statement, Parts 1 and 2; case No. 3:18-cv-03748-JCS

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Paragraph 92.

Also, see the EEO Investigator Mr. Hayo's statement that (ER Vol. 1 page 198), "[Mr. Johnson] told the complainant that he could not approve Leave Without Pay (LWOP) and that he would turn in the documentation **and if this was that important then she should go**."

Paragraph 93.

Because of Dunkelberger's Libel about the reasons of the termination of my employment, I was not receiving my Unemployment Insurance benefits (**ER Vol. 2, pages 506-517**.)

Paragraph 94.

Because of Dunkelberger's Libel about the reasons of the termination of my employment, my full time employment offer in the Minneapolis VAMC in 2018 (**ER Vol. 2, pages 597-598**) was rescinded  (**ER Vol. 2, pages 599-603**) after Hiring Official of the Minneapolis VAMC Mr. Joseph Glazer spoke over the phone with Dunkelberger and after she said to him that I had been fired for failure to follow the proper steps to obtain a LWOP and for subsequent absence without leave.

Paragraph 95.

Also, in 2018 I was not hired by the West Los Angeles VAMC (**ER Vol. 2, pages 605-607**.)

Paragraph 96.

The only job I could have performed was to clean streets together with firmer convicted felons and to work as a live-in Caregiver taking care of elderly people. In 2019, I was evicted from my place of living in Daly City. In July 2019, after Alsup maliciously accused me in lying in front of the audience and after he dismissed my Amended Complaint and entered a Judgment in favor of Defendants, I spent a week in a homeless shelter in San Francisco with no hope to

Case Management Statement, Parts 1 and 2; case No. 3:18-cv-03748-JCS

find a job and to ever get out of the shelter. Both Alsup and Robinson didn't care, and they kept laughing at me, and they kept torturing me with a pleasure.

Paragraph 97.

On December 03, 2018 and on July 11, 2019, during the litigation of my lawsuit No. 3:18-cv-03748-JCS, Alsup intentionally and maliciously ruled against me. Alsup didn't care that I was defamed about the reasons of the termination of my employment and that I was unable to obtain employment in my professional field as a Monitor Technician. I believe that Alsup could have possibly criminally conspired with Attorney Robinson. I believe that Robinson could have possibly filed a fabricated Declaration of Carla Dunkelberger under the penalty of perjury. I believe that Alsup ruled against me in all my lawsuits, granted all Robinson's frivolous Motions to Dismiss, recklessly disregarded all facts of the case and all my legal arguments, and intentionally tortured and humiliated me with pleasure because he wanted to conceal the material fact of the case that the alleged Declaration of Carla Dunkelberger under the penalty of perjury could have been possibly fabricated. I believe that Mr. Dunkelberger never wrote this Declaration herself and never redacted the Exhibits to this Declaration herself. For me, it is obvious that on March 04, 2020 Alsup intentionally, maliciously, and criminally accused me in abusing my IFP status, stated that my lawsuit No. 4:20-cv-00820-HSG was frivolous and duplicative, dismissed this lawsuit, and subsequently denied two Motions for Reconsideration. I believe it was done it furtherance of criminal conspiracy with Robinson because the lawsuit No. 4:20-cv-00820-HSG explicitly included the Declaration of Carla Dunkelberger.

Alsup denied all my Motions to Vacate the Judgment, never conducted a Case Management Conference, intentionally and maliciously denied my request to appoint a Counsel, and intentionally and maliciously denied my request to transfer the case to the U.S. District Court of New Mexico for a further proceeding. All Alsup did was: he constantly abused me, intentionally tortured and humiliated me, and intentionally and maliciously denied my right for relief. I believe that Alsup and Robinson could have possibly created a plan how to torture me

Case Management Statement, Parts 1 and 2; case No. 3:18-cv-03748-JCS

for a longer time and how to deny my right for relief. I wonder if Secretary Wilkie paid both Alsup and Robinson for intentionally torturing me and for denying my right for relief.

Paragraph 98.

On November 18, 2020, during the litigation of Appeal No. 19-16395, the U.S. Court of Appeals for the 9th Circuit remanded my Title VII claim and my Rehabilitation Act of 1973 claim back to the District Court for a further proceeding. Please, notice that Robinson didn't file any Petition for Rehearing, and she didn't challenge the ruling of the 9th Circuit that the Agency had violated the leave policies and that I had left my job with permission of Assistant Manager Mr. Phil Johnson. However, Robinson still continued to torture me, and she didn't petition to the District Court with a request to grant my Motion for Preliminary Injunction and to IMMEDIATELY reinstate me back to work. Instead, Robinson kept attempting to procrastinate for very extended periods of time, and she kept denying my right for relief. Therefore, the November 18, 2020 Memorandum of the 9th Circuit in Appeal No, 19-16395 didn't stop both Alsup and Robinson from harassing me.

Paragraph 99.

Please, notice that, after the 9th Circuit remanded my lawsuit No. 3:18-cv-03748-JCS back to the District Court, Alsup immediately resigned. I believe he resigned because he was no longer able to hide the fact that the alleged Declaration of Carla Dunkelberger under the penalty of perjury could have been possibly fabricated.

Paragraph 100.

Please, notice that, immediately after the 9th Circuit announced that it would remand my Title VII claim and my Rehabilitation Act claim back to the District Court, Robinson immediately emailed me and offered me to stipulate and to transfer my lawsuit No. 3:18-cv-03748-JCS to the District Court of New Mexico. I believe she did it not because she wanted to help me. I believe that she wanted to transfer my lawsuit No.3:18-cv-03748-JCS to the District

Case Management Statement, Parts 1 and 2; case No. 3:18-cv-03748-JCS

Court of New Mexico only because she wanted to escape liability for her crime that was intentionally and maliciously denying my right for relief on account of sex and filing a possibly fabricated Declaration of Carla Dunkelberger under the penalty of perjury with severely redacted Exhibits.

Paragraph 101.

Please, notice that, following Alsup's fraudulent March 04, 2020 Order in the lawsuit No. 4:20-cv-00820-HSG, the U.S. Supreme Court ruled in case No. 20-5581, October 13, 2020, "The motion for leave to proceed *in forma pauperis* is denied, and the petition for a writ of certiorari is dismissed. See Rule 39.8. As the petitioner has repeatedly abused this Court's process, the Clerk is directed not to accept any further petitions in noncriminal matters from petitioner unless the docketing fee required by Rule 38(a) is paid and the petition is submitted in compliance with Rule 33.1. See *Martin v. District of Columbia Court of Appeals*, 506 U. S. 1 (1992) (per curiam)."

The U.S. Supreme Court didn't change its mind after I sent a Motion for Reconsideration of the October 13, 2020 Order that accused me in abusing the Court's process (up to today, I have no idea what U.S. Supreme Court's process I allegedly abused and how.)

Paragraph 102.

I notified Alsup about the October 13, 2020 Order of the U.S. Supreme Court. Regardless, Alsup didn't change his mind, and he didn't do anything to relieve me from his fraudulent Judgment in case No. 3:18-cv-03748-JCS. Please, notice that, during the post-July 11, 2019 hearings, Alsup verbally admitted that he "made a mistake" in the lawsuit No. 3:18-cv-03748-JCS. However, despite Alsup verbally admitted a few times that he "made a mistake", he maliciously kept ruling against me in all lawsuits, and he maliciously kept denying my right for relief. I believe that Alsup could have possibly had an informal plan with Robinson about how to keep me away from obtaining relief. Please, notice that Robinson also intentionally and maliciously didn't do anything to expedite a fair resolution of all my lawsuits. Even after the 9th

Case Management Statement, Parts 1 and 2; case No. 3:18-cv-03748-JCS

1   Circuit remanded my lawsuit No. 3:18-cv-03748-JCS back to the District Court, Robinson

2   immediately filed a request to extend her deadline to respond to my Second Amended Complaint

3   for 30 days. Robinson's request was nothing but another dirty trick that was aimed to

4   procrastinate and to deny my right for relief.

5

6   **Conclusion.** The only fact that is in dispute is Ms. Dunkelberger's Report of Contact

7   dated May 16, 2017 (**ER Vol. 1, 289**), see also Paragraph 17. To the best of my knowledge, this

8   contact with Ms. Dunkelberger occurred on approximately May 10, 2017. On that day which was

9   May 10, 2017, I had ten hormonal pills left which was for 10 days. On that day which was May

10  10, 2017, Dunkelberger ordered me to obtain medical documentation, and I immediately

11  contacted with my Russian physician. It took seven calendar days to actually obtain this medical

12  documentation. I actually received this medical documentation from my Russian OB/GYN

13  during the night shift from May 17 to May 18, 2017 via email. As of May 17, 2017, I had three

14  hormonal pills left, and I notified Mr. Johnson that I had no time to stay in the United States for a

15  longer time in order to find a certified translator and to translate my medical documentation into

16  English language. On May 17, 2017, I informally authorized my Russian speaking co-worker

17  Ms. Nadya Das to translate my medical document for Dunkelberger and Johnson until I am able

18  to find a certified translator in Russia, to translate the document, and to email the document to

19  Dunkelberger and Johnson. Please, take into your consideration that I needed approximately 48

20  hours to get from Albuquerque, NM to Novosibirsk, Russia, and I needed to take the hormonal

21  pills during my trip.

22      I declare under the penalty of perjury and under the Federal laws that all foregoing is true

23  and correct. Executed at San Francisco, CA on April 11, 2021.

24      Respectfully submitted,

25

26  s/ Tatyana Drevaleva                                    Plaintiff Pro Se

27

28  April 11, 2021.

Case Management Statement, Parts 1 and 2; case No. 3:18-cv-03748-JCS